# Exhibit A
# Franchise Agreement

**AUTOGRAPH COLLECTION HOTEL**

**INTERNATIONAL**

**FRANCHISE AGREEMENT**

**BETWEEN**

**GLOBAL HOSPITALITY LICENSING S.À R.L.**

**AND**

**BH 5 S.p.A.**

**Location:  Corso Matteotti, 4-6, Milan, Italy**

**Dated as of:  July 15, 2011**

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

## TABLE OF CONTENTS

Page

1. DEFINITIONS ............................................................................................................. 2

2. LICENSE ................................................................................................................... 11
   2.1 LIMITED GRANT .............................................................................................. 11
   2.2 FRANCHISOR'S RESERVED RIGHTS .................................................................. 11
   2.3 TERRITORY ...................................................................................................... 12

3. FEES ........................................................................................................................ 12
   3.1 APPLICATION FEE ............................................................................................ 12
   3.2 FRANCHISE FEES ............................................................................................. 12
   3.3 INTERNATIONAL MARKETING FUND FEES; SPECIAL MARKETING PROGRAM FEES ......... 13
   3.4 ELECTRONIC SYSTEMS FEES ............................................................................ 14
   3.5 OTHER CHARGES ............................................................................................. 14
   3.6 TRAVEL EXPENSES AND REIMBURSEMENT ....................................................... 15
   3.7 MARRIOTT AGREEMENT PAYMENTS ................................................................ 15
   3.8 MAKING OF PAYMENTS AND PERFORMANCE OF SERVICES ............................... 15
   3.9 INTEREST ON LATE PAYMENTS ........................................................................ 16
   3.10 TAXES ............................................................................................................ 16
   3.11 RESTRICTIONS ON TRANSFERS OF FUNDS ........................................................ 17
   3.12 CURRENCY ...................................................................................................... 17
   3.13 KEY MONEY ................................................................................................... 17

4. TERM ....................................................................................................................... 18
   4.1 TERM ............................................................................................................. 18
   4.2 NOT RENEWABLE ............................................................................................ 18

5. SIZE, FINANCING, CONSTRUCTION, AND RENOVATION ........................................... 19
   5.1 SIZE ................................................................................................................ 19
   5.3 CONVERSION OF THE HOTEL ........................................................................... 19

6. SOURCING AND DESIGN APPROVALS ....................................................................... 19
   6.1 FURNITURE, FIXTURES, EQUIPMENT, SUPPLIES, AND SIGNAGE ......................... 19
   6.2 DESIGN REVIEW .............................................................................................. 20

7. LOCAL ADVERTISING AND MARKETING, PRICING, AND INTERNATIONAL
   MARKETING FUND ACTIVITIES ............................................................................... 21
   7.1 FRANCHISEE'S LOCAL ADVERTISING AND MARKETING PROGRAMS AND PRESS
       RELEASES ....................................................................................................... 21
   7.2 RESERVATIONS, PRICING, AND RATES ............................................................. 21
   7.3 INTERNATIONAL MARKETING FUND ACTIVITIES .............................................. 22
   7.4 SPECIAL MARKETING PROGRAMS .................................................................... 23

8. PROPERTY SYSTEM, RESERVATION SYSTEM, AND OTHER ELECTRONIC
   SYSTEMS ................................................................................................................. 23
   8.1 SYSTEMS INSTALLATION .................................................................................. 23
   8.2 RESERVATION SYSTEM .................................................................................... 23
   8.3 OPTIONAL SYSTEM(S) ..................................................................................... 24

| | | | |
|---|---|---|---|
| | 8.4 | SYSTEM COMMUNICATION COSTS | 24 |
| | 8.5 | ELECTRONIC SYSTEMS PROVIDED UNDER LICENSE | 24 |
| **9.** | | **OPERATIONS** | **24** |
| | 9.1 | OPERATING THE HOTEL | 24 |
| | 9.2 | SYSTEM PROMOTION AND DIVERSION TO OTHER BUSINESSES | 25 |
| | 9.3 | EMPLOYEES | 26 |
| | 9.4 | MANAGEMENT AND OPERATION OF THE HOTEL | 27 |
| **10.** | | **TRAINING, COUNSELING, AND ADVISORY SERVICES** | **27** |
| | 10.1 | TRAINING | 27 |
| | 10.2 | COUNSELING AND ADVISORY SERVICES | 28 |
| | 10.3 | QUARTERLY BUSINESS REVIEWS | 28 |
| **11.** | | **PHYSICAL FACILITIES, SUPPLIES, AND GOODS** | **28** |
| | 11.1 | REPAIRS AND MAINTENANCE | 28 |
| **12.** | | **SYSTEM AND STANDARDS** | **29** |
| | 12.1 | COMPLIANCE WITH SYSTEM AND STANDARDS | 29 |
| | 12.2 | MODIFICATION OF THE SYSTEM AND STANDARDS | 29 |
| **13.** | | **PROPRIETARY MARKS AND INTELLECTUAL PROPERTY** | **29** |
| | 13.1 | FRANCHISOR'S REPRESENTATIONS AND RESPONSIBILITY REGARDING THE LICENSED MARKS; LIMITATION ON LIABILITY | 29 |
| | 13.2 | FRANCHISEE'S USE OF SYSTEM AND INTELLECTUAL PROPERTY | 30 |
| | 13.3 | FRANCHISEE'S USE OF OTHER MARKS | 33 |
| | 13.4 | INTERNET WEBSITE | 33 |
| | 13.5 | USE OF FRANCHISEE MARKS; NAME OF HOTEL | 33 |
| **14.** | | **CONFIDENTIAL INFORMATION; DATA PROTECTION LAWS** | **34** |
| | 14.1 | CONFIDENTIAL INFORMATION | 34 |
| | 14.2 | DATA PROTECTION LAWS | 35 |
| **15.** | | **ACCOUNTING AND REPORTS** | **35** |
| | 15.1 | BOOKS, RECORDS, AND ACCOUNTS | 35 |
| | 15.2 | REPORTS | 36 |
| | 15.3 | FRANCHISOR EXAMINATION AND AUDIT OF HOTEL RECORDS | 36 |
| **16.** | | **INDEMNIFICATION AND INSURANCE** | **37** |
| | 16.1 | INDEMNIFICATION | 37 |
| | 16.2 | INSURANCE | 37 |
| | 16.3 | GENERAL INSURANCE REQUIREMENTS | 39 |
| | 16.4 | BLANKET INSURANCE | 39 |
| | 16.5 | FRANCHISEE'S FAILURE TO PROCURE INSURANCE | 39 |
| | 16.6 | COPIES OF POLICIES AND ENDORSEMENTS | 39 |
| **17.** | | **TRANSFERABILITY OF INTERESTS** | **40** |
| | 17.1 | TRANSFERS OF INTERESTS IN THE HOTEL AND FRANCHISEE | 40 |
| | 17.2 | CONTROLLING OWNERSHIP INTEREST TRANSFERS IN FRANCHISEE OR THE HOTEL | 40 |
| | 17.3 | MINORITY OWNERSHIP INTEREST TRANSFERS | 41 |
| | 17.4 | TRANSFERS OF THE HOTEL TO AN AFFILIATE | 41 |

17.5    TRANSFERS BY FRANCHISOR ...................................................................... 41
17.6    PROPOSED TRANSFERS TO SPECIALLY DESIGNATED NATIONAL OR BLOCKED
         PERSON ..................................................................................................... 41

18.    PUBLICLY-TRADED SECURITIES AND SECURITIES OFFERINGS ............................. 41

18.1    FRANCHISEE'S OBLIGATIONS ..................................................................... 41
18.2    LIMITED FRANCHISOR CONSENT ................................................................ 42

19.    DEFAULT AND TERMINATION ............................................................................. 43

19.1    IMMEDIATE TERMINATION .......................................................................... 43
19.2    TERMINATION UPON NOTICE WITH OPPORTUNITY TO CURE ........................ 44
19.3    TERMINATION AND LIQUIDATED DAMAGES ................................................. 45
19.4    TERMINATION BY PARTIES WITH NO DEFAULT ........................................... 46
19.5    TERMINATION FOR MATERIAL DEFAULT BY FRANCHISOR ............................ 50
19.6    TERMINATION BY EITHER PARTY FOR ANY REASON ................................... 50
19.7    EARLY TERMINATION RIGHTS ................................................................... 51

20.    POST-TERMINATION ........................................................................................... 51

20.1    FRANCHISEE OBLIGATIONS ....................................................................... 51
20.2    FRANCHISOR'S RIGHTS UPON TERMINATION OR EXPIRATION ..................... 53
20.3    SURVIVAL ................................................................................................ 53

21.    CONDEMNATION AND CASUALTY ....................................................................... 53

21.1    CONDEMNATION ....................................................................................... 53
21.2    CASUALTY ............................................................................................... 53

22.    COMPLIANCE WITH LAWS; LEGAL ACTIONS ..................................................... 54

22.1    COMPLIANCE WITH LAWS ......................................................................... 54
22.2    NOTICE REGARDING LEGAL ACTIONS ........................................................ 54
22.3    FOREIGN CORRUPT PRACTICES ACT ......................................................... 55
22.4    SPECIALLY DESIGNATED NATIONAL OR BLOCKED PERSON ......................... 55
22.5    ANTI-MONEY LAUNDERING ACTS .............................................................. 55
22.6    WAIVER OF PUNITIVE DAMAGES ............................................................... 55
22.7    BLOCK EXEMPTION .................................................................................. 56

23.    RELATIONSHIP OF PARTIES ............................................................................... 56

23.1    REASONABLE BUSINESS JUDGMENT .......................................................... 56
23.2    INDEPENDENT CONTRACTOR ..................................................................... 56

24.    GOVERNING LAW; INJUNCTIVE RELIEF; COSTS OF ENFORCEMENT ................... 57

24.1    GOVERNING LAW ..................................................................................... 57
24.2    INJUNCTIVE RELIEF .................................................................................. 57
24.3    COSTS OF ENFORCEMENT ......................................................................... 57
24.4    ARBITRATION ........................................................................................... 57

25.    NOTICES ............................................................................................................. 58

25.1    NOTICES .................................................................................................. 58

26.    CONSTRUCTION AND SEVERABILITY; APPROVALS, CONSENTS AND WAIVERS;
        ENTIRE AGREEMENT ...................................................................................... 60

26.1    CONSTRUCTION AND SEVERABILITY .......................................................... 60

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

26.2   Approvals, Consents and Waivers ..................................................... 61
26.3   Entire Agreement .................................................................................. 61
26.4   Amendments ........................................................................................... 61

**27.   REPRESENTATIONS, WARRANTIES AND COVENANTS ......................... 62**

27.1   Existence and Power; Authorization; Contravention ...................... 62
27.2   Ownership of Franchisee ..................................................................... 62
27.3   Ownership of the Hotel ....................................................................... 62
27.4   Additional Franchisee Acknowledgments and Representations ...... 63
27.5   Ownership and Operation of the Boscolo Hotel Brands .................. 64

**28.   MISCELLANEOUS ............................................................................................. 64**

28.1   Confidential Negotiated Changes ..................................................... 64
28.2   Translations ........................................................................................... 64
28.3   Multiple Counterparts .......................................................................... 65
28.4   EFFECTIVENESS OF THE OBLIGATIONS UNDER THE AGREEMENT ......................... 65

**EXHIBIT A   APPROVED LOCATION, NUMBER OF GUESTROOMS, AND OWNERSHIP INTERESTS IN FRANCHISEE .................................................... 66**

**EXHIBIT B   CONVERSION RIDER ..................................................................... 67**

ATTACHMENT ONE ............................................................................ 70

**EXHIBIT C   LIST OF LOCAL COUNTRY TRADEMARK REGISTRATIONS AND APPLICATIONS .............................................................................. 73**

**EXHIBIT D   FRANCHISEE MARKS ...................................................................... 74**

**EXHIBIT E   RESTRICTED TERRITORY MAP .................................................. 75**



## FRANCHISE AGREEMENT

This Franchise Agreement is effective as of the 15th day of July, 2011 ("Effective Date") by Global Hospitality Licensing S.à r.l., a Luxembourg private company with limited liability (*société à responsabilité limitée*), organized and existing under the laws of Luxembourg, having its registered office at 102, rue des Maraîchers, L-2124 Luxembourg, Grand-Duchy of Luxembourg, registered with the Luxembourg Trade and Companies Register under number B 139.166 and BH 5 S.p.A., a Società Per Azioni organized and existing under the laws of Italy having its registered office at Via Uruguay 47, Padova, Italy, registered with the Padova Companies Register under number 04123020283 ("Franchisee").

## RECITALS

A.    Franchisor and its Affiliates own the System.

B.    Franchisee has entered into a lease dated December 29, 2009 (the "Lease") with Beni Stabili S.p.A., a Società di Investimento Immobiliare Quotata organized and existing under the laws of Italy, a listed company, having its registered office at Via Piemonte 38, Rome, registered with the Rome Companies Register under number 00380210302 ("Owner"), pursuant to which Owner has leased the Hotel to Franchisee and Franchisee has rights to operate the Hotel, and Franchisee desires to operate the Hotel as a System Hotel and wishes to obtain a license to use the System and the Proprietary Marks for that purpose. Owner is the owner of the Hotel.

C.    Franchisor and Franchisee will use commercially reasonable efforts to enter into an Owner Agreement prior to the date the hotel enters the System (the "Owner Agreement").

D.    As individuality, rather than consistency in offerings, is a hallmark of the System, it is the intention of the parties that the Hotel, together with all other System Hotels, will be part of a worldwide chain of hotels each offering a distinct experience and providing distinctive, high quality hotel services and amenities, and that such experience, service and amenities will vary based on the Category of each System Hotel.

E.    It is important that the Hotel be operated in strict conformity with the System in order to enhance public acceptance of, and demand for, all System Hotels.

F.    In agreeing to grant the non-exclusive license under this Agreement to Franchisee, Franchisor is relying upon the business skill, financial capacity, and character of Franchisee and its principals.

G.    In accepting the grant of the non-exclusive license, Franchisee is doing so to obtain the benefits of Franchisor's experience, and to receive the training and benefits of the System, including the Reservation System.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Franchisee and Franchisor agree as follows:

1. **DEFINITIONS**

When used in this Agreement the following terms have the meanings indicated:

"Accounting Period" means any one of the twelve (12) months in a calendar year or any fiscal accounting and reporting period required by Franchisor.

"Affiliate" means, for any Person, a Person that is directly (or indirectly through one or more intermediaries) Controlling, Controlled by, or under common Control with such Person.

"Agreed System Removal Process" has the meaning given in Section 20.1.C.

"Agreement" means this Franchise Agreement, including any exhibits, attachments, and addenda.

"Applicable Law" means all laws, regulations, ordinances, rules, orders, decrees, and requirements of any governmental authority having jurisdiction over the Hotel, Franchisee, Boscolo Group or any of the Marriott Agreements, or applicable to the filing, registration, or approval of any of the Marriott Agreements or applicable to any of the Marriott Agreements in accordance with Section 24.1 hereof or the equivalent provisions set forth in any such Marriott Agreement.

"Application Fee" has the meaning stated in Section 3.1.

"Approved Location" means the site or parcel of land described under item 1 on Exhibit A.

"Approved Quality Standard" has the meaning stated in Section 6.1.A.

"Approved Supplier Purchases" has the meaning stated in Section 6.1.B.

"Base Franchise Fees" has the meaning stated in Section 3.2.A.

"Baseline Gross Room Sales" has the meaning stated in Section 3.2.B.

"Brand" has the meaning stated in the definition of "Competitor."

"Boscolo Confidential Information" means confidential information, knowledge, trade secrets, business information (such as financial performance information of the Boscolo Group Hotels or the Boscolo Group that Franchisor obtains as a result of its relationship with the Boscolo Group). Boscolo Confidential Information will not include information that Franchisor can demonstrate was, at the time of disclosure by Franchisee to Franchisor, part of the public domain or became part of the public domain, by publication or otherwise, except by breach of the provisions of this Agreement.

"Boscolo Group" means Boscolo Group S.p.A the parent company that directly or indirectly Controls Franchisee.

"Case Goods" means furniture and fixtures used in the Hotel, its Guestrooms, and its Public Facilities, such as chests, armoires, chairs, beds, headboards, desks, tables, television sets, mirrors, pictures, wall decorations, graphics and all other unspecified items of the same class.

"Category" means a group of System Hotels designated by Franchisor or its Affiliates, in their sole discretion, based upon certain criteria or attributes, such as luxury or resort hotels or unique

amenities, services, or locations (e.g., wellness/spa, urban, regional, boutique chic, luxury re-defined, or iconic/historic). A Category may have specific Standards or may merely be a descriptive classification.

"Competitor" means any Person that owns or has an interest in a hotel brand, trade name, trademark, system, or chain (a "Brand") or any Person that has, directly or indirectly, an Ownership Interest in, or is an Affiliate, principal, director, officer, or other individual with management responsibility of, a Person that owns or has an interest in, or any Person that is a master franchisee, master franchisor or sub-franchisor for, a Brand that is comprised of at least (i) ten (10) luxury hotels, (ii) twenty (20) full-service hotels, or (iii) fifty (50) limited-service hotels. For the purposes of defining "Competitor," "luxury hotels" are hotels that have a system average daily rate in excess of One Hundred Eighty United States Dollars ($180) and an average number of rooms per location in excess of 100, "full-service" hotels are hotels that typically offer three (3) meals per day and have an average of three thousand (3,000) square feet or more of meeting space per hotel, and "limited-service" hotels are hotels that are neither "luxury hotels" nor "full-service" hotels. No Person will be deemed to be a Competitor if such Person has an interest in a Brand merely as a franchisee or as a mere passive investor that has no Control or influence over the business decisions concerning the Brand at issue, such as limited partners in a partnership or as a mere non-Controlling stockholder in, or any corporation. Franchisor acknowledges that Boscolo Group owns the Boscolo Luxury Hotel Brand and the B4 Hotel Brand. Boscolo will not be deemed a Competitor for purposes of this Agreement in accordance with Section 27.5.

"Competitor Restriction" has the meaning stated in Section 19.4.B.

"Conditions" has the meaning stated in Section 19.4.C.

"Confidential Information" means any or all of the following information: (i) any Standards, documents, or trade secrets approved for use in the System in the design, construction, renovation or operation of the Hotel; (ii) any Electronic Systems and accompanying documentation developed for the System or elements thereof; (iii) Guest Profile Data; or (iv) any other confidential information, knowledge, trade secrets, business information or know-how obtained (a) through the use of any part of the System or concerning the System or the operation of the Hotel or (b) under any Marriott Agreements. Confidential Information will not include information that Franchisee can demonstrate was, at the time of disclosure by Franchisor to Franchisee, part of the public domain or became part of the public domain, by publication or otherwise, except by breach of the provisions of this Agreement.

"Consulting Agreement" means the agreement on the format utilized by Franchisor between Franchisee and Franchisor or its Affiliate, related to personnel who may act as Temporary Consultants to Franchisee, the current form of which is set forth in the Disclosure Document.

"Control" (and any form thereof, such as "Controlling" or "Controlled") means, for any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person.

"Control Affiliate" means an Affiliate of Franchisee that directly or indirectly Controls Franchisee.

"Controlling Ownership Interest Transfers" has the meaning stated in Section 17.2.A.

"Conversion Work Commencement Date" has the meaning stated in the Conversion Rider.

"Conversion Work Commencement Date Deadline" has the meaning stated in the Conversion Rider.

"Data Protection Laws" means data protection and privacy laws and regulations under Applicable Law.

"Design Criteria" means those Standards that comprise the design criteria and such other information that is necessary for planning and construction or renovation or refurbishment of a System Hotel.

"Design Review Agreement" means the agreement between Franchisee and an Affiliate of Franchisor related to constructing or renovating and furnishing the Hotel, as amended from time to time, the current form of which is set forth in the Disclosure Document.

"Design Theme" means the interior design theme or style reflected in the FF&E, fabrics, colors, and decorations that together give the interior spaces of the Hotel an identifiable style or theme, such as "art deco," "modern," or "neoclassical," or a style or theme that is idiosyncratic to the Hotel.

"Disclosure Document" means that certain document provided by Franchisor to prospective franchisees of System Hotels as may be required by Applicable Law, including specifically Law May 6, 2004 No. 129 and Regulation no. 204/2005 of the Republic of Italy.

"Dispute" means any dispute, controversy, or claim arising out of or relating to this Agreement or any other Marriott Agreement, or the making, breach, termination, or invalidity of this Agreement or any other Marriott Agreement, or the relationship created by any of those agreements.

"Distribution Channel Test" has the meaning stated in Section 19.4.C.

"Distribution Channel Test Measurement Period" has the meaning stated in Section 19.4.C.

"Distribution Channel Test Termination" has the meaning stated in Section 19.4.C.

"Distribution Channel Test Termination Notice" has the meaning stated in Section 19.4.C.

"Early Termination Date" has the meaning stated in Section 19.4.A.

"Early Termination Notice" has the meaning stated in Section 19.4.A.

"Effective Date" has the meaning stated in the preamble to this Agreement.

"Electronic Systems" means all Software, Hardware and all electronic access to Franchisor's systems and data, licensed or made available to Franchisee relating to the System, including the Reservation System, the Property System, the Yield Management System and any other system established under Section 8.3 or Section 12.2.

"Electronic Systems Fees" means the Reservation System Fee, the Property System Fee, the Yield Management System Fee, and the fees for any other system established under Section 8.3 or Section 12.2.

"Electronic Systems License Agreement" means the electronic systems license agreement that must be executed by Franchisee as a condition to using the Electronic Systems, the current form of which is set forth in the Disclosure Document.

"EURIBOR" means the Euro interbank rate offered for Euro deposits having a three month maturity.

"FCPA" means the Foreign Corrupt Practices Act, 15 U.S.C. §78dd-1, of the United States of America.

"FF&E" means Case Goods, Soft Goods, signage and equipment (including telephone systems, facsimile machines, copiers, vending machines, games, and electronic systems, such as equipment needed for the Electronic Systems), but does not include any item included in Fixed Asset Supplies.

"First Early Termination Date" has the meaning stated in Section 19.4.A.

"Fixed Asset Supplies" means supply items included within "Property and Equipment" under the Uniform System, including linen, china, glassware, silver, uniforms, and similar items.

"Franchisee" has the meaning stated in the preamble to this Agreement.

"Franchisee Marks" means the names and marks set forth in Exhibit D to this Agreement, in any format, style, design, or logo.

"Franchise Fees" has the meaning stated in Section 3.2.

"Franchisor" means Global Hospitality Licensing S.à r.l. and its successors and assigns.

"Franchisor Lodging Facilities" means all hotels and other lodging facilities, chains, brands, or hotel systems owned, leased, under development, or operated or franchised, now or in the future, by Franchisor or any of its Affiliates, including: (i) Marriott Hotels, Resorts and Suites; Marriott Marquis Hotels; JW Marriott Hotels and Resorts; Marriott Conference Centers; Marriott Executive Apartments; Courtyard by Marriott Hotels; Fairfield Inn by Marriott Hotels; Fairfield Inn & Suites by Marriott Hotels; Nickelodeon Resorts by Marriott; Renaissance Hotels and Resorts; Renaissance ClubSport; Autograph Collection Hotels; Residence Inn by Marriott Hotels; Bvlgari Hotels and Resorts; Edition Hotels; Ritz-Carlton Hotels and Resorts; AC Hotels by Marriott; SpringHill Suites by Marriott Hotels; and TownePlace Suites by Marriott Hotels; (ii) other lodging products or concepts, including Marriott ExecuStay; JW Marriott Residences; Marriott Marquis Residences; and The Residences at The Ritz-Carlton; (iii) vacation, timesharing, interval or fractional ownership facilities, including Marriott Vacation Club International, The Ritz-Carlton Club, and Horizons by Marriott Vacation Club; and (iv) any other lodging product or concept developed or utilized by Franchisor or any of its Affiliates in the future.

"Frequent Traveler Program(s)" means the frequent traveler appreciation program(s) for System Hotels and such other Franchisor Lodging Facilities designated by Franchisor or its Affiliates designed to increase the market share, length of stay and frequency of usage of such Franchisor Lodging Facilities, and/or any similar, complementary, or successor program. As of the Effective Date, such programs include "Marriott Rewards."

"Gross Reservations" has the meaning stated in Section 19.4.C.

"Gross Room Sales" means: (i) gross sales and receipts of every kind that accrue from the rental of Guestrooms (without netting for charge backs, credit card service charges, or uncollectible amounts), including no-show revenue, early departure fees, late check-out fees and other revenues allocable to rooms revenue pursuant to the Uniform System, but not including any sales tax, value added tax or similar taxes, or incorrect invoices properly voided and accounted for; (ii) resort fees and mandatory

surcharges for facilities (although inclusion of such fees or surcharges does not constitute approval by Franchisor of such fees and surcharges, which may be limited or prohibited by Franchisor, and such fees or surcharges shall be accounted for in accordance with the Uniform System); (iii) attrition or cancellation fees that are collected from groups that cancel or do not fulfill their guaranteed number of reservations for Guestrooms; and (iv) the amount of all lost revenues and receipts due to the non-availability of Guestrooms, upon which business interruption, loss of income, or other similar insurance proceeds are calculated.

"Guest Profile Data" means personal guest profiles and information regarding guest preferences, including any information derived from or contained in any Frequent Traveler Program.

"Guestroom" means each rentable unit in the Hotel consisting of a room, suite or suite of rooms generally used for overnight guest accommodation, entrance to which is controlled by the same key; provided that adjacent rooms with connecting doors that can be locked and rented as separate units are considered separate Guestrooms.

"Hardware" means all computer hardware and other equipment (including all future upgrades, enhancements, additions, substitutions, and other modifications thereof) required for the operation of and connection to any Electronic System.

"Hotel" means the hotel and all land used in connection with the hotel located or to be located at the Approved Location, including: (i) the freehold or long-term leasehold title to the Approved Location; (ii) all improvements, structures, facilities, entry and exit rights, parking, pools, landscaping, and other appurtenances (including the hotel building, Public Facilities, and all operating systems) located at the Approved Location; and (iii) all FF&E, Fixed Asset Supplies, and Inventories installed or located in such improvements at the Approved Location.

"ICC" means the International Chamber of Commerce.

"Implementation Period Exit Date" has the meaning stated in Section 19.4.B.

"Implementation Period Exit Notice" has the meaning stated in Section 19.4.B.

"Implementation Period Exit Right" has the meaning stated in Section 19.4.B.

"Implementation Period Exit Right Hotels" has the meaning stated in Section 19.4.B.

"Implementation Period Exit Termination Date" has the meaning stated in Section 19.4.B.

"Intellectual Property" means all of the following items, regardless of the form or medium involved (e.g., paper, electronic, tape, tangible or intangible): (i) all Software, including the data and information processed or stored by such Software; (ii) all Proprietary Marks; (iii) all Confidential Information; and (iv) all other information, materials, and copyrightable or patentable subject matter or any other subject matter that is or can be protected under applicable intellectual property laws, owned, developed, acquired, licensed, or used by Franchisor or any of its Affiliates in connection with the System.

"Intended Termination and Liquidated Damages Pre-payment" has the meaning stated in Section 19.6.

"Interestholders" means, with respect to any Person, any Person that directly or indirectly holds an Ownership Interest in that Person.

"Interest Rate" means the lesser of: (i) the amount calculated by multiplying the overdue amount by the EURIBOR plus three hundred (300) basis points computed daily on the basis of a three hundred sixty-day (360-day) year and actual days overdue; provided that the applicable EURIBOR rate for each Accounting Period is the closing EURIBOR rate quoted by the European Central Bank on the last Business Day of the preceding Accounting Period; or (ii) the amount calculated by multiplying the overdue amount by the maximum rate permitted by applicable usury laws.

"International Marketing Fund Activities" means: (i) the creation, production, and administration of Marketing Materials; (ii) the placement of Marketing Materials in magazines, newspapers, and similar printed, digital or electronic media or social media sites; (iii) the purchase of advertising on radio, television, the Internet, and other electronic or digital media; (iv) advertising, marketing, promotional, public relations, revenue management, reservation activities and sales campaigns, programs, seminars and other activities designed to increase sales or public awareness of the System, including publication and distribution of directories (whether offline or online), pamphlets and other forms of advertising media; (v) market research specific to marketing programs and marketing communications and, if Franchisor determines in its sole discretion, market research and oversight and management of the guest satisfaction program and Frequent Traveler Programs; (vi) the retention or employment of personnel, advertising agencies, marketing consultants, and other professionals or specialists to assist in the development and implementation of any of the foregoing; and (vii) the advertising, marketing, promotional, sales, and reservations activities of Franchisor and its Affiliates throughout the world.

"International Marketing Fund Charge" has the meaning stated in Section 3.3.A.

"International Marketing Funds" means monies collected and used by Franchisor and its Affiliates for International Marketing Fund Activities.

"Inventories" means "Inventories" as defined in the Uniform System, including: (i) provisions in storerooms, refrigerators, pantries, and kitchens; (ii) beverages in wine cellars and bars; (iii) other merchandise intended for sale; (iv) fuel; (v) mechanical supplies; (vi) stationery; and (vii) other expensed supplies and similar items.

"Key Money" has the meaning stated in Section 3.13.A.

"Key Money Repayment Test" has the meaning stated in Section 3.13.B.

"Lease" has the meaning stated in the Recitals to this Agreement.

"Licensed Marks" means (i) one or more of the registered trademarks, registered service marks, and registration applications all as shown on Exhibit C; and (ii) any other Proprietary Mark designated in writing as a Licensed Mark by Franchisor, all as may be changed, deleted, added to or otherwise modified by Franchisor in its sole discretion.

"Liquidated Damages" has the meaning stated in Section 19.3.

"Local Advertising Programs" means local advertising, marketing, promotional, sales and public relations programs and activities for the Hotel, and Marketing Materials used in connection therewith.

"<u>Marketing Materials</u>" means all advertising, marketing, promotional, sales and public relations concepts, press releases, materials, copy, concepts, plans, programs, brochures, or other information to be released to the public, whether in paper, digital, electronic or computerized form, or in any form of media now or hereafter developed.

"<u>Marriott Agreement(s)</u>" means, collectively, this Agreement, any other agreements executed in connection with this Agreement and any other agreement related to the Hotel to which Franchisee, Boscolo Group or any of their respective Affiliates is a party and to which Franchisor or its Affiliates is also a party or beneficiary, as any may be amended, modified, supplemented, or restated.

"<u>Material Alteration</u>" has the meaning stated in Section 6.2.A.

"<u>Opening Date</u>" means the date identified as the Hotel opening date in the letter agreement issued by Franchisor in accordance with Exhibit B, which grants Franchisee approval to open and operate the Hotel as a System Hotel.

"<u>Opening Date Deadline</u>" has the meaning stated in the Conversion Rider.

"<u>Other Mark(s)</u>" means any trademark, trade name, symbol, slogan, design, insignia, emblem, device, or service mark that is not a Proprietary Mark.

"<u>Owner</u>" has the meaning stated in the Recitals to this Agreement.

"<u>Owner Agreement</u>" has the meaning stated in the Recitals to this Agreement.

"<u>Ownership Interest</u>" means all forms of ownership of legal entities or property, both legal and beneficial, voting and non-voting, including stock interests, partnership interests, limited liability company interests, joint tenancy interests, leasehold interests, proprietorship interests, trust beneficiary interests, proxy interests, power-of-attorney interests, and all options, warrants, and any other forms of interest evidencing ownership or Control.

"<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, a government, or any department or agency thereof, a trustee, a trust, an unincorporated organization, or any other entity of any kind.

"<u>Plans</u>" has the meaning stated in Section 6.2.A.

"<u>Property System</u>" means all property systems (including all Software, Hardware and electronic access related thereto) designated by Franchisor for use by System Hotels in the front office, back-of- the-house, or other operations of System Hotels.

"<u>Property System Fee</u>" means the fee Franchisee must pay as required by Franchisor or its Affiliate representing the Hotel's share of the costs and expenses of the Property System, including development and incremental operating costs, ongoing maintenance, field support costs, and a reasonable return on capital.

"<u>Proprietary Marks</u>" means the Licensed Marks, and any other trademarks, trade names, trade dress, words, symbols, logos, slogans, designs, insignia, emblems, devices, service marks, and indicia of origin (including restaurant names, lounge names, or other outlet names), or combinations thereof, that are used by Franchisor or any of its Affiliates to identify the System or the Hotel or are otherwise associated by virtue of usage with the System or the Hotel, all as may be changed, deleted, added to or

otherwise modified by Franchisor or its Affiliates in their sole discretion. The term applies whether the Proprietary Marks are owned currently by Franchisor or any of its Affiliates, or are later developed or acquired, and whether or not they are registered in any foreign country or in the United States Patent and Trademark Office. For the avoidance of doubt, the term "Proprietary Marks" does not include the Franchisee Marks.

"Prospectus" means any registration statement, solicitation, prospectus (preliminary or otherwise), memorandum, offering document, or similar documentation for the sale or transfer of an Ownership Interest, including any related amendments.

"Public Facilities" means any meeting rooms, conference rooms, convention or banquet facilities, restaurants, bars, lounges, and all other similar public facilities.

"Quality Assurance Program" means the quality assurance program that Franchisor or its Affiliates use to monitor guest satisfaction and the operations, facilities and services at System Hotels.

"Reasonable Business Judgment" has the meaning stated in Section 23.1.

"Reservation System" means any reservation system designated by Franchisor for System Hotels (including all Software, Hardware and electronic access related thereto).

"Reservation System Fee" means the fee Franchisee must pay to Franchisor or its Affiliate representing the Hotel's share of the costs and expenses of the Reservation System, including development and incremental operating costs, ongoing maintenance, field support costs, and a reasonable return on capital.

"Restricted Period" has the meaning given in Section 2.3.

"Restricted Territory" has the meaning given in Section 2.3.

"Scope of Work" has the meaning given in the Conversion Rider.

"Soft Goods" means textile, fabric and vinyl and similar products used in finishing and decorating the Hotel, its Guestrooms, corridors and Public Facilities, such as vinyl wall and floor coverings, drapes, sheers, cornice coverings, carpeting, bedspreads, lamps, lamp shades, artwork, task chairs, upholstery and all other unspecified items of the same class.

"Software" means all computer software and accompanying documentation (including all future enhancements, upgrades, additions, substitutions and other modifications) provided to Franchisee by or through Franchisor and/or third parties designated by Franchisor or its Affiliates required for the operation of and connection to any Electronic System.

"Specially Designated National or Blocked Person" means: (i) a Person designated by the U.S. Department of Treasury's Office of Foreign Assets Control from time to time as a "specially designated national or blocked person" or similar status; (ii) a Person described in Section 1 of U.S. Executive Order 13224, issued on September 23, 2001; or (iii) a Person otherwise identified by government or legal authority as a Person with whom Franchisor, or any of its Affiliates, are prohibited from transacting business. As of the Effective Date, a list of such designations and the text of the Executive Order are published under the internet website address www.ustreas.gov/offices/enforcement/ofac.

"Special Marketing Programs" means, as further described in Section 7.4, advertising, marketing, promotional, public relations, and sales programs and activities that are not designated by Franchisor as International Marketing Fund Activities.

"Standards" means Franchisor's operating rules, manuals, standard operating procedures and other procedures, systems, guides, programs (including the Quality Assurance Program), requirements, directives, standards, specifications, design criteria, and such other information, initiatives and controls that are necessary for planning, designing, constructing, renovating, refurbishing, and operating System Hotels (including the Design Criteria) or any Category, as such may be modified, amended or supplemented by Franchisor or its Affiliates in accordance with Section 12.2 (and which may, with Franchisor's prior approval, take into account specific characteristics and conditions of the local market). The Standards may be in paper or in electronic form. A copy of the Standards in effect as of the date of this Agreement will be provided and initialed to designate same.

"System" means the Standards, Intellectual Property and other distinctive, distinguishing elements or characteristics that Franchisor or its Affiliates have developed, designated or authorized for the operation of System Hotels, as such may be modified, amended or supplemented by Franchisor or its Affiliates in accordance with Section 12.2, including: the Reservation System, the Property System, the Yield Management System, the Electronic Systems, the Software, the Frequent Traveler Program(s), the International Marketing Fund Activities, Special Marketing Programs, Training Programs, and other advertising programs and training.

"System Growth Test" has the meaning stated in Section 19.4.F.

"System Growth Test Termination Notice" has the meaning stated in Section 19.4.F.

"System Hotel" means a full-service hotel operated by Franchisor, an Affiliate of Franchisor, or a franchisee or licensee of Franchisor or its Affiliates under the trade name Autograph Collection Hotel outside of the fifty (50) states of the United States of America, the District of Columbia and Canada, and does not include any other Franchisor Lodging Facility or other business operation.

"Taxes" means all taxes (including any sales, gross receipts, value-added or goods and services taxes), levies, charges, impositions, stamp or other duties, fees, deductions, withholdings or other payments levied or assessed by any competent governmental authority, including by any federal, national, state, provincial, local, or other tax authority.

"Temporary Consultant" means any person that Franchisor places at the request of Franchisee at the Hotel under a Consulting Agreement.

"Term" has the meaning stated in Section 4.1.

"Term Expiration Date" has the meaning stated in Section 21.2.

"Transfer" means any sale, conveyance, assignment, exchange, pledge, encumbrance, lease or other transfer or disposition, directly or indirectly, voluntarily or involuntarily, absolutely or conditionally, by operation of law or otherwise.

"Transfer Notice" has the meaning stated in Section 17.2.A.

"Transient Rooms Occupied" has the meaning defined in the Uniform System.

"Travel Expenses" means all travel, food and lodging, living, and other out-of-pocket costs and expenses (including, the cost and expense of obtaining any required visas, work permits or similar documentation).

"Uniform System" means the Uniform System of Accounts for the Lodging Industry, Tenth Revised Edition, 2006, as published by the Educational Institute of the American Hotel & Lodging Association, or any later edition, revision or replacement that Franchisor approves or designates.

"Variable Franchise Fee" has the meaning stated in Section 3.2.B.

"Variable Franchise Fee Elimination Notice" has the meaning stated in Section 3.2.C.

"Variable Franchise Fee Elimination Test" has the meaning stated in Section 3.2.C.

"Yield Management System" means any yield management system (including all Software, Hardware and electronic access related thereto) designated or required by Franchisor for use by System Hotels. The Yield Management System may be part of the Property System.

"Yield Management System Fee" means the fee Franchisee must pay to Franchisor representing the Hotel's share of costs and expenses of the Yield Management System, including development and incremental operating costs, ongoing maintenance, field support costs, and a reasonable return on capital.

## 2.    LICENSE

### 2.1    Limited Grant.

Upon the terms of this Agreement, Franchisor hereby grants to Franchisee a limited, non-exclusive license to use the Licensed Marks and the System solely in connection with the Hotel and the right to operate the Hotel as a System Hotel solely at the Approved Location. Franchisee agrees to identify and operate the Hotel as a System Hotel in accordance with the System and this Agreement only as and when authorized by Franchisor.

### 2.2    Franchisor's Reserved Rights.

A.    Franchisee agrees that, except as specifically provided in Section 2.3 below: (i) Franchisor and its Affiliates retain the right, at any location other than the Approved Location, to develop, promote, construct, own, lease, acquire and/or operate, or authorize or otherwise license or franchise to other Persons the right to develop, promote, construct, own, lease, acquire and/or operate Franchisor Lodging Facilities (including other System Hotels) and other business operations; (ii) Franchisor or its Affiliates may exercise such right without notice to Franchisee; and (iii) Franchisee is not entitled to any protected territory, territorial rights or exclusivity. Franchisee covenants that it will not do anything that may interfere with the exercise of such right by Franchisor or any of its Affiliates.

B.    Nothing in this Agreement will prevent Franchisor from allowing other Franchisor Lodging Facilities operated or franchised by Franchisor or its Affiliates to use various components of the System, including the Reservation System. Franchisor and its Affiliates also have the right to enter into affiliation agreements with other lodging facilities to permit Frequent Traveler Program members (or members of similar guest recognition programs) to redeem awards for stays at such lodging facilities.

2.3    Territory.

Neither Franchisor nor its Affiliates shall open for business or authorize any other person to open for business a System Hotel within the Restricted Territory (as defined below) for a period of six (6) years after the Effective Date (the "Restricted Period"). The Restricted Territory is the highlighted bordered area as approximately set forth on the map attached hereto at Exhibit E (the "Restricted Territory"). For purposes of delineating the boundary of any of the roads, highways, rivers or lakes described above, such boundary will be the centerline or approximate center thereof and will be determined as of the Effective Date of this Agreement. Should a conflict exist between the map and the narrative description stated above, the narrative will control. The restrictions set forth in this Section 2.3 will not apply to (i) any System Hotel existing or under development as of the Effective Date within the Restricted Territory; (ii) any hotel or hotels that are members of a chain of hotels (provided that such chain has a minimum of four (4) or more hotels in operation), all or substantially all (but in no event less than three (3) hotels) of which is acquired by, or merged with, or franchised by or joined through marketing agreement with, Franchisor or one of its Affiliates (or the operation of which is transferred to Franchisor or one of its Affiliates); (iii) any hotel or hotels that are members of a group of hotels that is (in a single transaction, or combination of related transactions, with a single seller or transferor) acquired by, or merged with, or franchised by or joined through marketing agreement with, Franchisor or one of its Affiliates, or the operation of which is transferred to Franchisor or one of its Affiliates, provided that such group of hotels contains no fewer than three (3) hotels; (iv) any other Franchisor Lodging Facility that is not included within the System; or (v) if any existing hotel described in (i) above ceases to operate as a System Hotel, then for each such hotel (if any), an additional hotel that may operate as a System Hotel. With respect to (ii) and (iii) above the chain or group of hotels must have at least fifty (50%) of the hotels in such chain or group located outside of the Restricted Territory at the time of acquisition, merger, franchising or joining. In the event Franchisor were to open for business or authorize any other person to open for business a System Hotel within the Restricted Territory during the Restricted Period without the consent of Franchisee, Franchisor would be in material default of this Agreement, and Franchisee would be entitled to terminate this Agreement in accordance with Section 19.5. In the event that the Hotel achieves an average occupancy level of seventy-five percent (75%) for any period of twelve (12) consecutive months, which will be determined by taking the mean average occupancy for the entire twelve (12) month period, then this Section 2.3 shall be of no further force or effect without any further action by Franchisee or Franchisor, and this agreement shall be read as though this Section 2.3 was no longer contained therein thereafter.

3.    **FEES**

3.1    Application Fee.

The Application Fee generally charged in connection with the grant of a franchise is hereby waived by Franchisor in connection with Franchisee's application in consideration of the proposed relationship for multiple hotels.

3.2    Franchise Fees.

A.    Franchisee must pay to Franchisor each Accounting Period a franchise fee based on the Gross Room Sales of the Hotel (collectively, "Base Franchise Fees"). Franchisee must pay Franchisor Base Franchise Fees in the following amounts: (i) an amount equal to one percent (1%) of Gross Room Sales commencing with the Opening Date through the remaining Term on the baseline amount of annual Gross Room Sales Nine Million Seven Hundred Thousand Euros (€9,700,000) (the "Baseline Gross Room Sales"); unless (ii) the conditions of the

Variable Franchisee Fee Elimination Test (described in Section 3.2.C. below) have been met and Franchisee elects in writing to have the Variable Franchise Fee (described in Section 3.2.B. below) be eliminated, and in which case, commencing with the close of the first Accounting Period following the delivery of the Variable Franchise Fee Elimination Notice, the Franchise Fees for the remainder of the Term will be an amount equal to two percent (2%) of Gross Room Sales during each Accounting Period.

B.     In addition to the Base Franchise Fees, Franchisee must pay to Franchisor each Accounting Period a variable franchise fee (the "Variable Franchise Fee") based on the increase in Gross Room Sales above the Baseline Gross Room Sales. Franchisee must pay to Franchisor the Variable Franchise Fee in an amount equal to four percent (4%) of the Gross Room Sales of the Hotel in excess of the Baseline Gross Room Sales for each calendar year. Within thirty (30) days after the end of each calendar year Franchisee must pay to Franchisor the Variable Franchise Fees due for the preceding calendar year. For the first calendar year including the Opening Date, the amount of the Variable Franchise Fee due will be prorated based on the number of days from the Opening Date to the end of the first calendar year after the Opening Date, calculated by multiplying both the Gross Rooms Sales for that period and the Baseline Gross Room Sales by the number of days in that period and dividing both numbers by three hundred and sixty- five (365), and subtracting the prorated Baseline Gross Room Sales from the prorated Gross Room Sales. The result will be the amount of the Gross Room Sales on which the Variable Franchise Fee will be calculated in the first calendar year.

C.     Within thirty (30) days after the end of each calendar year, Franchisee has the right to notify Franchisor in writing (the "Variable Franchise Fee Elimination Notice") and require that the Variable Franchise Fee component be eliminated, and the Base Franchise Fees be converted to an amount equal to two percent (2%) of Gross Room Sales during each Accounting Period, as provided in Section 3.2.A.(ii) above. The determination by Franchisee to eliminate, and the process of eliminating, the Variable Franchise Fee and amending the Base Franchise Fee payment amount is referred to as the "Variable Franchise Fee Elimination Test". Such elimination and the new Base Franchise Fee amount will take effect with the close of the first Accounting Period following the delivery of the Variable Franchise Fee Elimination Notice. The term Base Franchise Fees together with Variable Franchise Fees will be referred to herein as "Franchise Fees." If the Variable Franchise Fee is eliminated the term Franchise Fees will mean the Base Franchise Fees, as modified.

D.     Franchisee must not discount or sacrifice Gross Room Sales (by methods including the offering of complimentary or reduced-price rooms or food and beverage) in order to further any other business at or outside of the Hotel. Gross Room Sales must be accounted for on an accrual basis. Franchisee may, at its discretion, discount the rate charged at up to one percent (1%) of the available rooms at the Hotel to associates of Franchisee or its Affiliates.

3.3    International Marketing Fund Charge; Special Marketing Program Fees.

A.     Franchisee must pay to Franchisor a charge (the "International Marketing Fund Charge"), as the Hotel's contribution for International Marketing Fund Activities. The International Marketing Fund Charge is one (1.0%) of Gross Room Sales for the preceding Accounting Period, for the time period from the Opening Date to the end of the Term. All sums Franchisor receives under this Section 3.3.A will be used as described in Section 7.3. Franchisor may modify the International Marketing Fund Charge for hotels in the System, including the Hotel, to reflect the following, as determined by Franchisor: (i) any increase or decrease in the cost of providing, or the scope of, International Marketing Fund Activities; (ii) any change in the method used to allocate the cost of International Marketing Fund Activities; or (iii) any change in the competitive needs of the System. Franchisee agrees to be bound by any such changes; provided, however, the amount of Franchisee's International Marketing Fund Charge may not be increased above one percent (1%) of Gross Room Sales.

B.     The current International Marketing Fund Charge applicable to other System Hotels is one and one half percent (1.5%) of Gross Room Sales.  The reduction of the International Marketing Fund Charge to one percent (1.0%) of Gross Room Sales during the Term is to provide Franchisee additional monies to use on local advertising and marketing of the Hotel.  Franchisee is required to spend at least 0.5% of its Gross Room Sales each Accounting Period during the Term on local advertising and marketing of the Hotel.  Amounts spent on advertising Boscolo Luxury Hotels will be credited in proportion to the amount of Boscolo Luxury Hotels participating as System Hotels in the advertising program so long as the Autograph Collection Brand is mentioned in connection with the advertising of marketing activity on a proportional basis.  Such local advertising and marketing must refer to the Hotel as a System Hotel and use the Proprietary Marks and Franchisee Marks in compliance with the Standards and this Agreement.

C.     Franchisee must pay to Franchisor the Hotel's fair share, as determined by Franchisor, of the cost of any Special Marketing Program as described in Section 7.4.

3.4     Electronic Systems Fees.

A.     Franchisee must pay to Franchisor the Electronic Systems Fees for any Electronic Systems provided to Franchisee for use at the Hotel.

B.     As of the Effective Date, the Yield Management System is not mandatory for all System Hotels.  When Franchisor notifies Franchisee that it must utilize the Yield Management System, Franchisee must pay to Franchisor the Yield Management System Fee for the use of the Yield Management System.

C.     Franchisor reserves the right to change the basis of the allocation of any Electronic Systems Fee to reflect the following, as determined by Franchisor:  (i) any increase or decrease in the costs and expenses of providing the applicable Electronic System to the Hotel; (ii) any change in the method Franchisor uses to determine the applicable Electronic Systems Fee payment; or (iii) any change in the competitive needs of the System, including the right to change the basis for charging for such Electronic Systems Fee.   The Electronic Systems Fees will be computed on a fair and consistent basis by and among similarly situated System Hotels or other Franchisor Lodging Facilities receiving the services or utilizing the applicable Electronic Systems at the time such services and Electronic Systems are utilized; provided that the amounts will vary by Franchisor Brand.  Any increase in the Electronic System Fees will be generally consistent with historical increases in such amounts, to the extent applicable.

3.5     Other Charges.

A.     Franchisee must pay to Franchisor (i) the tuition, fees, expenses, and costs (including allocations of internal costs and overhead of Franchisor and its Affiliates) of developing and providing any training required under Section 10.1 or any training in which Franchisee elects to participate under Section 10.1.C and (ii) an annual charge per manager (currently $750 per manager per year) for management training that is currently known as the "core management training" and is charged based on an allocation by Franchisor among System Hotels of the expenses and costs (including allocations of internal costs of Franchisor and its Affiliates) of developing and providing this training for managers. Franchisor may change the fees, expenses, and costs payable under this Section 3.5 to reflect the following, as determined by Franchisor:  (i) any increase or decrease in the costs and expenses of developing and providing current or future training; and (ii) any change in the method Franchisor uses to determine allocation of expenses and costs.  The charges for these payments will be computed on a fair

and consistent basis among similarly situated System Hotels receiving the services or utilizing the systems at the time such services are provided. Any increase in the charges will be generally consistent with historical increases in such amounts, to the extent applicable.

B.    Franchisee must pay to Franchisor or its Affiliates an amount specified by Franchisor to pay for (i) any training or orientation (including tuition, supplies, and Travel Expenses) required by Franchisor (including the general manager conference regardless of whether Franchisee's personnel attend) or in which Franchisee elects to participate, (ii) purchasing, staging, programming, installing and interfacing and upgrading of Hardware and Software for any Electronic Systems, (iii) any goods or services purchased, leased or licensed by Franchisee from Franchisor or an Affiliate of Franchisor, and (iv) any optional or mandatory programs of Franchisor or its Affiliates in which Franchisee participates. The charges for these payments will be computed on a fair and consistent basis among similarly situated System Hotels receiving the services or utilizing the systems at the time such services are provided. Any increase in the charges will be generally consistent with historical increases in such amounts, to the extent applicable.

3.6    Travel Expenses and Reimbursement.

Franchisee must pay to Franchisor all Travel Expenses for: (i) individuals designated by Franchisor to provide training or services under this Agreement; and (ii) Franchisor's and its Affiliates' corporate and regional representatives visiting the Hotel on specific Hotel business, as provided in Sections 3.5, 9.3.E., 10.2, 10.3, and Exhibit B, Section 4. In addition to such Travel Expenses, Franchisee must reimburse Franchisor, or such other Person designated by Franchisor, for the salary and other compensation of any individuals providing services to the Hotel, including training and services provided under Sections 3.5, 9.3.E., 10.2, and Exhibit B, Section 4. The charges for these payments will be computed on a fair and consistent basis among similarly situated System Hotels receiving the training or services at the time such training or services are provided.

3.7    Marriott Agreement Payments.

When Franchisee purchases goods and/or services from Franchisor or Franchisor's Affiliates related to the Hotel, Franchisee must pay any other amounts due to Franchisor or its Affiliates in accordance with the terms under any Marriott Agreement or other agreement or debt instrument between Franchisee and Franchisor or its Affiliates.

3.8    Making of Payments and Performance of Services.

All payments required by Sections 3.2 and 3.3 will be made for each Accounting Period in accordance with Sections 3.10 and 3.12 within thirty (30) days after the end of each Accounting Period, and will be submitted together with any reports required under Section 15.2. All other payments required by this Agreement will be made in accordance with Sections 3.10 and 3.12 within thirty (30) days after receipt by Franchisee of each statement for such payment, which statement will be accompanied by an invoice compliant with Applicable Law to the extent required. Payments due to Franchisor or its Affiliates will be paid by wire transfer of immediately available funds or such other method as Franchisor approves to the accounts designated by Franchisor. Franchisor has the right to have any service or obligation of Franchisor under this Agreement be performed by an Affiliate of Franchisor and Franchisee agrees to accept performance by such Affiliate. Franchisor also has the right to designate that payment be made to one of its Affiliates instead of Franchisor, and Franchisee must make such payments as designated.

3.9    <u>Interest on Late Payments.</u>

If any payment by Franchisee to Franchisor under this Agreement is not received on or before its due date, such payment will be deemed overdue, and Franchisee must pay to Franchisor, in addition to the overdue amount, interest on such overdue amount which will accrue at a rate per annum equal to the Interest Rate from the date such overdue amount was due until paid. Franchisor's entitlement to interest will be in addition to any other remedies Franchisor may have.

3.10    <u>Taxes.</u>

A.    Franchisee must promptly pay when due all Taxes levied or assessed by any Tax authority relating to the Hotel, Franchisee, this Agreement, any other Marriott Agreement or in connection with operating the Hotel, other than income or franchise taxes assessed against or charged to Franchisor.

B.    If any amount to be paid or reimbursed under this Agreement to Franchisor, or any of its Affiliates, is subject to any deductions or withholdings (except with respect to any Franchise Fees due hereunder, which shall be paid by Franchisor) for any present or future taxes, levies, imposts, duties, fees, charges, or liabilities imposed by any competent governmental authority (other than those imposed by Luxembourg) then Franchisee must pay or reimburse an additional amount to Franchisor or one of its Affiliates, as the case may be, as is necessary so that the net amount actually received by Franchisor or its Affiliate after such deduction, payment or withholding will equal the full amount stated to be payable or reimbursable under this Agreement. If Franchisor is aware that amounts to be paid or reimbursed hereunder are subject to a withholding or similar tax, Franchisor will advise Franchisee of such tax prior to the performance of the services subject to the tax.  To the extent Applicable Law requires any such amounts to be paid by Franchisee directly to a governmental authority, Franchisee shall pay such deductions or withholdings promptly and receipts or other written proof of such payment shall be provided to Franchisor or its Affiliates promptly upon receipt.  To the extent that such tax (deduction or withholding) applied in Italy is imposed on the net income of Franchisor or its Affiliates according to the Italy law, Franchisor or its Affiliates will issue to Franchisee an invoice showing the amounts of tax due to the Italy governmental authorities after Franchisor or one of its Affiliates has filed its income tax return in Italy.  Within fifteen (15) days of receipt of such invoice, Franchisee shall pay to Franchisor or one of its Affiliates the amount shown as due to the Italy governmental authorities on the invoice.

C.    The consideration for the services provided in this Agreement, or any of the other Marriott Agreements, is exclusive of value added, goods and services, sales, or similar taxes.  Franchisee will be responsible for payment of all value added, goods and services, sales, or similar taxes, if any, levied on or deducted from any amounts payable to Franchisor or its Affiliates under this Agreement. The amount of such value added, goods and services, sales, or similar taxes will be payable by Franchisee to Franchisor or such Affiliate together with the payment to which it relates or as otherwise required by Applicable Law so that the amount actually received by Franchisor or such Affiliate in respect of such payment (after payment of such taxes) equals the full amount stated to be payable in respect of such payment.  To the extent any Applicable Law requires any such taxes to be paid by Franchisee directly to a governmental authority, or to the extent a reverse charge mechanism is available and applicable to the Franchisee, Franchisee must account for and pay such taxes promptly and receipts or other proof of such payment will be provided to Franchisor or such Affiliate promptly upon receipt.

D.    If there is a bona fide Dispute by Franchisee as to liability for Taxes, Franchisee may contest the validity of the amount of the Tax in accordance with Applicable Law, provided that Franchisee will not permit a Tax sale or seizure by levy of execution or similar writ or warrant, or attachment by creditor, to occur against any part of the Hotel.  If such Dispute involves payments of



Taxes that must be withheld, deducted, and paid by Franchisee related to payments to Franchisor as described in 3.10.B and 3.10.C, Franchisee must pay such Taxes and submit to the withholding authority for reimbursement in connection with such Dispute, and Franchisee will be responsible for any interest or penalties assessed in connection with any delayed or non-payment.

3.11    Restrictions on Transfers of Funds.

If any governmental authority imposes restrictions on the transfer of funds or currency and such restrictions result in Franchisor, or any of its Affiliates, not receiving payments under any Marriott Agreement in a timely fashion, Franchisor will have the following options: (i) Franchisor may curtail performance of some or all of its obligations under the Marriott Agreements to the extent the restrictions on transfer of currency limit Franchisor from being compensated adequately, in Franchisor's Reasonable Business Judgment, for the performance of those obligations (including the provision of International Marketing Fund Activities and access to the Reservation System) and such curtailment will not constitute a breach or default under the applicable Marriott Agreement; (ii) Franchisor may terminate any Marriott Agreement upon sixty (60) days notice if such restrictions prevent Franchisor from being so compensated for a period of sixty (60) days or longer; and/or (iii) Franchisor may direct Franchisee to deposit all payments required under the Marriott Agreements to such accounts in the country in which the Hotel is located as Franchisor may designate and Franchisee will take such other action as Franchisor may request to cause payment of the accumulated amounts to be made as Franchisor may direct as soon as possible after the applicable currency restriction is no longer in effect.

3.12    Currency.

All amounts payable to Franchisor or its Affiliates under this Agreement or any other Marriott Agreement (including any judgment or arbitral award rendered with respect to this Agreement) must be paid in United States Dollars (except Franchise Fees and the International Marketing Fund Charges payable pursuant to Section 3.2 and Section 3.3.A., respectively, which may be paid in Euros), unless Franchisor agrees to an alternative currency, to the accounts Franchisor designates. The United States Dollar value of payments based on Gross Room Sales for each Accounting Period will be determined by using the exchange rates quoted in The Wall Street Journal (New York edition) on the last business day of such Accounting Period for which The Wall Street Journal quotes such exchange rates, if such payment is timely made by Franchisee, and, in the case of a late payment, on the last business day of such Accounting Period or the date on which payment is made, whichever results in the highest amount to Franchisor. If The Wall Street Journal does not quote such exchange rates or is otherwise unavailable for the day in question, the exchange rates quoted for such day by an internationally recognized publication reasonably determined by Franchisor will be the rate for purposes of making payments hereunder. If for any reason an amount is received in a currency other than United States Dollars without Franchisor's direction or consent, Franchisee's obligations under this Agreement will be discharged only to the extent that Franchisor may purchase United States Dollars with such other currency in accordance with normal banking procedures upon receipt of such amount. If the amount in United States Dollars that may be purchased, after deducting any costs of exchange and any other related costs, is less than the relevant sum payable under this Agreement, Franchisee must immediately pay the shortfall to Franchisor.

3.13    Key Money.

A.    Franchisor agrees to pay to Franchisee key money in the amount of Two Hundred Thousand Euros (€200,000) ("Key Money") in consideration for the execution and delivery of this Agreement by Franchisee and Franchisee's development, construction or conversion, as the case may be, and operation of the Hotel for the Term pursuant to this Agreement. Franchisor's obligation to pay the Key Money to Franchisee is expressly conditioned upon Franchisee's: (i) commencing and

completing conversion of the Hotel and the Opening Date occurring on or before the dates required in Exhibit B; (ii) three (3) other hotels of Franchisee or its Affiliates commencing and completing conversion to System Hotels prior to the opening date provided in the respective franchise agreements for those hotels (for a total of four (4) hotels of Franchisee and its Affiliates converting to System Hotels); and (iii) (a) Franchisee and its Affiliates, as applicable, waiving the Implementation Period Exit Right in this Agreement and the respective franchise agreements for all four (4) System Hotels owned or operated by Franchisee and its Affiliates (to the extent these rights remain in effect) or (b) a total of six (6) hotels owned or operated by Franchisee and its Affiliates have opened and are operating as System Hotels pursuant to franchise agreements with Franchisor. The Key Money will be paid to Franchisee by Franchisor within thirty (30) days after the earlier of: (x) the second (2nd) anniversary of the Opening Date for each of the first four (4) of the hotels that are owned or operated by Franchisee and its Affiliates have opened and are operating as System Hotels pursuant to franchise agreements with Franchisor hotels and the Implementation Period Exit Right has not been exercised and has expired for such of Franchisee's System Hotels (or has been earlier waived), or (y) the conditions of (i) through (iii) have been met. In the event that Franchisee or one of its Affiliates sells the Hotel or one of the three (3) other hotels described in (ii) above so that there is only a total of only three (3) hotels (as opposed to four (4) hotels) operating under the System prior to the payment of the Key Money, Franchisor will reduce the amount of the total key money that Franchisor is obligated to pay based on the amount of key money allocated to the hotel that was sold, and will pay the key money allocable to the other hotels if the remaining conditions of payment described above have been met. For the avoidance of doubt, a Transfer of a single hotel prior to the Implementation Period Exit Termination Date shall not be deemed the exercise of the Implementation Period Exit Right, and such Transfer will be covered by Section 17.

B.    Franchisee acknowledges that if Franchisee has been paid the Key Money, Franchisee is obligated to re-pay the Key Money to Franchisor in connection with any termination of this Agreement before the First Early Termination Date without regard to: (i) the reason for such termination (other than there is has been a material default of Franchisor in accordance with Section 19.5); (ii) whether such termination is voluntary or involuntary; (iii) whether the Hotel remains in the System after termination of this Agreement; or (iv) whether Franchisor consents to or approves the transaction pursuant to which this Agreement is terminated. The determination as to whether such Key Money must be repaid is referred to as the "**Key Money Repayment Test**". Such Key Money must be repaid by Franchisee to Franchisor no later than sixty (60) days following written notice from Franchisor to Franchisee that the Key Money Repayment Test has been met. Any dispute as to whether the Key Money Repayment Test has been met will be submitted to the Expert for determination in accordance with Section 19.4.E.

## 4.    TERM

### 4.1    Term.

Unless this Agreement is terminated earlier in accordance with Section 19 of this Agreement, the term of this Agreement begins on the Effective Date and expires on the thirtieth (30th) anniversary of the Opening Date (the "Term"). If this Agreement is terminated pursuant to an Early Termination in accordance with Section 19.4 or 19.6 of this Agreement, upon the effectiveness of such Early Termination, this Agreement shall be treated as if the Term had expired on the effective date of such Early Termination.

### 4.2    Not Renewable.

This Agreement and the rights granted by this Agreement are not renewable and Franchisee has no expectation of any right to extend the Term.

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

**5.    SIZE, CONVERSION, AND RENOVATION**

    5.1    Size.

        A.    The Hotel will consist of the number of Guestrooms stated in Exhibit A or such other number approved by Franchisor.

        B.    Any Guestrooms added to the Hotel must be in compliance with Section 6. Franchisee understands that increases in Guestrooms of twenty percent (20%) or more are subject to committee review, and any failure to comply with such review process may, in Franchisor's Reasonable Business Judgment, be deemed a default hereunder.

    5.2    Conversion of the Hotel.

        Franchisee, at its expense, must start and complete in a timely fashion and to Franchisor's satisfaction the conversion of the Hotel in accordance with (i) the Design Review Agreement, (ii) Exhibit B, and (iii) the Standards.

**6.    SOURCING AND DESIGN PROCEDURES**

    6.1    Furniture, Fixtures, Equipment, Supplies, and Signage.

        A.    The requirements of this Section 6.1 are to insure that items used at System Hotels will be of high quality to maintain the identity, integrity and reputation of the System. Franchisee and Franchisor acknowledge the unique nature and character of Hotels operating under the System, and that the Hotel has been approved to become a System Hotel based on the quality and condition, and current design, color scheme, FF&E, Inventories and Fixed Asset Supplies, and ranking as a five-star luxury Hotel ("Approved Quality Standard"), subject to completion of the Scope of Work set forth in Exhibit B. With respect to all renovations required pursuant to the Design Review Agreement and Exhibit B, and all renovations and modifications made during the Term, Franchisee will use only such signs, FF&E, Inventories and Fixed Asset Supplies that conform to the Approved Quality Standard. If Franchisee proposes to purchase or lease any signs, FF&E, Inventories, Fixed Asset Supplies that fail to meet the Approved Quality Standards in Franchisor's Reasonable Business Judgment, Franchisor will notify Franchisee in writing. If Franchisee elects to proceed with such purchases and renovations that Franchisor believes do not meet the Approved Quality Standards, Franchisor shall have the right to declare the Agreement in default and commence the Agreed System Removal Process as set forth in Section 20.1.C.

        B.    Franchisor may designate approved suppliers, including Franchisor or any of its Affiliates, as the only approved supplier for certain items that bear or utilize Franchisor's Intellectual Property or as is necessary to access or be a part of the Electronic Systems, and with respect to those designated items, such shall be purchased only from such approved suppliers and in accordance with the Standards ("Approved Supplier Purchases"). If Franchisee proposes to obtain Approved Supplier Purchases from sources not previously approved by Franchisor as meeting the Standards, Franchisee and such supplier or manufacturer will submit to Franchisor, at no cost to Franchisor, sufficient specifications and other information and samples for Franchisor to determine whether such items meet the Standards. Franchisor may require payment of an amount not to exceed the cost of such inspection, and Franchisor will not be liable for damage to any sample. Franchisor may require such supplier or manufacturer to demonstrate to Franchisor's satisfaction that such supplier and/or manufacturer: (i) can manufacture such products to specifications that meet the Standards; (ii) can deliver them in a timely manner and in

sufficient quantities to meet the needs of the Hotel; and (iii) has, if reasonably required and commercially available, insurance protecting Franchisor and its Affiliates against any relevant claims. If the proposed arrangement involves the supplying or manufacturing of products utilizing Franchisor's Intellectual Property, Franchisor may also require the supplier or manufacturer to: (a) enter into a written agreement with Franchisor concerning the use of Franchisor's Intellectual Property on terms acceptable to Franchisor; and (b) demonstrate to Franchisor's satisfaction that it can comply with the terms of such agreement. Franchisor may revoke its approval as to future purchases if the supplier or manufacturer at any time after such approval fails to meet the requirements of this Section 6.1 or the Standards.

6.2     Design Review.

A.      If Franchisee elects or is required by this Agreement (including, under Section 11) to perform construction work or renovations or refurbishment of the Hotel that will materially affect the design, character, or appearance of the Hotel ("Material Alteration"), Franchisee will ensure that any such construction work or significant renovations or refurbishment complies with the Approved Quality Standards and the requirements set forth in this Section 6. Franchisee is responsible for ensuring that all construction documents for Material Alterations, including site plans and architectural, mechanical, electrical, civil engineering, landscaping and interior design drawings and specifications, and material samples (collectively, the "Plans") conform to the Approved Quality Standards, or the Standards if applicable. In the event requested by Franchisee to do so, Franchisor will promptly review the Plans to confirm that the Approved Quality Standards are met in Franchisor's Reasonable business Judgment. Each party will act speedily and in good faith in the preparation, submission, review and revision of the Plans. If Franchisor does not believe in its Reasonable Business Judgment that the Plans demonstrate that the Hotel will continue to meet the Approved Quality Standards after such Material Alteration, Franchisor will notify Franchisee in writing and identify any areas of concern. If Franchisee elects to proceed with such Material Alteration, Franchisor shall have the right to declare the Agreement in default and commence the Agreed System Removal Process as set forth in Section 20.1.C. If Franchisor does not believe in its Reasonable Business Judgment after the Material Alteration that the Hotel meets the Approved Quality Standards, Franchisor will notify Franchisee in writing to declare the Agreement in default and commence the Agreed System Removal Process as set forth in Section 20.1.C.

B.      Franchisee agrees that Franchisee, and not Franchisor or its Affiliates, is responsible for:   (i) ensuring that any design, construction documents, specifications, and any construction, renovation, or refurbishment complies with any Applicable Law, including any requirements relating to disabled persons; (ii) any errors or omissions; or (iii) discrepancies (of any nature) in any drawings or specifications. Franchisee further acknowledges and agrees that: (a) Franchisor's review of the Plans is limited solely to determining whether the Plans comply with the Design Criteria; and (b) Franchisor will have no liability or obligation with respect to renovation, upgrading or furnishing of the Hotel. Except for Franchisee's own uses related to its construction or operation of the Hotel, Franchisee will not reproduce, use or permit the use of any of the design concepts, drawings, or Standards.

C.      Nothing in this Section 6.2. shall be deemed a waiver of any obligation of Franchisee to comply with the Quality Assurance Program or the Standards or to maintain the Hotel in good repair and a first-class condition or the right of Franchisor to designate the Hotel as being within a Category and thus subject to the Standards applicable to such Category. Nothing in this Section 6.2. shall in any way limit Franchisor's right to approve or set Standards with respect to quality or condition of any element of the Hotel. Franchisor will not, however, set Standards for the Design Theme of the Hotel.

**7.    LOCAL ADVERTISING AND MARKETING, PRICING, AND INTERNATIONAL MARKETING FUND ACTIVITIES**

7.1    Franchisee's Local Advertising and Marketing Programs and Press Releases.

A.    Franchisee will undertake Local Advertising Programs that will be (i) at Franchisee's expense, (ii) conducted to the extent that Franchisee deems necessary, and (iii) in accordance with the Standards, or agreed by the parties.

B.    Franchisor will advise Franchisee of the requirements for and Franchisee will prominently use and display in, upon and in connection with the Hotel: (i) signs and other Marketing Materials and the Licensed Marks only in the combination, arrangement, and manner approved or required by Franchisor and in accordance with the Standards; and (ii) such other trade names, trademarks, logos, and designs as may be provided, approved, or required by Franchisor. All signs and Marketing Materials must comply with Applicable Law. Franchisee must not display in or on the Hotel premises or elsewhere, any sign or Marketing Materials of any kind that does not comply with the Standards or that Franchisor has not approved or to which Franchisor objects. Franchisee must submit samples of Marketing Materials not provided by Franchisor or its Affiliates and obtain prior approval from Franchisor before any public use of such Marketing Materials. If Franchisor, subsequent to its approval of Marketing Materials or Local Advertising Programs, withdraws its approval, Franchisee must immediately cease the use, distribution, and dissemination thereof. Any Marketing Materials developed by Franchisee may be used by other Franchisor Lodging Facilities without compensation to Franchisee.

7.2    Reservations, Pricing, and Rates.

A.    Franchisee must provide its prices and rates for use in the Reservation System as requested by Franchisor or in accordance with the Standards. Franchisee must: (i) honor any prices, rates, or discounts that appear in the Reservation System, or any other publication, system, program, or promotion (written or electronic); (ii) honor all reservations made through the Reservation System or that are otherwise confirmed; and (iii) not charge any Hotel guest a rate higher than the rate specified at the time that the Hotel guest's reservation was made, according to the records of the Reservation System or, if not made through the Reservation System, the record of the reservation. Franchisee will also honor all other contracts or pricing and terms for meeting rooms or any other activity or service at or in connection with the Hotel offered or authorized by Franchisee.

B.    Franchisee is responsible for setting its own prices and rates for Guestrooms and other products and services at the Hotel and determining any prices or rates that appear in the Reservation System or any other publication or system (written or electronic) that lists any prices or rates for the Hotel. Franchisor, however, may: (i) prohibit certain types of charges or billing practices that Franchisor determines are misleading or otherwise detrimental to the System, including price-gouging or incremental fees for services that guests would normally expect to be included in the room charge; (ii) require that Franchisee price consistently in various distribution channels; or (iii) impose other pricing requirements permitted or required by Applicable Law.

C.    Franchisor may recommend or suggest prices or rates for the products and services offered by Franchisee or require participation in various sales or revenue management programs or promotions offered by Franchisor and its Affiliates. Franchisor's recommendations or suggestions concerning prices or rates are not mandatory; Franchisee is ultimately responsible for determining the prices or rates at which it offers its products and services, and Franchisor's recommendations or suggestions are not a representation or warranty by Franchisor that the use of such suggested or recommended prices or rates will produce, increase, or optimize Franchisee's profits, and Franchisor will

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

not be liable for any such recommendations or suggestions. This provision expressly includes any prices or rates for any bookings made by or for Franchisee in connection with any sales activity or program of Franchisor or its Affiliates in which Franchisee participates.

7.3    International Marketing Fund Activities.

A.    Franchisor and its Affiliates and any of their designees will direct the International Marketing Fund Activities, including the placement and allocation thereof. Upon the request of Franchisee, Franchisor will provide to Franchisee, in the same manner provided to other System Hotel franchisees, an unaudited accounting of the uses of International Marketing Funds in any fiscal year of Franchisor if such request is made no earlier than ninety (90) days and no later than one hundred eighty (180) days after the end of such fiscal year. Franchisee can request, and upon such request, Franchisor will provide copies of the unaudited accountings previously prepared for a period of up to the previous five (5) years from the date of such request. International Marketing Fund Activities are intended to promote general public recognition and acceptance of the Proprietary Marks and use of System Hotels, and Franchisor, its Affiliates, and their designees are not obligated to make expenditures for the Hotel on a basis equivalent or proportionate to the Hotel's International Marketing Fund Charges or to ensure that any particular System Hotel benefits directly or proportionately from International Marketing Fund Activities or expenditures. International Marketing Fund Activities may not necessarily include all of the System Hotels and some International Marketing Fund Activities may benefit or include other Franchisor Lodging Facilities in addition to System Hotels. In the event other Franchisor Lodging Facilities are participating in any joint marketing program in which monies from the International Marketing Fund are utilized, such other Franchisor Lodging Facilities will pay their allocable fair share for such promotion.

B.    Franchisor reserves the right to: (i) modify or reconstitute the local, regional, national or international scope of the International Marketing Fund Activities as such affects all System Hotels or Categories thereof; and (ii) terminate the International Marketing Fund Activities and establish methods of funding International Marketing Fund Activities other than payment of the International Marketing Fund Charge. In the event Franchisor terminates the International Marketing Fund Activities and establishes new methods of funding International Marketing Fund Activities, the payment requirements applicable to Franchisee shall not exceed those required of System Hotels generally in effect as of the date hereof.

C.    Franchisor and its Affiliates do not hold International Marketing Funds as a trustee or as a trust fund, and Franchisor and its Affiliates have no fiduciary duty to Franchisee with regard to the administration, use, or expenditure of International Marketing Funds. International Marketing Funds may be commingled with other money of Franchisor and its Affiliates and used to pay: (i) all costs associated with developing, preparing, producing, directing, administering, researching, conducting, and disseminating International Marketing Fund Activities, as well as the administrative costs and overhead incurred by Franchisor, or any of its Affiliates, with respect to the foregoing (including the cost of salaries and overhead for Franchisor's and its Affiliates' personnel involved in International Marketing Fund Activities); and (ii) the cost of collecting and accounting for the International Marketing Funds. Franchisor or its Affiliates may (but will not be obligated to) (i) loan money to be used for International Marketing Fund Activities and Franchisor reserves the right to charge interest at then-current market rates with respect to such loans, and (ii) use International Marketing Funds to repay any such loan plus interest.

D.    When and if Marketing Materials are produced using International Marketing Funds, all System Hotels will receive a portion of such materials in quantities determined by Franchisor on the same basis as that provided to other System Hotels in the same Category. If Franchisee requests

any Marketing Materials in excess of such portion allocated to Franchisee, Franchisor may require Franchisee to pay for the costs of such additional Marketing Materials. The costs will be computed on a fair and consistent basis among similarly situated System Hotels receiving the Marketing Materials or services at the time such Marketing Materials or services are provided. Any increase in the charges will be generally consistent with historical increases in such amounts, to the extent applicable.

7.4    Special Marketing Programs.

Franchisor and its Affiliates may establish, coordinate, affiliate with, and require Franchisee's participation in Special Marketing Programs. Special Marketing Programs may vary in duration, apply on a local, regional, national, or Category basis, or involve clusters or groups of Franchisor Lodging Facilities utilizing services on a shared basis. Examples of Special Marketing Programs include cooperative advertising programs, sales and marketing programs, customer satisfaction programs, travel agency programs, events and Frequent Traveler Programs. Special Marketing Programs have a cost to Franchisee that is in addition to the International Marketing Fund Charge. If Franchisee participates in a Special Marketing Program, Franchisee will pay for such programs on the same basis as paid by other participating System Hotels, as contemplated in Section 3.3.B. Franchisee may elect to participate in such activities. As of the Effective Date, Marriott Rewards is the only Special Marketing Program that is mandatory for all franchisees. Franchisor may require participation in other programs in the future, if such are mandatory for all System Hotels, or if done on a regional basis, all hotels in that region, and a Standard is promulgated for such program. The charges for these Special Marketing Programs will be computed on a fair and consistent basis among similarly situated System Hotels participating in the Special Marketing Programs at the time of such participation. Any increase in the charges for the Special Marketing Programs will be generally consistent with historical increases in such amounts, to the extent applicable.

8.    **PROPERTY SYSTEM, RESERVATION SYSTEM, AND OTHER ELECTRONIC SYSTEMS**

8.1    Systems Installation.

Franchisee must, at its expense, purchase or lease, install, maintain, and use at the Hotel all Electronic Systems in accordance with specifications provided by or on behalf of Franchisor and may not use such Electronic Systems to process administrative functions not specifically related to the System.

8.2    Reservation System.

Franchisor will make the Reservation System available to the Hotel, provided if Franchisee is in material default of this Agreement and if such material default is not cured within the time period required for cure of such material default under this Agreement, Franchisor may, in addition to any other remedies it may have, suspend the Hotel from using the Reservation System for so long as such material default remains uncured. By way of example and not limiting Franchisor's rights under the foregoing, Franchisor will not suspend the Reservation System for material default, instead of termination, with respect to non-payment unless Franchisee has failed to pay amounts due after notice and opportunity to cure in accordance with 19.2.B. or Franchisee has failed three (3) times or more to pay amounts due when due for more than thirty (30) days late after having been so advised in writing. In the event of a danger to health or life safety (e.g., disease breakout, black mold, etc., subject to Section 19.1.F), Franchisor will have the right to immediately suspend Franchisee's access to the Reservation System. Franchisee waives all claims against Franchisor and its Affiliates arising from Franchisee's suspension from the Reservation System under this Section 8.2, other than claims that Franchisee is not in breach of this Agreement. Franchisee will cause the Hotel to participate in the Reservation System, will

use the Reservation System only for the benefit of the Hotel, and will comply with all Standards related to participation.

8.3    Optional System(s).

Franchisor may provide to Franchisee the specifications for the Electronic Systems for optional systems. If Franchisor makes available optional system(s) and Franchisee elects to use such system(s), Franchisee must, at its expense, purchase or lease, install, maintain, and use at the Hotel all Hardware and Software necessary for the proper and efficient utilization and operation of such system(s) in accordance with specification provided by or on behalf of Franchisor and pay any fees associated therewith pursuant to Section 3.4. The charges for these payments will be computed on a fair and consistent basis among similarly situated System Hotels receiving the services or utilizing the systems at the time such services are provided. Any increase in the charges for the electronic Systems will be generally consistent with historical increases in such amounts, to the extent applicable.

8.4    System Communication Costs.

As part of the Property System, Reservations System, Yield Management System and other systems, Franchisee will:  (i) at its cost and expense, use the communication system (such as telephone or Internet systems) as specified or otherwise approved by Franchisor for System Hotels; and (ii) be responsible for and pay: (a) charges for any communication system (such as telephone or Internet lines) that connects Franchisee's equipment to the Property System, Reservation System, Yield Management System or other systems; (b) the cost of supplies used in the operation of such equipment; and (c) all other related expenses. The charges for these payments will be computed on a fair and consistent basis among similarly situated System Hotels receiving the services or utilizing the systems at the time such services are provided. Any increase in the charges will be generally consistent with historical increases in such amounts, to the extent applicable.

8.5    Electronic Systems Provided Under License.

The Electronic Systems will remain the sole property of Franchisor or any third party vendors, as applicable. Franchisee will at all times treat the Electronic Systems as confidential. As a condition to using the Electronic Systems, Franchisee must execute the Electronic Systems License Agreement. Franchisee acknowledges that the Electronic Systems will be modified, enhanced, replaced, or become obsolete, and that new Electronic Systems will be created to meet the needs of the System and System Hotels and the continual changes in technology and that any such new Electronic Systems will be subject to the terms of the Electronic Systems License Agreement. If from time to time Franchisor determines that it is advisable or necessary to amend or replace the Electronic Systems License Agreement as a result of the creation, modification, enhancement, replacement or obsolescence of any Electronic Systems, Franchisee, upon the request of Franchisor, will execute the then-current form of Electronic Systems License Agreement or an amendment to the Electronic Systems License Agreement.

9.    **OPERATIONS**

9.1    Operating the Hotel.

A.    Franchisee will operate the Hotel using the System, in compliance with the Standards, and in such a manner as to provide courteous, uniform, respectable, and high quality lodging and other services and conveniences to the public. Franchisee will maintain a high moral and ethical standard and atmosphere at the Hotel. Franchisee will:

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

(1) permit the duly authorized representatives of Franchisor to: (i) enter Franchisee's facilities and inspect same at all reasonable times to confirm that Franchisee is complying with the terms of this Agreement and the Standards; and (ii) test any and all equipment, food products, and supplies located at the Hotel. Franchisee may be required to pay any costs related to such inspections and provide free lodging to any such inspector or inspectors on official duty for such time as may be reasonably necessary;

(2) not knowingly permit gambling to take place at the Hotel (except for a limited number of reputable charitable events permitted by Applicable Law) or use the Hotel for any casino, lottery, or other type of gaming activities, or otherwise directly or indirectly associate with any gaming activity, or use the Hotel for any discotheque, karaoke, nightclub, massage, or similar types of entertainment activities that have not been previously approved in the Standards or by Franchisor in its Reasonable Business Judgment, as applied to System Hotels of the same Category. Franchisee acknowledges that special approval of Franchisor's casino oversight committee is required for the approval of any casino or other gaming activities;

(3) not sell, display or use in the Hotel any vending machines, honor bars (in Guestrooms), entertainment devices, or similar products that have not been previously approved by Franchisor as meeting the Standards in Franchisor's Reasonable Business Judgment;

(4) fully participate in all customer surveys and guest satisfaction audits and offer all guest services, which may include complimentary services within reasonable limitations, as Franchisor may implement for System Hotels including programs and services for senior citizens, children and frequent guests. Franchisor shall provide at Franchisee's reasonable request and Franchisee shall pay for all costs associated with one additional mystery shopper review of the Hotel per year.

(5) fully participate in travel agent programs, any complaint resolution and other programs as Franchisor may reasonably establish for System Hotels, which programs may include providing complimentary rooms or refunds to guests; and

(6) except as otherwise set forth herein, make when due all payments in accordance with the terms of all contracts, agreements, and invoices, except for payments that are disputed by Franchisee in good faith.

B. Franchisee will provide food and beverage service in the Hotel in conformity Approved Quality Standards, and to the extent the Standards apply, the Standards.

9.2 <u>System Promotion and Diversion to Other Businesses.</u>

A. Franchisee must use all reasonable means to encourage and promote the use of System Hotels everywhere. If Franchisee receives a request for reservations or hotel services or accommodations or use of Public Facilities in any area where a System Hotel or other suitable Franchisor Lodging Facility is located, Franchisee must promptly refer such request to Franchisor or such Franchisor Lodging Facility. Franchisee will not, without obtaining Franchisor's prior consent, associate or affiliate with any other hotel business organization that requires Franchisee to refer business to other members of that organization.

B. Franchisee will ensure that no part of the Hotel or the System is used to divert business to any lodging business (including any other hotel operated by Franchisee or its Affiliates or in which Franchisee, its Affiliates or a principal of Franchisee or its Affiliates owns or holds an Ownership Interest) not operated under a trade name or trademark owned by Franchisor or any of its Affiliates,

including advertising or promotion of hotels, vacation or time-sharing facilities (or any similar product sold on a fractional or other basis with use rights on a weekly or other periodic basis), conference centers, or other lodging products.

C.    Franchisee will ensure that no part of the Hotel or the System is used in any manner inconsistent with the Standards, the image of Autograph Collection Brand, or otherwise authorized by Franchisor to further or promote:

(1)    any lodging not operated under a trade name or trademark owned by Franchisor or any of its Affiliates, including advertising or promotion of hotels, vacation or time-sharing facilities (or any similar product sold on a fractional or other basis with use rights on a weekly or other periodic basis), conference centers, or other lodging products business (except that Franchisee shall be free to continue: (i) to promote the Boscolo Luxury Hotel Brand hotels and the B-4 Hotel Brand hotels in directories and Marketing Materials in the Hotel and in other venues together with the Hotels operating under the Autograph Collection Brand so long as it is done in a manner that clearly distinguishes which hotels are part of the System and which are not and it is done in a manner that is consistent with the Approved Quality Standard, and (ii) to promote its Boscolo Tours business so long as it is done in a manner that is consistent with the Approved Quality Standard; provided that if the Autograph collection Brand is used or the Proprietary Marks are utilized in connection with the activities described in (i) and (ii), Franchisee or such Affiliate shall first obtain Franchisor's prior written consent ); or

(2)    any other business or concession; provided, however, Franchisor acknowledges that there may be retail space within the Approved Location, and so long as such use is consistent with the Approved Quality Standard and use at the Hotel on the date of this Agreement., such use shall not be subject to further approval by Franchisor.

9.3    Employees.

A.    Franchisee must employ suitable individuals as a general manager and other managers (e.g., reservations manager, sales manager, and other department managers or persons with different titles but similar duties to the foregoing) and qualified personnel sufficient to staff all positions at the Hotel as required by the Standards or Franchisor. Franchisee's general manager and other managers will devote their full time to the management and operation of the Hotel, and such Persons will not be employed in any other capacity by Franchisee or its Affiliates. Franchisee must use its best efforts to ensure that Franchisee's employees at all times: (i) conduct themselves in a competent and courteous manner in accordance with the image and reputation of Franchisor and the System; and (ii) maintain a neat and clean appearance and render competent, sober and courteous service to all Persons.

B.    Franchisee will seek Franchisor's input regarding candidates that are being considered for manager positions at the Hotel. After considering Franchisor's comments, all hiring decisions at the Hotel will be made solely by Franchisee. Franchisor does not exercise any direction or control over the employment policies or employment decisions of Franchisee. All employees of Franchisee are solely employees of Franchisee, not Franchisor, and Franchisee is not Franchisor's agent for any purpose with regard to Franchisee's employees.

C.    Franchisee agrees that Franchisor has the right to communicate directly with the general manager and the other managers at the Hotel regarding day-to-day operations of the Hotel, and such communications will be deemed made to Franchisee. Franchisee authorizes Franchisor to rely on the statements of such managers as to matters relating to the operation of the Hotel.

D.     Unless the employee in question first solicits Franchisee or Franchisor (as applicable), neither Franchisee nor Franchisor will seek to employ or employ any person who is employed by the other without obtaining the other party's prior consent.

E.     Upon the request of Franchisee, Franchisor, in Franchisor's discretion and depending on availability of Franchisor's employees, may, place one or more Temporary Consultants in the Hotel who will work for Franchisee under an executed Consulting Agreement.  Franchisee must pay all Travel Expenses for any Temporary Consultant or person traveling to the Hotel or Franchisee's offices as a potential or acting Temporary Consultant.  Franchisor reserves the right at any time to withdraw any Temporary Consultant and terminate the Consulting Agreement.   The charges for the Temporary Consultants will be computed on a fair and consistent basis among similarly situated System Hotels receiving the services at the time such services are provided.  Franchisor and Franchisee have agreed that one Temporary Consultant will work with Franchisee for at least one year to assist Franchisee and its Affiliates with the conversion of the Hotel and other hotels of Franchisee's Affiliates to System Hotels. Franchisee and its Affiliates shall pay for the services and Travel Expenses for such Temporary consultant pursuant to a consulting Agreement.

9.4     Management and Operation of the Hotel.

A.     The Hotel will at all times be operated by Franchisee.  In the event Boscolo Group wishes to Transfer the operation of the Hotel to an Affiliate, such Transfer will be subject to Section 17.4.

B.     Franchisee agrees that Franchisor will have the right to communicate directly with the managers at the Hotel on matters relating to the operation of the Hotel, and Franchisee authorizes Franchisor to rely on the communications of such managers as being on behalf of Franchisee.

10.     **TRAINING, COUNSELING, AND ADVISORY SERVICES**

10.1     Training.

A.     The Hotel must be managed by an individual or individuals who have timely and successfully completed the training program(s) required by Franchisor.  Franchisor will have the right to require that the Hotel's or Franchisee's management personnel attend or complete specific training program(s), including before the opening or conversion of the Hotel or in connection with a Transfer of Control of Franchisee or the Hotel.  Such training courses will be conducted at such time and place as Franchisor will designate.  Franchisee will advise Franchisor of all newly hired management personnel within thirty (30) days after they commence employment, and such personnel will attend and successfully complete such training program(s) within the time frame Franchisor specifies.  Franchisor or its designee will conduct the "core management training" identified in Section 3.5 (or such replacement training), and Franchisor may require Franchisee's management personnel to participate.

B.     Franchisee must conduct such training for Franchisee's employees as is required for them to properly operate, administer and manage the Hotel in accordance with the Standards.

C.     Franchisor will have the right to charge tuition, fees or reimbursements described in Section 3.5 for all educational, training and orientation programs that Franchisor offers, which must be paid before receiving training materials or attending.  Franchisor reserves the right to require Franchisee to pay and/or reimburse Travel Expenses of the providers of such training programs and services. Franchisor reserves the right to require that Hotel employees execute confidentiality agreements in form and substance satisfactory to Franchisor.

10.2    Counseling and Advisory Services.

Franchisor will make its representatives available at Franchisor's designated offices at reasonable hours or to meet in person to consult with and advise (but not provide legal counsel or advice to) Franchisee regarding the design, operation, and management of the Hotel as a System Hotel. If Franchisor's representative travels to the Hotel to provide such services, Franchisee must pay the expenses of such representative while at, going to, and coming from, the Hotel, including Travel Expenses, and salary or other compensation, in accordance with Section 3.6.

10.3    Quarterly Business Reviews.

On a quarterly basis, Franchisor will make its representatives available at Franchisee's designated offices, or at one of Franchisee's System Hotels, at reasonable hours and agreed upon times to meet in person to analyze the performance, operation, and the sales and marketing of the Hotel and the other hotels operated by Franchisee and its Affiliates as System Hotels ("Quarterly Business Reviews"). Franchisee must pay the Travel Expenses of Franchisor's representatives in connection with Quarterly Business Reviews. Representatives of Franchisor and Franchisee may organize meetings to discuss the development and promotion of the Autograph Collection Brand, and Franchisee's assistance and participation in the System, and Franchisee shall not be responsible for the Travel Expenses or salary and other compensation of such Representatives of Franchisor's representatives in connection with System meetings.

11.    **PHYSICAL FACILITIES, SUPPLIES, AND GOODS**

11.1    Repairs and Maintenance.

A.    Franchisee will maintain the Hotel in good repair and first-class condition and in conformity with Applicable Law and the Approved Quality Standards and the Standards, to the extent applicable. Franchisee or its Affiliates must fund the cost of all repairs and alterations at the Hotel. Franchisee will not make any material alterations, renewals, replacements, or additions to the Hotel that would materially change the Design Theme, character, or appearance of the Hotel, unless such repairs, alterations, renewals, replacements, or additions are required by Applicable Law, or are otherwise required for the continued safe and orderly operation of the Hotel. In the event Franchisee makes any material alterations, renewals, replacements, or additions to the Hotel that would change the Design Theme, character, or appearance of the Hotel, and in Franchisor's Reasonable Business Judgment are not in accordance with the Approved Quality Standards and the Standards, as applicable, Franchisor may declare this Agreement to be in default and will notify Franchisee in writing of same.

B.    Franchisee agrees that significant renovations of Guestrooms, Guestroom corridors and Public Facilities, including (i) replacement of Soft Goods at least every five (5) to seven(7) years after the date such Soft Goods were installed and (ii) replacement of Case Goods at least every ten (10) to fourteen (14) years after the date such Case Goods were installed are typically required to maintain a Hotel in a first-class condition depending on occupancy, wear and tear and changes in style; provided, however earlier or more frequent renovations or replacements may be necessary to maintain the quality level of the Hotel in compliance with the Approved Quality Standards and to comply with the Quality Assurance Program, and the Standards to the extent applicable. Franchisee may request in writing sixty (60) days prior to the date on which the Early Termination Notice is due that Franchisor provide a summary of those items that would be subject to a Soft Goods or Case Goods replacement in the next five –year period in order for the Hotel to continue to meet the Approved Quality Standards and Standards, in Franchisor's Reasonable Business Judgment. In the event Franchisee fails to make periodic

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

renovations and maintain the Hotel in accordance with the Approved Quality Standard, Franchisor may declare this Agreement to be in default and will notify Franchisee in writing of same.

## 12.    SYSTEM AND STANDARDS

12.1    Compliance with System and Standards.

A.    Franchisee agrees that conformity with all aspects of the System, the Approved Quality Standards, and the Standards, as applicable, is essential in order to maintain the quality and guest service of System Hotels and to enhance public acceptance of and demand for System Hotels. Therefore, Franchisee agrees that it will comply with the Standards in all matters involving the Hotel, and operate the Hotel in compliance with the System, this Agreement, and the other Marriott Agreements.

B.    Franchisor will make the Standards available to Franchisee either in paper copy or in digital, electronic, or computerized form or in some other form now existing or hereafter developed. Franchisee must pay the charges for access to Franchisor's intranet. The charges will be computed on a fair and consistent basis among similarly situated System Hotels receiving access to the systems where the Standards are located at the time such access is provided. Any increase in the charges will be generally consistent with historical increases in such amounts, to the extent applicable. The Standards will at all times remain the sole property of Franchisor and its Affiliates. Franchisee will at all times ensure that Franchisee's copy of the Standards is kept up-to-date, and if there is any dispute as to the contents of the Standards, the then-current Standards will control.

12.2    Modification of the System and Standards.

A.    Franchisor and its Affiliates expressly reserve the right, in their Reasonable Business Judgment, to modify the System and Standards or any part of either and such modifications may include materially changing, adding, or deleting elements of the System; provided, however, that any modification of the Proprietary Marks under Section 13.2.B(3) may be made in Franchisor's sole discretion. Franchisee agrees that modifications to the System may be made for all System Hotels or for any Category thereof. If Franchisor totally changes the character and concept of the Autograph Brand (for example, to a concept of hotels for children's amusement), then Franchisee will have the right to decline to make such changes and to terminate the Agreement and have the Hotel leave the System pursuant to the Agreed Removal Process and no damages will be due to either party.

B.    Franchisor may allocate the costs of modifications to the System to System franchisees, and, in such event, Franchisee must pay its allocable share of the cost of such modifications, which will be calculated on a fair and consistent basis with other participating System Hotels at the time such modifications are implemented. Any increase in the charges will be generally consistent with historical increases in such amounts, to the extent applicable. To the extent that such modification relates to an ongoing program or system, such as the Reservation System, the Yield Management System, or Property System, or to any new Electronic Systems or other program or system, ongoing payments related to such modifications will be made in accordance with Section 3.

## 13.    PROPRIETARY MARKS AND INTELLECTUAL PROPERTY

13.1    Franchisor's Representations and Responsibility Regarding the Licensed Marks; Limitation on Liability.

A.    Franchisor represents that (i) it has submitted the applications to register the Licensed Marks and (ii) to the best of its actual knowledge: (x) Franchisor and its Affiliates have the right

to grant Franchisee the right to use the Licensed Marks and (y) there are no claims, litigation or proceedings pending or threatened by any Person that would materially affect Franchisee's use of the Licensed Marks as contemplated by the terms of this Agreement; and

B.    Franchisor will take or will cause to be taken all steps reasonably necessary to preserve and protect the ownership and validity of the Licensed Marks; provided Franchisor will not be required to maintain any registration for the Licensed Marks that Franchisor determines, in its sole discretion, cannot or should not be maintained.

C.    Subject to Franchisee's compliance with the terms of this Agreement, Franchisor will indemnify and hold Franchisee harmless against claims that Franchisee's use of the Licensed Marks infringes upon the rights of any third party unrelated to Franchisee, if Franchisee gives immediate notice of any such claim to Franchisor, permits Franchisor to have sole control over the defense and settlement of the claim, and cooperates fully with Franchisor in defending or settling the claim.

D.    Notwithstanding any other provision contained in this Agreement or any other Marriott Agreement to the contrary, the maximum liability of Franchisor in the aggregate under (i) Section 2.1 of this Agreement to the extent arising out of or resulting from the inability of Franchisee to use the Licensed Marks as contemplated by this Agreement, (ii) Section 13.1.A of this Agreement, or (iii) Section 13.1.C. of this Agreement, will, in the absence of fraud, gross negligence or willful misconduct on the part of Franchisor, not exceed the initial amount paid by Franchisee prior to the Opening Date to renovate the Hotel in compliance with the Standards, including amounts paid for signage containing Proprietary Marks, but excluding amounts paid by Franchisee for ordinary repairs and maintenance of the Hotel or for FF&E that could be used by Franchisee in the operation of the Hotel as a hotel that is not a System Hotel.

E.    At any time during the term of this Agreement, Franchisee may petition Franchisor to convert the Hotel, on the same economic conditions as those described herein, to another Brand that is licensed or franchised by Franchisor.  At the time of such petition, Franchisor will create the scope of work for the Hotel conversion for discussion with Franchisee.  Prior to any conversion, the parties will have to mutually agree upon the scope of the work, which could vary materially between the scope of work required to convert the Hotel to the Autograph Collection brand.

13.2    Franchisee's Use of System and Intellectual Property.

A.    With respect to Franchisee's use of the System and Intellectual Property under this Agreement:

(1)    Franchisee will use the System and Intellectual Property only for such uses regarding the operation of the Hotel as are expressly authorized under this Agreement or otherwise authorized by Franchisor and only in the form and manner authorized by Franchisor, and any use thereof not so authorized will constitute an infringement of Franchisor's rights as well as a material default of this Agreement;

(2)    Franchisee will use the Licensed Marks only in substantially the same places, combination, arrangement, and manner as provided in the Standards or approved by Franchisor. Franchisee will use the symbol "®," "™," "SM" or such symbols or words as Franchisor may designate to protect the Licensed Marks;

(3)    Franchisee must identify itself as a franchisee or licensee of Franchisor and the owner and/or operator of the Hotel only as allowed or required by Franchisor and only in a

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

30

manner and form designated by Franchisor. Franchisee will not use the Licensed Marks in any manner that would or could imply that Franchisee has an Ownership Interest in the Licensed Marks, including, on Franchisee's corporate letterhead, business forms, contracts, or business cards, except as set forth in the Standards;

(4)    Franchisee does not have any right to and will not Transfer, sublicense, or allow any Person to use any of the Intellectual Property, except as expressly permitted in this Agreement;

(5)    Franchisee will not use the Intellectual Property to incur any obligation or indebtedness on behalf of Franchisor or any of its Affiliates;

(6)    Franchisee will not use any mark that consists of, contains or is, in Franchisor's sole opinion, similar to any Proprietary Mark, as part of Franchisee's corporate or legal name or in connection with any business activity or venture (other than the Hotel) or as a road name or address, or apply for trademark or service mark registration of any mark that consists of, contains or is, in Franchisor's sole opinion, similar to any Proprietary Mark, in the United States or any other jurisdiction, whether alone or in combination with other trademarks, trade names, trade dress, symbols, logos, slogans, designs, insignia, emblems, devices, or service marks;

(7)    Franchisee must: (i) comply with Franchisor's instructions in filing and maintaining any required business, trade, fictitious, assumed, or similar name registrations related to the use of the Proprietary Marks if such filing is required by Applicable Law; (ii) obtain Franchisor's prior approval of any name to be so registered; and (iii) indicate in the registration documents that Franchisee has the right to use such name only subject to the terms of this Agreement. Franchisee must also execute any documents and take such other action deemed necessary by Franchisor or its counsel to protect the Proprietary Marks or maintain their validity and enforceability; and

(8)    if litigation involving the Intellectual Property is instituted or threatened against Franchisee or any notice of such infringement is received by Franchisee, or if Franchisee becomes aware of any infringement, Franchisee will promptly notify Franchisor in writing and will cooperate fully with Franchisor in Franchisor's defense or settlement of such litigation. Franchisee will not make any demand or serve any notice orally or in writing, or institute any legal action, or negotiate, litigate, compromise or settle any controversy with respect to any such litigation without first obtaining Franchisor's prior consent, which consent may be withheld in Franchisor's sole discretion. Franchisor will have the right to bring such action and to join Franchisee as a party to any action in which Franchisor is or may be a party as to which Franchisee is or would be a necessary or proper party.

B.    Franchisee agrees that:

(1)    Franchisor and its Affiliates are, in the aggregate, the owners or licensees of all right, title, and interest in and to the System (other than Electronic Systems provided by or licensed by third parties) and the goodwill associated with and symbolized by the Proprietary Marks;

(2)    the Proprietary Marks are valid and serve to identify the System and those who hold rights to operate hotels under the System;

(3)    the Proprietary Marks and other aspects of the System are subject to replacement, addition, deletion, and other modification by Franchisor (or the Affiliate that owns the Proprietary Marks) in its sole discretion. If any such action is taken by Franchisor (or the Affiliate that owns the Proprietary Marks), Franchisee will promptly accept and use such replacement, addition,

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

31

deletion, and other modification, and, in the case of the Proprietary Marks, display such changed Proprietary Marks as if they were part of the System as of the Effective Date (and replace, add, remove or modify the Proprietary Mark(s) that have been so changed), and Franchisee will bear the cost of conforming the Hotel to any such replacement, modification, addition, deletion, or other change;

(4)     During the Term and thereafter, Franchisee will not directly or indirectly (i) attack the ownership, title or rights of Franchisor or its Affiliates in and to any part of the System; (ii) contest the validity of any part of the System, or the right of Franchisor to grant to Franchisee the use of any part of the System (other than Electronic Systems provided by or licensed by third parties) in accordance with this Agreement; (iii) take any action or refrain from taking any action that could impair, jeopardize, violate, or infringe any part of the System; (iv) claim adversely to Franchisor or its Affiliates any right, title, or interest in and to the System; or (v) misuse or harm or bring into dispute the System;

(5)     Franchisee has no Ownership Interest in the System. Franchisee's use of the Intellectual Property and other aspects of the System under this Agreement (including any modifications, derivatives or additions thereto proposed by or on behalf of Franchisee or its Affiliates) will not give Franchisee any Ownership Interest or other interest in or to the Intellectual Property or any other aspect of the System, except the nonexclusive license granted by this Agreement. Franchisee hereby assigns (and will cause each of its employees or independent contractors who contributed to such modifications, derivatives or additions to assign) to Franchisor, in perpetuity throughout the world, all rights, title and interest (including the entire copyright and all renewals, reversions and extensions thereof) in and to all modifications, derivatives or additions to the Intellectual Property and other aspects of the System proposed by or on behalf of Franchisee or its Affiliates. To the maximum extent permitted by Applicable Law, Franchisee waives (and will cause each of its employees or independent contractors who contributed to such modifications, derivatives or additions to waive) all rights of "droit moral" or "moral rights of authors" or any similar rights that Franchisee (or its employees or independent contractors) may now or hereafter have in the modifications, derivatives and additions to the Intellectual Property and other aspects of the System proposed by or on behalf of Franchisee or its Affiliates. Franchisee agrees to execute (or cause to be executed) and deliver to Franchisor any documents and to do any acts that may be deemed necessary by Franchisor to perfect or protect the title in the modifications, derivatives or additions herein conveyed, or intended to be conveyed now or in the future;

(6)     all goodwill arising from Franchisee's use of the System (other than Electronic Systems provided by or licensed by third parties) and any other aspect of the System will inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement, no monetary amount will be assigned as attributable to any goodwill associated with Franchisee's use of any aspect of the System and upon such termination or expiration, Franchisee will not be required to pay to Franchisor additional amounts for such goodwill; and

(7)     the rights in, and license of, the System granted hereunder to Franchisee are nonexclusive, and thus Franchisor and its Affiliates may:

(a)     use and may grant franchises and/or licenses to others to use the System, and otherwise profit from the System; and

(b)     establish, develop, franchise, and license other systems that use the Intellectual Property and other aspects of the System, without offering or providing Franchisee any rights in, to, or under such other systems.

C.     The provisions of this Section 13.2 will survive the expiration or termination of this Agreement.

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

13.3    Franchisee's Use of Other Marks.

A.    Franchisor will provide to Franchisee and Franchisee will only use the Proprietary Marks in the manner authorized and designated by Franchisor, including in combination with the Franchisee Marks.  If Franchisee wishes to use the Proprietary Marks in a manner not previously authorized or designated by Franchisor, Franchisee will obtain Franchisor's consent prior to doing so.

B.    Franchisee will not use in connection with the Hotel any name or Other Mark that may infringe upon or tend to be confused with a third party's trade name, trademark, or other rights in intellectual property.

C.    Except as expressly set forth in Section 13.5 with respect to the Franchisee Marks, Franchisee will not use or permit the use of any Other Mark in or at the Hotel or in any Marketing Materials, advertising of, for, relating to or involving the Hotel or its operation except as provided in the Standards or other protocols or uses previously approved by Franchisor, without Franchisor's prior approval, which approval may be granted or withheld in Franchisor's sole discretion.

13.4    Internet Website.

A.    With the exception of a website that describes Franchisee's franchise relationship with Franchisor and as stated in this Section 13.4 or the Standards, Franchisee will not display the Proprietary Marks on or associate the System with (through a link or otherwise) any website, electronic Marketing Materials, domain name, address, designation, or listing on the Internet or other communication system without the express consent of Franchisor.  If Franchisor permits Franchisee to display or use the Proprietary Marks on Franchisee's Internet site, the form, content and appearance of Franchisee's Internet site, and any modifications thereto, must comply with the Standards and be approved by Franchisor before it is posted on the Internet so that Franchisor can maintain the common identity of the System Hotels and the Proprietary Marks.

B.    Franchisee acknowledges that the www.marriott.com domain name is the sole property of Franchisor and its Affiliates.  Franchisee will not, directly or indirectly, use, register, obtain or maintain a registration for any Internet domain name, address, or other designation that contains any Proprietary Mark or any mark that is in Franchisor's sole opinion confusingly similar, including misspellings and acronyms.  Upon Franchisor's request, Franchisee must promptly take all steps to cancel or transfer to Franchisor or its designee any such domain name, address, or other designation under its control.

13.5    Use of Franchisee Marks; Name of Hotel.

A.    Franchisee represents that: (i) Franchisee owns the registrations and/or the applications to register the Franchisee Marks identified on Exhibit D to this Agreement; and (ii) to the best of its actual knowledge: (x) Franchisee has the right to consent to Franchisor's use the Franchisee Marks and (y) there are no claims, litigation or proceedings pending or threatened by any Person that would materially affect Franchisor's use of the Franchisee Marks as contemplated by the terms of this Agreement.  Franchisee hereby consents to the use of the Franchisee Marks by Franchisor and its Affiliates in connection with the Hotel (including in printed marketing and promotional materials, and on Franchisor's website) and agrees that such consent shall remain in full force and effect until thirty (30) days following the earlier of (i) the termination of this Agreement for any reason or (ii) the change of the Hotel name to omit the Franchisee Marks pursuant to the terms set forth in this Section 13.5.  Franchisee agrees to not use the Franchisee Marks in connection with any hotel or other lodging product or concept,

or vacation, timesharing or fractional ownership facility, other than the Hotel or other Boscolo Group hotels. Franchisor consents to Franchisee's use of the Franchisee Marks in connection with the Proprietary Marks on the terms and conditions set forth in this Section 13.5.

B.    Franchisee will use the Franchisee Marks together with the Proprietary Marks only in connection with the Hotel the other Boscolo Group hotels, and only as authorized in advance by Franchisor in writing. Franchisee will strictly conform all uses of Franchisee Marks together with the Proprietary Marks to the content, layout and graphic design of sample materials approved in advance by Franchisor, and Franchisee shall restrict such usage to types of activity, medium or signage specifically approved in advance by Franchisor. Franchisee hereby acknowledges and agrees that, in the event Franchisee desires to modify or alter the Franchisee Marks in a material manner for use in connection with the Propriety Marks or the Hotel, Franchisee will advise Franchisor in advance of such modification or use with the Proprietary Marks or otherwise, in connection with the Hotel.

C.    Franchisee will not file, seek or make any registration containing any of the Franchisee Marks together with any Proprietary Marks except where required by Applicable Law, and such registration shall be subject to the prior written approval of Franchisor. Franchisee shall withdraw, cancel or assign to Franchisor, at Franchisor's option, any unauthorized registration upon the request of Franchisor. Franchisee shall withdraw, cancel or assign to Franchisor any authorized registration containing Proprietary Marks upon the earlier of the termination of this Agreement for any reason or the change of the Hotel name to omit the Franchisee Marks pursuant to the terms set forth in this Section 13.5.

D.    Upon termination of this Agreement for any reason, Franchisee will cease using the Proprietary Marks as specified in Section 20.1 of this Agreement, including all use of the Proprietary Marks together with the Franchisee Marks as authorized pursuant to this Section 13.5.

E.    Franchisee acknowledges and agrees that (a) it shall not acquire any right, title or interest in or to the Proprietary Marks as a result of the use of the Franchisee Marks together with the Proprietary Marks, (b) all goodwill associated with the Proprietary Marks generated by their use together with the Franchisee Marks shall inure to Franchisor, and (c) it shall not assert that the Proprietary Marks and the Franchisee Marks when used together comprise a composite mark.

F.    Franchisee hereby acknowledges and agrees that if at any time the use of the Franchisee Marks in the name of the Hotel is subject to a third-party lawsuit, Franchisee shall advise Franchisor of same. Franchisor may require that the Hotel be renamed in accordance with the Standards to a name that does not include the Franchisee Marks if the lawsuit is successful challenging the use of the Franchisee Marks, and, if the Hotel is renamed (a) Franchisee shall immediately cease using the Franchisee Marks in the name of the Hotel and any references to the Hotel, (b) Franchisee shall use the new name of the Hotel as if it had been the name of the Hotel at all times since the Effective Date (including, without limitation, in any printed marketing and promotional materials, signage, and on Franchisor's website), and (c) Franchisee shall modify or destroy, as appropriate, any items that refer to the Hotel other than by its new name, as required by the judicial decision.

## 14.    CONFIDENTIAL INFORMATION; DATA PROTECTION LAWS

14.1    Confidential Information.

A.    Franchisee will not, during the Term or thereafter, without Franchisor's prior consent, which consent may be granted or withheld in Franchisor's sole discretion, copy, duplicate, record, reproduce, in whole or in part, or otherwise transmit or make available to any "unauthorized"

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011



34

Person any Confidential Information. Franchisee may divulge such Confidential Information only to such of Franchisee's employees or agents as require access to it in order to operate the Hotel, and only if such employees or agents are apprised of the confidential nature of such information before it is divulged to them and they are bound by confidentiality obligations substantially similar to those listed above. All other Persons are "unauthorized" for purposes of this Agreement. Franchisee agrees that the Confidential Information has commercial value and that Franchisor and its Affiliates have taken reasonable measures to maintain its confidentiality, and, as such, the Confidential Information is proprietary and a trade secret of Franchisor and its Affiliates. Franchisee will be liable to Franchisor for any breaches of the confidentiality obligations in this Section 14.1 by its employees and agents. Franchisee will maintain the Confidential Information in a safe and secure location and will immediately report to Franchisor the theft or loss of all or any part of the Confidential Information.

B.     Franchisor will not, during the Term or thereafter, without Franchisee's prior consent, which consent may be granted or withheld in Franchisee's sole discretion, copy, duplicate, record, reproduce, in whole or in part, or otherwise transmit or make available to any "unauthorized" Person any Boscolo Confidential Information. Franchisor may divulge such Boscolo Confidential Information only to such of Franchisor's employees or agents as require access to it in order to operate have the Hotel be operated as a System Hotel, and only if such employees or agents are apprised of the confidential nature of such information before it is divulged to them and they are bound by confidentiality obligations substantially similar to those listed above. All other Persons are "unauthorized" for purposes of this Agreement. Franchisor agrees that the Boscolo Confidential Information has commercial value and that Franchisee and its Affiliates have taken reasonable measures to maintain its confidentiality, and, as such, the Boscolo Confidential Information is proprietary and a trade secret of Franchisee and its Affiliates. Franchisee will be liable to Franchisor for any breaches of the confidentiality obligations in this Section 14.1.B. by its employees and agents. Franchisor will maintain the Boscolo Confidential Information in a safe and secure location and will immediately report to Franchisee the theft or loss of all or any part of the Boscolo Confidential Information.

14.2     Data Protection Laws.

Franchisee will: (i) comply with all applicable Data Protection Laws, including security and confidentiality issues; (ii) comply with all of Franchisor's requirements and instructions regarding the Data Protection Laws contained in the Standards or otherwise; (iii) refrain from any action or inaction that could cause Franchisor or its Affiliates to breach any of the Data Protection Laws; (iv) do and execute, or arrange to be done and executed, each act, document and thing necessary or desirable to keep Franchisor and its Affiliates in compliance with any of the Data Protection Laws, including but not limited to processing by Franchisor and its Affiliates of any personal data communicated or in any way made available to Franchisee; and (v) reimburse Franchisor and its Affiliates for any and all costs incurred in connection with the breach by Franchisee of such Data Protection Laws or Standards or instructions of Franchisor and its Affiliates; and (vi) to the extent allowed under Applicable Law, execute or cause to be executed each act or document required to permit Franchisor and its Affiliates to use any data or other information each of them gathers concerning Franchisee, Management Company and their Affiliates in connection with the establishment and operation of System Hotels by Franchisor and its Affiliates.

## 15.     ACCOUNTING AND REPORTS

15.1     Books, Records, and Accounts.

Franchisee at its expense must maintain and preserve for the Hotel for at least five (5) years from the dates of their preparation, complete and accurate books, records, and accounts in accordance with the Uniform System and generally accepted accounting principles of Italy, consistently

applied, Applicable Law and the Standards. Franchisee's obligation to preserve such books, records and accounts will survive the expiration or termination of this Agreement.

15.2    Reports.

A.    Franchisee must, at its expense, submit to Franchisor within thirty (30) days after the close of each Accounting Period, an operating statement containing such information required by Franchisor setting forth the Gross Room Sales, including all components of its calculation and channel distribution, for such Accounting Period, which will be prepared in accordance with the Uniform System and generally accepted accounting principles of Italy, consistently applied, Applicable Law and the Standards. Franchisee must furnish Franchisor a copy of the statements from the operation of the Franchisee and its Affiliates that Franchisee files with the applicable taxing authority within thirty (30) days after such filing. The annual financial statements must be prepared in accordance with the generally accepted accounting principles of Italy, consistently applied, Applicable Law and the Standards.

B.    Franchisee must, at its expense, submit to Franchisor such other miscellaneous forms, periodic and other reports, records and other information relating to Franchisee, the Hotel and the Hotel's marketing, sales and guests as Franchisor may reasonably request, in the form and at the times and places specified by Franchisor. Franchisor has the right to access Franchisee's Property System and Reservation System directly to obtain marketing, sales and guest information, and Franchisee will take all actions reasonably necessary to provide such access. Franchisor and its Affiliates may use any data or other information each of them gathers concerning Franchisee and its Affiliates in connection with the establishment and operation of System Hotels by Franchisor and its Affiliates.

15.3    Franchisor Examination and Audit of Hotel Records.

A.    Franchisor and its authorized representatives have the right, at any time, but upon reasonable notice to Franchisee, to: (i) examine and copy, at Franchisee's expense, all books, records, accounts, and tax returns of Franchisee related to payments due under this Agreement from the operation of the Hotel during the five years preceding such examination; and (ii) have an independent audit made of any of such books, records, accounts, and tax returns for purposes of determining payments due hereunder. Franchisee must provide lodging without charge to Franchisor's representatives or independent auditors while conducting and completing such audits, and Franchisee must provide such other assistance as may be reasonably requested related to the audit. If an examination or audit reveals that Franchisee has made underpayments to Franchisor or any of its Affiliates, Franchisee must immediately pay to Franchisor or such Affiliate upon demand, the amount underpaid plus interest on the underpaid amount which will accrue thereon at a rate per annum equal to the Interest Rate from the date such amount was due until paid.

B.    If an examination or audit discloses an understatement of payments due to Franchisor of five percent (5%) or more for the period being examined or audited, or if the examination or audit reveals that the accounting procedures are insufficient to determine the accuracy of the calculation of any payments due, Franchisee must reimburse Franchisor for all costs and expenses connected with the examination or audit (including reasonable accounting and attorneys' fees). If the examination or audit establishes a pattern of underreporting, Franchisor has the right to require that the annual financial reports due under Section 15.2.A be audited by an internationally recognized independent accounting firm consented to by Franchisor. The foregoing remedies are in addition to any other remedies that Franchisor may have under this Agreement, including the right to terminate this Agreement in accordance with Section 19.

C.    If an examination or audit reveals that Franchisee has made overpayments to Franchisor or any of its Affiliates, the amount of any such overpayment, without interest, will be promptly re-paid or credited against future payments due and payable by Franchisee to Franchisor or such Affiliate as agreed by the parties.

## 16.    INDEMNIFICATION AND INSURANCE

16.1    Indemnification.

Franchisee will, and hereby does, indemnify, defend, and hold harmless Franchisor and its Affiliates, their officers, directors, agents and employees, and their respective successors and assigns, from and against all losses, costs, liabilities, damages, claims, and expenses of every kind and description, including allegations of negligence by Franchisor and its Affiliates and their officers, employees, and agents, to the fullest extent permitted by Applicable Law, and including reasonable attorneys' fees, arising out of or resulting from:  (i) the unauthorized use of the Proprietary Marks; (ii) the violation of Applicable Law; or (iii) the construction, renovation, upgrading, alteration, remodeling, repair, operation, ownership or use of the Hotel or the Approved Location (including losses, costs, liabilities, damages, claims and expenses resulting from claims that the use by Franchisor or Franchisee of the Franchisee Marks or any Other Marks used in connection with the Hotel infringes the rights of any Person or constitutes unfair competition or violates any other intellectual property, contractual or other rights of any Person) or of any other business conducted on, related to, or in connection with the Hotel or the Approved Location. Franchisee must promptly give notice to Franchisor of any action, suit, proceeding, claim, demand, inquiry, or investigation related to the foregoing. Franchisor will in any event have the right, through counsel of its choice, at Franchisee's expense, to control the defense or response to any such action to the extent such action affects the interests of Franchisor, and such undertaking by Franchisor will not, in any manner or form, diminish Franchisee's obligations to Franchisor hereunder. Under no circumstances will Franchisor or a Person indemnified hereunder be required or obligated to seek recovery from third parties or otherwise mitigate its losses in order to maintain a claim for indemnification against Franchisee under this Agreement, and the failure to pursue such recovery or mitigate a loss will in no way reduce the amounts recoverable from Franchisee by a Person indemnified hereunder. Franchisee's obligations under this Section 16.1 will survive the termination or expiration of this Agreement.

16.2    Insurance.

A.    During the Term, Franchisee, at its expense, will procure and maintain such insurance as may be required by the terms of any lease or mortgage on the Hotel premises, and in any event no less than the following:

(i)    Public liability or commercial general liability insurance on an occurrence basis against claims for bodily injury, death, or third party property damage occurring on, in, or in conjunction with the construction, renovation, or operations of the Hotel.  Such insurance will include, as applicable and, to the extent commercially reasonable and available:  (a) premises and operations; (b) liquor liability; (c) independent contractors; (d) international acts of terrorism (which coverage will not be required as of the date hereof in Prague and Budapest); (e) blanket contractual liability to include coverage insuring the indemnity found in Section 16.1; (f) products and completed operations; (g) advertising injury, personal injury; (h) incidental medical malpractice; (i) severability of interest; (j) innkeeper's and safe deposit box liability; (k) third-party motor liability or business automobile insurance providing coverage for bodily injury and property damage for owned, non-owned, and hired vehicles covering all vehicles used in conjunction with the Hotel; and (l) employers liability insurance covering all Hotel employees. All such insurance (in total) will provide worldwide defense and

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

37

indemnity (including the United States of America) with a combined single limit for each occurrence of not less than €10,000,000:

(ii)    Property insurance (or construction risk insurance during any period of construction) on the Hotel and all contents against loss or damage by risks commonly covered by an "all risk of physical loss" form, including coverage for the perils of fire, lightning, windstorm, and international acts of terrorism (to the extent available, but which coverage will not be required as of the date hereof in Prague and Budapest), all in an amount not less than the Hotel's full replacement or reinstatement cost thereof, excluding land;

(iii)    If flood insurance is excluded under the property insurance required under Section 16.2.A(ii) and the Hotel is located in whole or in part within an area identified as having a special flood hazard, Flood Insurance in an amount equal to not less than ten percent (10%) of the replacement cost of the Hotel, to the extent available at commercially reasonable terms;

(iv)    If the Hotel is located in whole or in part within an earthquake prone zone, insurance coverage for loss or damage caused by earth movement or earthquake. Such coverage, including business interruption, will be for not less than the probable maximum loss as determined by a recognized earthquake engineering firm reasonably acceptable to Franchisor, less a reasonable deductible. If Franchisee procures the insurance described in this Section 16.2.A(iv), and Franchisee participates in a blanket or shared insurance program, Franchisee will provide written notice to Franchisor if actual losses under such program erode the coverage available to the Hotel;

(v)    If excluded under the property insurance required under Section 16.2.A(ii), terrorism insurance to the extent such coverage is available at commercially reasonable terms;

(vi)    Boiler and machinery insurance against loss or damage from explosion of boilers or pressure vessels to the extent applicable to the Hotel;

(vii)    Business interruption or loss of profits insurance covering at least eighteen (18) months loss of profits and necessary continuing expenses for interruptions caused by any occurrence covered by the insurance referred to in Sections 16.2.A (ii) and (vi), including coverage for delayed opening and such insurance will name Franchisor as a loss payee as its interest may appear; and

(viii)    Workers compensation or such similar employee benefit insurance as may be required under Applicable Law covering all Hotel employees.

B.    Franchisor will have the right to require Franchisee to obtain additional or different types of insurance and/or increase the amount of coverage if, Franchisor determines such type of insurance or an increase is required to comply with the Standards or as otherwise prescribed by Franchisor.

C.    All policies will be written by insurance companies approved by Franchisor that are properly licensed in the country in which the Hotel is located, except such licensing requirement will not apply to those insurers providing umbrella excess liability above Five Million United States Dollars (US $5,000,000) under Section 16.2.A(i).

D.    Franchisee's obligation to maintain the insurance hereunder will not relieve Franchisee of its obligations under Section 16.1.

16.3    General Insurance Requirements.

A.    The comprehensive general liability, liquor liability, and umbrella excess liability policies will specifically name Franchisor, any of its Affiliates, and the employees, representatives and agents of Franchisor, and any such Affiliates as unrestricted additional insureds.

B.    The business interruption or loss of profits insurance policies must specifically note the interest of Franchisor and its Affiliates as additional insureds.

C.    No deductibles will exceed Twenty-five Thousand United States Dollars (US $25,000), unless a higher amount is approved by Franchisor.

D.    All policies under Section 16.2.A(i) will be specifically endorsed to provide that the coverages will be primary and that any insurance carried by an additional insured will be non-contributory.

E.    All policies will contain an endorsement whereby the policies will not be canceled or materially changed without at least thirty (30) days prior notice to Franchisor.

F.    All policies that have more than one named insured will contain a waiver of subrogation by the insurer in favor of all insureds.

G.    Franchisee will require all of its vendors/concessionaires to procure and maintain all appropriate insurance for services provided to guests. All such policies will specifically name Franchisor, any of its Affiliates, and the employees, representatives and agents of Franchisor, and any such Affiliates as unrestricted additional insureds.

16.4    Blanket Insurance.

All insurance required hereunder may be effected under policies of blanket insurance that cover other properties of Franchisee and its Affiliates so long as such blanket insurance fulfills the requirements herein.

16.5    Franchisee's Failure to Procure Insurance.

Should Franchisee for any reason fail to procure or maintain the insurance required by this Agreement, Franchisor will have the right and authority (without however any obligation to do so) to immediately procure such insurance and to charge the cost thereof to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting will be payable by Franchisee immediately upon notice.

16.6    Copies of Policies and Endorsements.

Certified copies or certificates of insurance of all insurance policies (evidencing the required coverages and the amount of any deductibles), endorsements and proof of premium payments must be promptly delivered to Franchisor in the English language in accordance with the notice requirements of Section 25.1 with the added notation: Attention: Insurance Department. Renewal certificates (or certified copies of such insurance policy, if requested by Franchisor) will be delivered to Franchisor, in the English language, not less than fourteen (14) days prior to their respective inception dates. If Franchisee or its broker deliver such copies in a language other than English, and fail to have English language copies delivered within fourteen (14) days after notice to Franchisee, Franchisor will

have the right to have the copies received translated into English, and Franchisee must pay to Franchisor the costs of such translation upon notice from Franchisor.

## 17.    TRANSFERABILITY OF INTERESTS

17.1    Transfers of Interests in the Agreement.

Franchisee agrees that its rights and duties in this Agreement are personal to Franchisee, and that Franchisor entered into this Agreement in reliance on the business skill, financial capacity, and character of Franchisee and its principals and Affiliates, and that this Agreement or the rights and obligations under it are not transferable without the consent of Franchisor. Franchisee will not grant a security interest in, or otherwise pledge this Agreement as collateral.

17.2    Controlling Ownership Interest Transfers in Franchisee or the Hotel

A.    If Franchisee or any Interestholder of Franchisee or a Control Affiliate wishes to Transfer the Hotel, its Ownership Interest in the Hotel, a direct or indirect Controlling Ownership Interest in Franchisee, or effect a transaction that otherwise results in a direct or indirect change of Control in Franchisee (collectively, "Controlling Ownership Interest Transfers"), Franchisee will provide notice ("Transfer Notice") of such proposed Controlling Ownership Interest Transfer to Franchisor. The Transfer Notice will state the full name and identity of all of the parties to the proposed Controlling Ownership Interest Transfer, including Interestholders of such parties and the terms of the Transfer, together with all other related information that is reasonably requested by Franchisor. Prior Transfers of Ownership Interests by or to the same Person or an Affiliate of such Person will be considered in determining whether the proposed Transfer constitutes a Controlling Ownership Interest Transfer.

B.    Subject to Section 17.2.C., a Controlling Ownership Interest Transfer may be made, provided that (i) Franchisee provides the Transfer Notice to Franchisor at least thirty (30) days prior to such Controlling Ownership Interest Transfer; (ii) the proposed transferee has sufficient financial resources and liquidity to fulfill Franchisee's obligations under this Agreement and is capable of successfully operating the Hotel under this Agreement, as determined by Franchisor in its Reasonable Business Judgment; (iii) Franchisee and the proposed transferee execute all documents that Franchisor reasonably requires to document such Controlling Ownership Interest Transfer (iv) Franchisee is not in default under any of the Marriott Agreements; (v) the proposed transferee is (a) not a Competitor of Franchisor, (b) is not known in the community as being of bad moral character; (c) has not been convicted of a felony or indictable offence in any court, (and is not in control of or controlled by Persons who have been convicted of felonies or indictable offences in any court), and (d) is not, or has no Affiliate that is, a Specially Designated National or Blocked Person; and (vi) Franchisee pays for any reasonable outside legal expenses incurred by Franchisor in documenting such Transfer.

C.    If a Controlling Ownership Interest Transfer is made in accordance with Section 17.2.B., Franchisor will, nevertheless, have the right, for any or no reason, to notify Franchisee at any time before such Controlling Ownership Interest Transfer is consummated, that it wishes to terminate this Agreement, in which event, Franchisor and Franchisee shall enter into a mutual termination and release agreement in the form agreed to by the parties under which the parties will agree, among other things, to mutually terminate this Agreement; that neither party will be liable for any damages (except, Liquidated Damages under Section 19.3 hereof which will be due) to the other in connection with the early termination of this Agreement; and to effect an orderly removal of the Hotel from the System within ninety (90) days following the effective date of such Controlling Ownership Interest Transfer.

17.3    <u>Minority Ownership Interest Transfers</u>.

Franchisee may make a Minority Ownership Interest Transfer, provided that: (i) Franchisor is provided at least fifteen (15) days advance written notice of such Transfer; (ii) Franchisee delivers to Franchisor all documentation and information Franchisor requires with respect to transferee's corporate organization, authority, and ownership requested by Franchisor; (iii) Franchisee is not in default under any of the Marriott Agreements; and (iv) the proposed transferee is (a) not a Competitor of Franchisor, (b) is not known in the community as being of bad moral character; (c) has not been convicted of a felony or indictable offence in any court, (and is not in control of or controlled by Persons who have been convicted of felonies or indictable offences in any court), and (d) is not, or has no Affiliate that is, a Specially Designated National or Blocked Person.  In the event Franchisee fails to timely notify of such Minority Interest Transfer, but all of the other conditions of this Section are met, it will not be deemed a material default hereunder.

17.4    <u>Transfers of the Hotel to an Affiliate</u>.

Ownership Interests in the Hotel or Franchisee may be Transferred to an Affiliate that is under the direct or indirect Control of Boscolo Group, provided that: (i) Franchisor is provided at least thirty (30) days advance written notice of such Transfer; (ii) the transferee provides to Franchisor documentation acceptable to Franchisor evidencing the Transfer by which such Affiliate expressly assumes the obligations of Franchisee or Owner, as applicable, and under each other Marriott Agreement; (iii) the agreements with Boscolo Group remain in effect; (iv) Franchisee is not in default under any of the Marriott Agreements; and (v) Franchisee or Owner, as applicable, pays for any reasonable outside legal expenses incurred by Franchisor in documenting such Transfer.

17.5    <u>Transfers by Franchisor</u>.

Franchisor will have the right to Transfer this Agreement to any Person without prior notice to, or consent of, Franchisee, provided such Person (a) assumes Franchisor's obligations to Franchisee under this Agreement, (b) is an Affiliate of Franchisor or acquires substantially all of Franchisor's rights in respect of System Hotels in the relevant Category, and (c) is a Person reasonably capable of performing Franchisor's obligations under this Agreement.  Franchisee agrees that any such Transfer will constitute a release and novation of Franchisor with respect to this Agreement. This Agreement will be binding on and inure to the benefit of Franchisor and the successors and assigns of Franchisor.

17.6    <u>Proposed Transfers to Specially Designated National or Blocked Person</u>.

No Transfer of any direct or indirect Ownership Interest in Franchisee, the Hotel or any Marriott Agreement will be made to a Specially Designated National or Blocked Person or to a Person in which a Specially Designated National or Blocked Person has an interest or provides funding.  Any such Transfer will be a material default under this Agreement.

18.    **PUBLICLY-TRADED SECURITIES AND SECURITIES OFFERINGS**

18.1    <u>Franchisee's Obligations</u>.

A.    Publicly-traded securities (as defined by Applicable Law or the law of the United States of America) in Franchisee or in any Control Affiliate may be Transferred in compliance with Applicable Law without Franchisor's consent if the Transfer will not result in a Transfer of Control (as determined by Franchisor) in Franchisee or a Control Affiliate.  Any Transfer of Ownership Interests in

Franchisee or a Control Affiliate that will result in a Transfer of Control of Franchisee or any Control Affiliate (as determined by Franchisor) will be subject to Section 17.2.

B.      Without limiting Franchisor's rights under Section 17.2, in connection with any Transfer of Ownership Interests in Franchisee or a Control Affiliate involving any proposed public or private offering of securities that uses in any way the Proprietary Marks, identifies the Hotel, Franchisor or its Affiliates, or discusses the relationship between Franchisor or its Affiliates and franchisee or its Affiliates, Franchisee must also:

(1)      provide Franchisor with appropriate representation or information demonstrating the lawfulness of the offering and obtain Franchisor's consent to such use;

(2)      fully and unconditionally indemnify and hold harmless Franchisor and its Affiliates in connection with the Prospectus and the offering;

(3)      use any Proprietary Marks in the Prospectus and in any supporting or related materials only as approved by Franchisor in writing; and

(4)      submit to Franchisor for its review at least thirty (30) days before the earliest of the date on which any Prospectus is delivered to a potential investor or filed with the governmental authority responsible for the regulation of the sale of securities, a copy of the proposed Prospectus, all supporting and related materials and releases.  Franchisor, in its sole discretion, may require Franchisee to pay for its costs and expenses in performing the limited review of the proposed Prospectus in accordance with this Section 18, including attorneys' fees and expenses.

C.      If the indemnification provided for in Section 18.1.B(2) above will for any reason be unavailable or insufficient to hold Franchisor and its Affiliates harmless in respect of any claim, then Franchisee will, in lieu of indemnifying Franchisor and its Affiliates, contribute to the amount paid or payable by Franchisor and its Affiliates as a result of any such claim, action, loss liability, cost, and expense of any kind, including reasonable attorneys' fees, in respect thereof, (i) in such proportion as will be appropriate to reflect the relative benefits received by Franchisor and its Affiliates on the one hand and Franchisee and its Affiliates on the other or (ii) if (but only if) the allocation provided by clause (i) above is not permitted by Applicable Law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of Franchisor and its Affiliates on the one hand and Franchisee and its Affiliates on the other with respect to any claim, or action in respect thereof, as well as any other relevant equitable considerations. Franchisee and Franchisor agree that it would not be just and equitable if contributions under this Section 18.1 were to be determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to herein.  Franchisee's obligations under this Section 18.1 will survive the termination or expiration of this Agreement.

18.2    Limited Franchisor Consent.

Franchisor's review of the Prospectus will be conducted solely for the benefit of Franchisor to determine the accuracy and completeness of any description of Franchisor's relationship with Franchisee and compliance with the other requirements of Section 18.1 and not to benefit or protect any other Person, and its consent will not constitute any kind of authorization, acceptance or agreement, endorsement, or ratification of the offering or Prospectus, either express or implied.

## 19.    **DEFAULT AND TERMINATION**

19.1    Immediate Termination.

Franchisor may terminate this Agreement and all rights granted to Franchisee under this Agreement without affording Franchisee any opportunity to cure the material default, effective immediately upon notice to Franchisee (or upon such notice period or cure period given by Franchisor in its sole discretion or as required by Applicable Law), if:

A.    Franchisee or Boscolo Group makes a general assignment for the benefit of creditors; or proceedings for a compromise with creditors are instituted by, against, or consented to by Franchisee or Boscolo Group; or

B.    Franchisee or Boscolo Group files a voluntary petition under any bankruptcy, insolvency, liquidation, administration or similar law, or consents to an involuntary petition under any bankruptcy, insolvency, liquidation, administration or similar law filed against it, or an effective order approving an involuntary petition in bankruptcy, insolvency, liquidation, administration, or similar declaration filed against Franchisee or Boscolo Group remains unvacated ninety (90) days after the date of entry thereof; or

C.    a court of competent jurisdiction enters an effective order, judgment, or decree, on the application of a creditor, adjudicating Franchisee or Boscolo Group as bankrupt, insolvent, or similar status or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of Franchisee's or Boscolo Group's assets, and such effective order, judgment, or decree remains unstayed and in effect for a period of ninety (90) days or will be consented to by Franchisee or Boscolo Group; or

D.    execution is levied against the Hotel, Franchisee, or any material real or personal property comprising the Hotel in connection with a final judgment for the payment of money in an amount of One Million United States Dollars (US $1,000,000) or more and such remains unstayed and in effect for a period of ninety (90) days or will be consented to by Franchisee or Boscolo Group; or

E.    an effective decision of any court to foreclose any lien, mortgage, or security interest in the Hotel or any material real or personal property that is a part of the Hotel, or any security interest in Franchisee in an amount of One Million United States Dollars (US $1,000,000) or more is initiated and not vacated within ninety (90) days; or

F.    a condition of material threat or danger to public health or safety shall have occurred from the construction, renovation, repair, refurbishment, upgrading, remodeling, maintenance, or operation of the Hotel that based on available evidence could reasonably be expected to result in: (i) substantial liability or (ii) an adverse effect on the Hotel, other System Hotels, the System, the Proprietary Marks, or the goodwill associated therewith, and, if after receiving written notice, Franchisee refuses to close the Hotel or cannot restrict access or cordon off the area in a manner acceptable to Franchisor in its Reasonable Business Judgment, and is not diligently pursing the cure of such condition; provided, however, Franchisee may request that Franchisor reinstate this Agreement , and Franchisor will thereafter reinstate this Agreement, if, within six (6) months after termination under this Section 19.1.F, the threat or danger to public health or safety is eliminated and Franchisor has determined in its Reasonable Business Judgment that such reinstatement would not cause substantial liability or loss of goodwill; or

G.    Franchisee or any principal, director, officer, shareholder, or agent of Franchisee (at Franchisee's direction) contrary to the provisions of this Agreement discloses or causes to be disclosed

any Confidential Information injurious to Franchisor and fails to exercise reasonable care to prevent such disclosure; or

H.    (i) any of the representations and warranties by Franchisee under Sections 22.3, 22.4, 22.5, or 27 fails to be true and correct in any material respect when made, deemed made, furnished or as of the date of this Agreement or (ii) any of the representations and warranties by Franchisee under Sections 22.3, 22.4, 22.5, or 27 fails to be true and correct at any time during the Term; or

I.    an inspection of Franchisee's books and records under Section 15.3.B establishes a pattern of underreporting by Franchisee involving three (3) or more Accounting Periods within any twenty-four (24) month period; or

J.    Franchisee or any Interestholder of a Controlling Ownership Interest in Franchisee is or has been convicted of a felony or other similar crime or offense or has engaged in a pattern or practice of acts or conduct that is likely in Franchisor's judgment to, as a result of the adverse publicity that has occurred in connection with such offense, acts, or conduct, adversely affect the Hotel, other System Hotels, the System, the Proprietary Marks, the goodwill associated therewith or Franchisor's interests therein, any Franchisor Lodging Facility or any other business conducted by Franchisor or any of its Affiliates; or

K.    Franchisee becomes a Competitor or an Affiliate of a Competitor or a Transfer occurs that does not comply with the provisions of Section 17 or 18; or

L.    (i) Franchisee dissolves or liquidates, (ii) Franchisee loses its right to manage or operate the Hotel, (iii) Franchisee loses ownership or the right to possession of the Hotel or the Approved Location, except as otherwise provided in Section 21 or (iv) the Hotel ceases to operate as a System Hotel; or

M.    Franchisee fails to achieve the thresholds of performance established by the Quality Assurance Program and such failure has not been cured within the applicable cure period for such failure under the Quality Assurance Program; or

N.    If the Owner Agreement, if applicable, is terminated for any reason.

19.2    Termination Upon Notice with Opportunity to Cure.

Franchisor may terminate this Agreement and all rights granted to Franchisee hereunder for the reasons set forth below if (i) Franchisor gives Franchisee notice of the material default that provides thirty (30) days for cure of the material default (or such greater number of days given by Franchisor in its sole discretion or required by Applicable Law) and identifies the breach or breaches of this Agreement, and (ii) Franchisee fails to cure in the time and manner specified in the notice of material default or as specifically provided in this Section 19.2:

A.    Franchisee fails to do any of the following in a timely manner to Franchisor's satisfaction: (i) perform any of the requirements stated in the Design Review Agreement or Exhibit B by the dates required for commencement or completion of such requirements (including any extensions requested and granted in accordance with Exhibit B); (ii) begin or complete any renovation, repair, refurbishment, upgrading or remodeling of the Hotel as required by Franchisor under Section 11.1 or any Standards for the renovation, repair, refurbishment, upgrading or remodeling of the Hotel; or (iii) comply with Section 6 in connection with any renovation, repair, refurbishment, upgrading or remodeling of the Hotel.  If any default pursuant to this Section 19.2.A. cannot be cured within thirty (30) days because of

the nature of the renovation, repair, refurbishment, upgrading or remodeling of the Hotel, but Franchisee is diligently pursuing such cure, Franchisee will be given additional time reasonably necessary to complete the cure, not to exceed ninety (90) days in total; or

B.    Franchisee and its Affiliates fail to pay any indebtedness to Franchisor or any of its Affiliates when same becomes due and payable within thirty (30) days of receiving the default notice under this Section, as provided above.  Franchisor will provide notices of late payment to Franchisee in accordance with its accounts receivable protocol; or

C.    any Interestholder of a non-Controlling Ownership Interest in Franchisee, or any officer, director, or employee of Franchisee is or has been convicted of a felony or other crime or offense or has engaged in a pattern or practice of acts or conduct that is likely, as a result of the adverse publicity that has occurred in connection with such offense, acts or conduct, in Franchisor's judgment, to adversely affect the Hotel, other System Hotels, the System, the Proprietary Marks, the goodwill associated therewith or Franchisor's interests therein, any Franchisor Lodging Facility or any other business conducted by Franchisor or any of its Affiliates, and such Person is not terminated from its relationship with Franchisee within thirty (30) days of the occurrence of such event (provided, however, with respect to the termination of any officer, director, or employee of Franchisee, Franchisee will have the time period required by Applicable Law to effect such termination, and with respect to any Interestholder of a non-Controlling Ownership Interest in Franchisee, Franchisee did not use commercially reasonable efforts to terminate such relationship.  Recognizing that Franchisee may not have the contractual right to terminate the interests Interestholder of a non-Controlling Ownership Interest in Franchisee, in the event that Franchisee cannot terminate the interests of an Interestholder of a non-Controlling Ownership Interest in Franchisee after using commercially reasonable efforts, and Franchisor believes it is necessary to effect such termination, it will be a termination without payment of Liquidated Damages); or

D.    any of the Marriott Agreements or other franchise agreements entered into between Franchisor and Franchisee or any of their respective Affiliates is terminated based on default of Franchisee or its Affiliates.  The notice of default of this Agreement may run concurrently with the notice of default of the other Marriott Agreements, but shall not be earlier than the right provided in such other Marriott Agreement (provided, any termination for non-payment related to another Marriott Agreement will have the same notice and cure period provided in 19.2.B above); or

E.    Franchisee fails to fully comply with the Standards in a material manner or there occurs any other material default of this Agreement or any of the other Marriott Agreements, and Franchisee fails to cure the material default, after notice as provided above.  The initial notice of default will provide a reasonable period of time to effect a cure relative to the nature of the default.

F.    if Franchisee or Owner is in material default under the Owner Agreement, if applicable, and such default is not cured in accordance with the terms thereof.

19.3    Termination and Liquidated Damages.

A.    Franchisee has agreed to operate the Hotel as a System Hotel in compliance with this Agreement for the Term.  If Franchisee should fail to do so, Franchisee acknowledges and agrees that Franchisor would be damaged in several ways, including loss of future Franchise Fees and International Marketing Fund Charges and injury to the goodwill in the Proprietary Marks.  Franchisee acknowledges and agrees that it is difficult to estimate the revenues of the Hotel over a period of years and that elements of Franchisor's damages not directly calculated from the Hotel's revenues are inherently difficult to calculate and the proofs thereof would be burdensome and costly (although such damages are real and meaningful to Franchisor and the System).  Franchisor and Franchisee agree that Liquidated Damages

(calculated as set forth in this Section 19.3) are not a penalty and represent a reasonable estimate of just and fair compensation of Franchisor for the damages in accordance with Section 1382 of the Italian Civil Code that it would suffer if Franchisee should fail to operate the Hotel as a System Hotel in compliance with this Agreement for the Term as a result of a material default by Franchisee. Upon termination of this Agreement under Sections 19.1 and 19.2, Franchisee will promptly pay to Franchisor Liquidated Damages in an amount equal to (i) the amount set forth in Schedule 19.3.A attached hereto, if the termination takes place prior to the fifth (5th) anniversary of the Opening Date or (ii) the average monthly Franchise Fees and International Marketing Fund Charges payable to Franchisor during the previous two (2) years multiplied by twelve (12) months, if the termination takes place after the fifth (5th) anniversary of the Opening Date ("Liquidated Damages").    Franchisor and Franchisee also agree that Liquidated Damages (calculated as set forth in Section 19.3) are not a penalty and represent a reasonable estimate of just and fair compensation payable to Franchisee for the damages that Franchisee would suffer if Franchisee is prevented from operating the Hotel as a System Hotel in compliance with this Agreement for the Term as a result of a material default by Franchisor.

B.    In addition to Liquidated Damages, Franchisor will have the right to recover reasonable attorneys' fees and court costs incurred in collecting such sums plus interest on all amounts due under Section 19.3 which will accrue at a rate per annum equal to the Interest Rate from the date such Liquidated Damages are due until paid. Such legal remedies will not preclude Franchisor from any equitable remedies to which it may be entitled under Applicable Law. Franchisee's obligation to pay Franchisor Liquidated Damages, if applicable, and other sums pursuant to Section 19.3 will survive termination of this Agreement.  Payment of Liquidated Damages to Franchisor will not affect the obligations of Franchisee to take action or abstain from taking action after the termination of this Agreement as required by Section 19.3 and Section 20 or Franchisor's remedies in the event that Franchisee does not comply with its obligations thereunder.

19.4    Termination by Parties with No Default.

A.    Subject to the conditions set forth in this Section 19.4.A, either Franchisee or Franchisor shall have the right to terminate this Agreement on any of the following dates (each such date, an "Early Termination Date"): (i) the fifth (5th) anniversary of the Opening Date (the "First Early Termination Date"); (ii) the tenth (10th) anniversary of the Opening Date; (iii) the fifteenth (15th) anniversary of the Opening Date; (iv) the twentieth (20th) anniversary of the Opening Date;  or (v) the twenty-fifth (25th) anniversary of the Opening Date. The termination right provided to Franchisee and Franchisor in Section 19.4.A is subject to the satisfaction of each of the following conditions set forth in Section 19.4.A. (1) – (2) below:

(1)    the party terminating shall have given written notice (the "Early Termination Notice") to the non-terminating party of its intent to terminate this Agreement pursuant to this Section 19.4.A not later than the date that is one hundred eighty (180) days prior to the applicable Early Termination Date;  and

(2)    as of the applicable Early Termination Date, the terminating party is not in or default under, this Agreement as of the date of the Early Termination Notice.

Franchisee and Franchisor agree that each shall execute an agreed upon form of termination agreement and release and the Hotel shall discontinue as a System Hotel no later than ninety (90) days after the Early Termination Date.

B.    Subject to the conditions set forth in this Section 19.4.B, either Franchisee or Franchisor shall have the right to terminate this Agreement, along with all other franchise agreements

between Franchisor and Franchisee and Franchisee's Affiliates (the "Implementation Period Exit Right") having this right, on the second (2nd) anniversary of the Opening Date of the fourth System Hotel by Franchisee or its Affiliates (the "Implementation Period Exit Date"). The Implementation Period Exit Right provided to Franchisee and Franchisor in Section 19.4.B is subject to the satisfaction of each of the following conditions set forth in Section 19.B.4 (1) – (3) below:

(1)    the party terminating shall have given written notice (the "Implementation Period Exit Notice") to the non-terminating party of its intent to terminate this Agreement, and all other franchise agreements between Franchisor and Franchisee and Franchisee's Affiliates subject to the Implementation Period Exit Right (the "Implementation Period Exit Right Hotels"), pursuant to this Section 19.4.B not earlier than one-hundred eighty (180) days but not later than thirty (30) days prior to the Implementation Period Exit Date. Upon the delivery by Franchisee of the Implementation Period Exit Notice to Franchisor, the Restricted Territory shall terminate and Section 2.3 shall be of no further force or effect.;

(2)    the terminating party is not in default under, this Agreement as of the date of the Implementation Period Exit Date; and

(3)    at the time of termination Franchisee has not entered into any management agreement, franchise agreement, license agreement or other agreement to operate the Hotel (or any other Implementation Exit Right Hotel) under a Brand owned or licensed by a Competitor.

Franchisee and Franchisor agree to execute an agreed upon form of termination agreement and release that will provide for the orderly removal of the Hotel from the System, and the Hotel (along with the remaining Implementation Period Exit Right Hotels) shall discontinue as a System Hotel at an agreed upon date no earlier than the Implementation Period Exit Date and no later than ninety (90) days after the Implementation Period Exit Date (the "Implementation Period Exit Termination Date"). Franchisee further agrees that for a period of twenty-four (24) months following the Implementation Period Exit Termination Date that Franchisee will not enter into any management agreement, franchise agreement, license agreement or other agreement to operate the Hotel (or any other Implementation Exit Right Hotel) under a Brand owned or licensed by a Competitor ("Competitor Restriction"). In the event Franchisee or any of its Affiliates violate the Competitor Restriction, it shall be a material default hereunder, and Franchisee agrees that the damages to Franchisor's goodwill and Brand will be substantial and that Franchisor shall be entitled to the amount of Liquidated Damages due pursuant to Section 19.3 multiplied by three. Franchisee shall pay such amount to Franchisor prior to commencing operation of the Hotel or hotels under the Competitor Brand. The amount of this payment is reasonable as agreed and is not a penalty in accordance with Section 1382 of the Italian Civil Code.

In the event Franchisee has four (4) or more hotels open and operating as System Hotels, and Franchisee notifies Franchisor in writing that it has closed the termination window by waiving its Implementation Period Exit Right for all such Hotels operated under the System by Franchisee and its Affiliates prior to the Implementation Period Exit Termination Date, Franchisor will waive its Implementation Period Exit Right. The parties shall execute an amendment to this Agreement, and the franchise agreements for the other Implementation Exit Right Hotels, and this provision will not longer have any force or affect. For the avoidance of doubt, a Transfer of a single hotel prior to the Implementation Period Exit Termination Date shall not be deemed the exercise of the Implementation Period Exit Right, and such Transfer will be covered by Section 17.

C.    If, after the second (2nd) anniversary of the Opening Date but prior to the fifth (5th) anniversary of the Opening Date, during any twelve month period (a "Distribution Channel Test Measurement Period"), the following aspects of the Reservation System, as it may exist (GDS;

Marriott.com, and all Marriott reservation call centers), fail to provide gross reservations (total reservations before any reservation changes or cancellations ("Gross Reservations"), as reflected in the MRDW Source Activity Reports, on average (arithmetic mean of all Boscolo Luxury Hotels then active in the System) of at least twenty-five percent (25%) of the total number of Room Nights (produced during any Distribution Channel Test Measurement Period, provided that the Conditions (set forth in Section 19.4.C) are met, either Franchisee or Franchisor will have the right to notify the other party that the Distribution Channel Test (defined below) was failed in accordance with Section 19.4.C and that such party desires to terminate this Agreement (the "Distribution Channel Termination Notice"). For illustration purposes, the Distribution Channel Test for hypothetically four hotels of distribution percentages of 20%, 20%, 30% and 30% would be 25% ((20%+20%+30%+30%)/4=25%). The determination regarding whether the target percentage of Gross Reservations set forth above is met during any Distribution Channel Test Measurement Period is referred to herein as a Distribution Channel Test ("Distribution Channel Test"). A termination of this Agreement pursuant to this provision is referred to herein as a "Distribution Channel Test Termination."

(1)    Upon written notice delivered within thirty (30) days after the third (3rd) anniversary of the Opening Date, but prior to the fifth (5th), anniversary of the Opening Date, if the Hotel has failed the Distribution Channel Test, either Franchisor or Franchisee may notify the other party that it desires to terminate this Agreement one-hundred and eighty (180) days after delivery of the Distribution Channel Termination Notice. Provided the Conditions have been met as described in 19.4.C. below, the termination will take place effective on the end of the first Accounting Period following such one hundred eighty (180) day period.

(2)    Franchisee's right to terminate this Agreement pursuant to this Section 19.4.C is subject to the satisfaction of the following conditions (the "Conditions"), as applicable:

(a)    At all times throughout each Distribution Channel Test Measurement Period, Franchisee must have: (i) installed and used at the Hotel a 2-way interface between the Hotel's Property System and the Reservation System that meets Franchisor's then-current Standards; (ii) preferred placement contracts with Amadeus, Sabre, and Galileo in effect; (iii) participated in and used for the Hotel the Marriott Enterprise Property Information Center (EPIC) hotel identification and database system, the MARRFP web-based rate collection tool, and the Marriott Reservations Data Warehouse (MRDW); and (iv) subscribed to and used the Hotellingence report and the FuturePace report at the Hotel. Additionally, at all times during each Distribution Channel Test Measurement Period, (u) Franchisee shall not have been in material default of the Franchise Agreement and shall have paid in full all fees and other amounts owing to Franchisor and its Affiliates at the time that the Distribution Channel Termination Notice is provided to Franchisor, (v) the Hotel shall not have been in the Yellow Zone or Red Zone (or equivalent non-passing standards) under the Quality Assurance Program at any time during the applicable Distribution Channel Test Measurement Period, (w) the Hotel shall not have been subject to a renovation or remodeling program that affected more than twenty-five percent (25%) of the Guestrooms or twenty-five percent (25%) of the public space of the Hotel at any time during the applicable Distribution Channel Test Measurement Period, (x) Franchisee must have accepted all reservations provided to the Hotel through the Reservation System, unless Franchisee was in an oversold position, (y) Franchisee did not establish or utilize any other reservation system for the Hotel other than the Reservation System, and (z) no casualty affecting ten percent (10%) or more of the Guestrooms has occurred at any time during the applicable Distribution Channel Test Measurement Period. For the avoidance of any doubt, it is not a Condition that Franchisee participate in any ARSO. If Franchisee should, however, decide to join any ARSO, any and all reservations produced by the ARSO shall be included in the calculation of Gross Reservations during any Distribution Channel Test Measurement Period.

(b)    Franchisee shall provide Franchisor with all documentation and other evidence reasonably requested by Franchisor to substantiate Franchisee's right to terminate and shall permit Franchisor to audit Franchisee's reservations and occupancy records to confirm the failure of Distribution Channel Test, such audit to occur within thirty (30) days of Franchisor's receipt of any notification from Franchisee under Section 19.4.C .

D.    If Franchisee or Franchisor fail to timely submit the notice of termination to the other party in accordance with Section 19.4.A, 19.4.B, or 19.4.C, as applicable, the rights provided for such termination shall expire.

E.    If the parties fail to agree on the calculation of any Distribution Channel Test, the Key Money Repayment Test, or whether any action taken by Franchisor was subject to the exercise of Franchisor's Reasonable Business Judgment, either party may seek resolution of the matter by an Expert (as defined below) in accordance with this Section 19.4.E:

(1)    The use of the Expert will be the exclusive remedy of the parties and neither party shall attempt to adjudicate any dispute in any other forum. The decision of the Expert shall be final and binding on the parties and shall not be capable of challenge, whether by arbitration, in court or otherwise.

(2)    Each party shall be entitled to make written submission to the Expert, and if a party makes any submission it shall also provide a copy to the other party and the other party shall have the right to comment on such submission. The parties shall make available to the Expert all books and records relating to the issue in dispute and shall render to the Expert any assistance requested of the parties. The costs of the Expert and the proceedings shall be borne equally by the parties or as otherwise directed by the Expert.

(3)    The terms of engagement of the Expert shall include an obligation on the part of the Expert to: (i) notify the parties in writing of his or her decision within fifteen (15) days from the date on which the Expert has been selected (or such other period as the parties may agree); and (ii) establish a timetable for the making of submission and replies.

(4)    For purposes of this Section 19.4.E., "Expert" means an independent, internationally recognized hotel consulting firm or individual who is qualified to resolve the issue in question, and who is appointed in each instance by agreement of the parties or, failing agreement, each party shall select one (1) such internationally recognized consulting firm or individual to be the Expert. Each party agrees that it shall not appoint an individual as an Expert hereunder if the individual is, as of the date of the appointment or within six (6) months prior to such date, employed by such party, either directly or as a consultant, in connection with any other matter. In the event that either party calls for an Expert determination pursuant to the terms hereof, the parties shall have ten (10) days from the date of such request to agree upon an Expert and, if they fail to agree, each party shall have an additional ten (10) days to make its respective selection of a firm or individual, and within ten (10) days of such respective selections, the two (2) respective firms and/or individuals so selected shall select another internationally recognized consulting firm or individual to be the Expert. If either party fails to make its respective selection of a firm or individual within the ten (10) day period provided for above, then the other party's selection shall be the Expert. If the two (2) respective firms and/or individuals so selected shall fail to select a third internationally recognized consulting firm or individual to be the Expert, then such Expert shall be appointed by the International Chamber of Commerce and shall be a qualified person having at least ten (10) years recent professional experience as to the subject matter in question.

F.    If at any time during the Term (i) Franchisor notifies Franchisee in writing that Franchisor is no longer pursuing the development of hotels under the System or (ii) after Franchisee has six (6) hotels open and operating under the System for at least thirty (30) months and Franchisor does not have agreements signed providing for at least fifty (50) hotels to be operated under the System ( in either case, the "System Growth Test"), Franchisee may notify the Franchisor that it desires to terminate this Agreement one-hundred and eighty (180) days after delivery of the (the "System Growth Test Termination Notice").  Provided the conditions have been met as described in the System Growth Test, the termination will take place effective on the end of the first Accounting Period following such one hundred eighty (180) day period following deliver of the System Growth Test Termination Notice to Franchisor.

G.    A termination by either party pursuant to this Section 19.4, will not be a default by either party and the non-terminating party will not be entitled to any damages as a result of such termination (except as expressly provided herein).  In the event that Franchisee fails to comply with all of its obligations under Section 20.1. or 19.4.B(4) after a termination pursuant to this Section 19.4, it will be a material default hereunder that will be deemed to have survived such termination, and Franchisor will be entitled to damages hereunder.

19.5    Termination for Material Default by Franchisor.

Franchisee may terminate this Agreement and all rights granted to Franchisee hereunder for the reasons set forth below if (i) Franchisee gives Franchisor notice of the material default that provides thirty (30) days for cure of the material default (or such greater number of days given by Franchisee in its sole discretion or required by Applicable Law) and identifies the breach or breaches of this Agreement, and (ii) Franchisor fails to cure in the time and manner specified in the notice of material default or as specifically provided in this Section 19.5:

A.    if Franchisor is in material default of Section 2.3 and Franchisor fails to cure such default with sixty (60) days of receipt of written notice from Franchisee; or

B.    if Franchisor fails to provide a Reservation System for a period of thirty (30) consecutive days or more than sixty (60) days in a consecutive twelve (12) month period; or

C.    Franchisor is found by arbitration to be in material default of this Agreement and Franchisee is entitled to terminate this Agreement as matter of law.

Upon such termination, the parties will proceed pursuant to the Agreed System Removal Process described in Section 20.1.C., and Franchisor will promptly pay the Liquidated Damages amounts due to Franchisee, after offsetting any amounts due from Franchisee pursuant to Section 20.1, and such payment will be deemed to satisfy all claims Franchisee has for the early termination of this Agreement and loss of future revenues or benefits under this Agreement, including any claims for damages or costs Franchisee has expended to convert to a System Hotel.  The amount of this payment is reasonable as agreed and is not a penalty in accordance with Section 1382 of the Italian Civil Code.

19.6    Termination by Either Party for Any Reason.

Either party may terminate this Agreement at anytime for any reason or no reason at all by providing written notice of its intent to terminate this Agreement to the other party accompanied by payment of the Liquidated Damages due hereunder (collectively, the notice and the payment, the "Intended Termination and Liquidated Damages Pre-payment").  Upon delivery of the Intended Termination and Liquidated Damages Prepayment, the parties shall proceed pursuant to the Agreed

system Removal Process described in Section 20.1.C., such payment will be deemed to satisfy all claims Franchisor has for the early termination of this Agreement based on the loss of future Franchise Fees or International Marketing Charges due under this Agreement., and all claims Franchisee has for the early termination of the Franchise Agreement and loss of any future revenues or benefits from the use of the System, including any claims for damages or costs Franchisee has expended to convert to a System Hotel. The amount of this payment is reasonable as agreed and is not a penalty in accordance with Section 1382 of the Italian Civil Code.

19.7    Early Termination Rights..

Franchisee acknowledges that Law No. 129/04 of May 6, 2004 and Regulation No. 204/2005, Article 3, paragraph 3 requires that the Franchisee be given a minimum term of the franchise agreement sufficient to amortize the investment and that the term shall not be less than 3 years, except for the cases where the agreement is terminated due to a breach of one of the parties.    Notwithstanding the requirements of the Italian Franchise Disclosure Law, Franchisee is a subsidiary of the Boscolo Group, which is currently through its subsidiaries operating multiple hotels under the Boscolo Luxury Hotel Brand and the B4 Hotel Brand, and has requested that Franchisor agree to the provisions of Section 19.4 and 19.6 of this Agreement which permit the Agreement to be terminated prior to the third anniversary of the Opening Date without default or breach by one of the parties.  Boscolo Group has made this request because Boscolo Group wants the freedom convert back from operating as a System Hotel and to continue to operate the hotels, including the Hotel, as they are operated today under the Boscolo Luxury Brand in the event it chooses to do so.  Boscolo Group believes that the specific costs to convert to a System Hotel is relatively small, when compared to its investment in the Hotel, and that Franchisee will fully amortize the costs to convert in twenty-four (24) months.   Franchisee acknowledges that Franchisor does not generally grant early termination rights and that it grants franchises for a term of twenty (20) years or more, and that as a condition to agreeing to Franchisee's request, Franchisor has requested that these early termination rights be reciprocal and that Franchisor would not have agreed to grant Franchisee the early termination rights without such reciprocity.  Franchisee further acknowledges and agrees that such reciprocal termination rights on behalf of Franchisor are fair, just, and bargained for, and consideration for Franchisor agreeing to such rights granted to Franchisee.

## 20.    POST-TERMINATION

20.1    Franchisee Obligations.

A.    Upon expiration or other termination of this Agreement, all rights granted under this Agreement to Franchisee will immediately terminate, and Franchisee, at its expense, will comply with each of the following obligations:

(1)    Franchisee will immediately cease to operate the Hotel as a System Hotel and will not directly or indirectly represent or give the impression that it is a present or former franchisee or licensee of Franchisor or that the Hotel was previously part of the System;

(2)    Franchisee will immediately and permanently cease to use and remove from the Hotel and any other place of business any Intellectual Property and any other identifying characteristics and marks of the System, including any Electronic Systems, signs, fixtures, furniture, furnishings, equipment, advertising materials, stationery, supplies, forms, or other articles that display any Proprietary Marks or any trade dress or other distinctive features or designs associated with Franchisor or the System.  Any signs containing any Proprietary Marks that Franchiseé is unable to remove from the Hotel despite its best efforts upon termination or expiration of this Agreement will be completely covered by Franchisee from view and physically removed within twenty-four (24) hours after termination or

expiration. Franchisee also will immediately remove all content regarding Franchisor, the System, and the Proprietary Marks from any Internet sites under its control and will take all necessary actions required by Franchisor to disassociate itself from Franchisor on the Internet. Franchisee will, at Franchisor's option, cancel or assign to Franchisor or its designee, any domain name owned by or under the control of Franchisee or its Affiliates that contains any Proprietary Mark, or any mark that is in Franchisor's sole opinion confusingly similar, including misspellings and acronyms;

(3)    Franchisee must take such action as may be necessary to cancel any fictitious, trade, or assumed name or equivalent registration that contains any Proprietary Mark or any variations thereof, and Franchisee must furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement;

(4)    Franchisee will immediately turn over to Franchisor the originals and all copies of any Confidential Information, Intellectual Property, and all other System materials relating to the operation of the Hotel and the System, or such other information generated by Franchisee through its use of the System that is deemed confidential by Franchisor, all of which are acknowledged by Franchisee to be Franchisor's property. Franchisee will not retain a copy or record of any of the foregoing, except for Franchisee's copy of this Agreement, any correspondence between the parties, and any other documents that Franchisee reasonably needs for compliance with any provisions of Applicable Law. If Franchisor permits Franchisee to continue to use any Intellectual Property after the termination or expiration date (such permission to be explicit and specific), such use by Franchisee will be in accordance with the terms of this Agreement;

(5)    Franchisee agrees that it will make no use of any of the Confidential Information or System or disclose or reveal it or any portion thereof to anyone not employed by Franchisor or its franchisees or licensees. Franchisor agrees that it will make no use of the Boscolo Confidential Information after termination or disclose or reveal it or any portion thereof to anyone not employed by Franchisee. Additionally, Franchisee will not assist anyone not franchised or licensed to use the System in constructing or equipping any hotel premises incorporating the distinctive features or equipment layout that Franchisor (or any of its Affiliates) owns, has originated, or developed and which are identifying characteristics of businesses using the System; and

(6)    Franchisee must maintain a conspicuous sign at the registration desk in a form specified by Franchisor, stating that the Hotel is no longer associated with System Hotels for a period of thirty (30) days following termination, unless the Hotel is re-branded under another brand affiliation that clearly demonstrates to the public that the Hotel is no longer affiliated with the System. Franchisee will in good faith advise all customers and prospective customers that Franchisee has reason to believe are expecting that they are booking at a hotel affiliated with the System that the Hotel is no longer associated with System Hotels. Franchisee agrees that its failure to comply with any of the requirements of this Section 20.1.A will cause irreparable injury to Franchisor.

B.    Upon expiration or other termination of this Agreement, Franchisee will promptly pay: (i) all amounts owing to Franchisor and any of its Affiliates; (ii) if this Agreement is terminated as a result of a default by Franchisee, any costs and expenses incurred by Franchisor, or fees charged by Franchisor, in connection with removing the Hotel from the System; and (iii) without limiting Franchisee's obligations that relate to the period prior to the date of such termination, an amount equal to a reasonable estimate of costs and fees incurred or that will be incurred based bookings as of the date of removal, but not yet accumulated, billed and/or invoiced, which will be due on the date Franchisee is notified of such amount. Franchisor is entitled to receive interest on any amount not paid when due hereunder which will accrue at a rate per annum equal to the Interest Rate from the date such payment was due.

C.      In the event this Agreement is terminated for any reason that is expressly subject to this Section 20.1.C., the parties shall agree on a date on which the Hotel will leave the System that is no earlier than thirty (30) but no longer than ninety (90) days from the date of the termination notice. Franchisee and Franchisor will execute an agreed upon form of termination agreement and release that will provide for the orderly removal of the Hotel from the System, and the Hotel will discontinue as a System Hotel on such agreed upon date (the "Agreed System Removal Process), and Franchisee shall comply with all obligations set forth in the Section 20.1.

20.2    Franchisor's Rights Upon Termination or Expiration.

Upon or prior to the termination or expiration of this Agreement, Franchisor may give notice of the pending expiration or termination of this Agreement to, and take such other action relating to, customers, suppliers, travel agents, wholesalers, concessionaires, and other Persons that might be affected by such expiration or termination.

20.3    Survival.

The rights and obligations of the parties under this Section 20 will survive termination or expiration of this Agreement.

## 21.    **CONDEMNATION AND CASUALTY**

21.1    Condemnation.

Franchisee will, at the earliest possible time, give Franchisor notice of any proposed taking by nationalization, expropriation, eminent domain, condemnation, compulsory acquisition, or similar proceeding. If such taking is substantial enough to render impractical the continued operation of the Hotel in accordance with the System and guest expectations, this Agreement will terminate upon notice by Franchisor or Franchisee to the other party and the execution and delivery of a termination agreement and release in form and substance acceptable to Franchisor and Franchisee, and Franchisor and Franchisee will share equitably in the award; provided, however, Franchisor's portion of such award will be limited to compensating Franchisor for Franchisor's lost Franchise Fees under this Agreement, which amount will not exceed the amount of the Liquidated Damages due under Section 19.3. Further, if such condemnation is the sole basis for termination of this Agreement, Franchisor's portion of such award will be in lieu of payment of the Liquidated Damages due under Section 19.3. If such taking, in the reasonable opinion of the parties, will not render the continued operation of the Hotel impractical, Franchisee must promptly make whatever repairs and restorations are necessary to make the Hotel conform substantially to its condition, character, and appearance immediately before such taking, according to the Approved Quality Standard. Franchisee will take all measures necessary to ensure that the resumption of normal operation of the Hotel is not unreasonably delayed.

21.2    Casualty.

If the Hotel is damaged or destroyed by fire or other cause and such damage or destruction is substantial and material, affecting over fifty percent (50%) of the Hotel, and necessitates the closing of the Hotel for a period in excess of ninety (90) days, Franchisee will have the right to terminate this Agreement upon notice to Franchisor given within ninety (90) days of such closing of the Hotel if it elects not to repair or rebuild the Hotel. Franchisee will not be required to pay Franchisor the Liquidated Damages due under Section 19.3 in connection with such termination if such casualty is the sole basis for termination of this Agreement. Franchisee agrees to execute and deliver to Franchisor a termination agreement and release in form and substance acceptable to Franchisor and Franchisee; provided, however, if subsequent to such notice and before the date on which the Term would otherwise have ended under Section 4 if such notice of termination had not been given (the "Term Expiration Date"), Franchisee or

any of its Affiliates or any Interestholder in Franchisee with an Ownership Interest of twenty percent (20%) or greater operates a hotel; vacation, timesharing, interval or fractional ownership facility; condominium; apartment; or other lodging product at the Approved Location (the "Other Lodging Product"), which Other Lodging Product is not operated under a license or franchise from Franchisor or one of its Affiliates, then in such event, Franchisee will be obligated to promptly pay to Franchisor an amount equal to the applicable Liquidated Damages set forth in Section 19.3, but clause (ii) in the calculation of liquidated damages in Section 19.3 will be the lesser of (a) twelve (12) or (b) one-half (1/2) the number of months then remaining between (x) the date upon which the Other Lodging Product is first operated, and (y) the Term Expiration Date. Franchisee's obligation set forth in this Section 21.2 will survive termination of this Agreement. If the Hotel does not close for ninety (90) days or Franchisee does not elect to terminate this Agreement in accordance with the provisions of this Section 21.2, the Hotel will be promptly renovated and reopened within a reasonable time in accordance with the System and pursuant to plans and specifications meeting the Approved Quality Standard in accordance with Section 6.2.

## 22.    COMPLIANCE WITH LAWS; LEGAL ACTIONS

22.1    Compliance with Laws.

A.    Franchisee will comply with all Applicable Law, and will obtain in a timely manner all permits, certificates, and licenses necessary for the full and proper operation of the Hotel and compliance with the Marriott Agreements. Franchisee will forward to Franchisor within seven (7) days of Franchisee's receipt copies of all inspection reports, warnings, certificates, and ratings issued by any governmental entity related to the Hotel that indicate a material failure to meet or maintain governmental standards regarding health or life safety or any other material violation of Applicable Law that may adversely affect the operation or financial condition of the Hotel or Franchisee.

B.    Franchisee will, if required by Applicable Law, timely file, register, or report this Agreement or the payments to be made hereunder, as applicable, to the appropriate governmental authorities having jurisdiction over the Hotel or this Agreement. If Franchisee is required to file a version of this Agreement in a language other than English to satisfy Applicable Law, Franchisee will be responsible for all costs incurred in producing such version, together with any other fees or costs that may be incurred in making such filing, registration, or report and obtaining any approval. Franchisee must provide a copy of all materials prepared in satisfaction of Applicable Law to Franchisor for Franchisor's review and confirmation that such translation or report accurately reflects the terms of this Agreement before furnishing such materials to any governmental authority. If the time for delivery does not provide sufficient time for review and comment by Franchisor, Franchisee will amend such materials as requested by Franchisor upon receipt of such comments and amend its filing with such governmental authority.

22.2    Notice Regarding Legal Actions.

Franchisee will notify Franchisor within fourteen (14) days: (i) after Franchisee has received notice or has knowledge of the commencement of any material action, suit, or other proceeding that involves the Hotel or Franchisee; or (ii) after Franchisee has received notice or has knowledge of the commencement of any action, suit, or other proceeding that involves Franchisor or Franchisor's relationship with Franchisee or the Hotel; or (iii) after Franchisee has received notice or has knowledge of the issuance of any judgment, order, writ, injunction, award, or other decree of any court, agency, or other governmental instrumentality that may adversely affect the operation or financial condition of the Hotel or Franchisee. Nothing in this Section 22.2, however, will abrogate any notice requirement that Franchisee may have under any insurance program or contract.

22.3    Foreign Corrupt Practices Act.

Franchisee agrees that as of the Effective Date, a copy of the FCPA is available at http://www.justice.gov/criminal/fraud/fcpa. Franchisee represents that it has a copy of, and is familiar with, the FCPA and the purposes of the FCPA, and in particular, the FCPA's prohibition of the payment or the gift of any item of value, either directly or indirectly, by a company organized under the laws of the United States of America, or any of its states, to an official of a foreign government for the purpose of influencing an act or decision in such Person's official capacity, or inducing such Person to use influence with the foreign government to assist a company in obtaining or retaining business for, with, or in that foreign country or directing business to any Person or obtaining an improper advantage. Franchisee has not taken, and during the Term, will not take any action that would constitute a violation of the FCPA or any similar law.

22.4    Specially Designated National or Blocked Person.

Franchisee represents and warrants to Franchisor that: (i) neither Franchisee (including any and all of its directors and officers) nor any of its Affiliates or the funding sources for any of the foregoing is a Specially Designated National or Blocked Person; (ii) neither Franchisee nor any of its Affiliates is directly or indirectly owned or controlled by the government of any country that is subject to an embargo by the United States government; and (iii) neither Franchisee nor any of its Affiliates is acting on behalf of a government of any country that is subject to such an embargo. Franchisee agrees that it will notify Franchisor in writing immediately upon the occurrence of any event that would render the foregoing representations and warranties of this Section 22.4 incorrect.

22.5    Anti-Money Laundering Acts.

Franchisee represents and warrants that it is, and during the Term will remain, in full compliance with Applicable Law of Italy or any other country in which Franchisee or any principal thereof conducts business that prohibits unfair, fraudulent, or corrupt business practices in the performance of its obligations under this Agreement and related activities, including any such actions or inactions that would constitute a violation of Applicable Law regarding money laundering or terrorist financing, and acknowledges the importance to Franchisor, the System, and the parties' relationship of Franchisee's continuing compliance with the requirements of this Section 22.5. Franchisee agrees to take all steps necessary to require its consultants, agents, and employees to comply with such laws prior to engaging or employing any such persons.

22.6    Waiver of Punitive Damages.

**FRANCHISEE AND FRANCHISOR EACH HEREBY ABSOLUTELY, IRREVOCABLY AND UNCONDITIONALLY WAIVES THE RIGHT TO CLAIM OR RECEIVE PUNITIVE DAMAGES IN ANY ARBITRATION, LITIGATION, ACTION, CLAIM, SUIT OR PROCEEDING, AT LAW OR IN EQUITY, ARISING OUT OF, PERTAINING TO OR IN ANY WAY ASSOCIATED WITH THE COVENANTS, UNDERTAKINGS, REPRESENTATIONS OR WARRANTIES SET FORTH HEREIN, THE RELATIONSHIPS OF THE PARTIES HERETO, WHETHER AS "FRANCHISEE" OR "FRANCHISOR" OR OTHERWISE, THIS AGREEMENT OR ANY OTHER MARRIOTT AGREEMENT, OR ANY ACTIONS OR OMISSIONS IN CONNECTION WITH ANY OF THE FOREGOING.**

22.7    Block Exemption.

Franchisor and Franchisee acknowledge and agree that the franchise is granted on the assumption that this Agreement complies, and will continue to comply, with the European Commission's Block Exemption Regulation for Vertical Agreements (EU No. 330/2010) (the "Regulation") and with Article 101 of the Treaty on the Functioning of the European Union ("Article 101") and with the official interpretative guidelines of 2010, and any successor to the Regulation and to the guidelines. If, at any time during the term of this Agreement, questions arise concerning this Agreement's compliance with the Regulation, the parties agree to use their best efforts and to cooperate with each other to amend this Agreement either to bring it into conformity with the requirements of the Regulation or to seek an alternative way to comply with Article 101. If, in Franchisor's sole judgment, this Agreement cannot be modified to comply with Article 101, including the Regulation, without undermining material elements of the franchise relationship, Franchisor may, at its option, without liability for such action or any further obligation to Franchisee, terminate this Agreement and the franchise upon 30 days' written notice to Franchisee. In such event, the post-termination obligations described in Article 20 of this Agreement will apply; provided that Franchisee shall not be obligated to pay liquidated damages pursuant to Section 19.3.

## 23.    RELATIONSHIP OF PARTIES

23.1    Reasonable Business Judgment.

Except where Franchisor has reserved "sole discretion" or as otherwise indicated in this Agreement, Franchisor agrees to use "Reasonable Business Judgment" when discharging its obligations or exercising its rights or discretion under this Agreement, including with respect to any consents and approvals and the administration of Franchisor's relationship with Franchisee. "Reasonable Business Judgment," with respect to the System, means that Franchisor's action or inaction has a business basis that is intended to: (i) benefit the System or the profitability of the System, including Franchisor and Franchisee's generally, regardless of whether some individual hotels may be unfavorably affected; (ii) increase the value of the Proprietary Marks; (iii) increase or enhance overall hotel guest or franchisee or owner satisfaction; or (iv) minimize possible brand inconsistencies or customer confusion. If Franchisor's action or exercise of discretion is unrelated to the System (e.g., is related to a requested approval with respect to the Hotel), as described above, Reasonable Business Judgment means that Franchisor has a business basis, has treated Franchisee on a fair and consistent basis with similarly situated hotels in both the System and in Franchisor's other Brands generally, and has not acted in bad faith. To the extent that any implied covenant, such as the implied covenant of good faith and fair dealing, or civil law duty of good faith is applied to this Agreement, Franchisor and Franchisee intend that Franchisor will not have violated such covenant or duty if Franchisor has exercised Reasonable Business Judgment. Any dispute as to whether Franchisor has exercised Reasonable Business Judgment under this Agreement shall first be submitted for Expert determination in accordance with Section 19.4.E., prior to filing any claim for arbitration.

23.2    Independent Contractor.

A.    This Agreement does not create a fiduciary relationship between Franchisor and Franchisee. Franchisee is an independent contractor, and nothing in this Agreement is intended to constitute either party as an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose, except, that Franchisor will have the right to act on Franchisee's behalf as Franchisee's agent for purposes of booking reservations at the Hotel.

       B.     Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty, or representation on Franchisor's behalf or to incur any debt or other obligation in Franchisor's name.

## 24.  GOVERNING LAW; INJUNCTIVE RELIEF; COSTS OF ENFORCEMENT

24.1   Governing Law.

       A.     This Agreement is executed pursuant to, and will be interpreted and construed under the laws of England and Wales, without regard to the conflict of laws provisions of such jurisdiction. Nothing in this Agreement is intended, or will be deemed, to make the Maryland Franchise Registration and Disclosure Law apply to this Agreement, or the transactions or relationships contemplated hereby, if such law otherwise would not be applicable.

       B.     Franchisee and Franchisor hereby expressly and irrevocably submit themselves to the non-exclusive jurisdiction of the Admiralty and Commercial Registry of the High Court of Justice, Queen's Bench Division, London, England for the purpose of resolving any Dispute under Section 24.4.G concerning this Agreement or any other Marriott Agreements. So far as is permitted under the laws of the England and Wales, this consent to personal jurisdiction will be self-operative.

24.2   Injunctive Relief.

       Franchisor will be entitled to injunctive or other equitable or judicial relief, without the necessity of proving the inadequacy of money damages as a remedy, without the necessity of posting a bond, and without waiving any other rights or remedies at law or in equity, for any actual or threatened material breach or violation of this Agreement or the Standards.

24.3   Costs of Enforcement.

       If for any reason it becomes necessary for either party to initiate any legal or equitable action to secure or protect its rights under this Agreement, the prevailing party will be entitled to recover all costs incurred by it in successfully enforcing such rights, including reasonable attorneys' fees.

24.4   Arbitration.

       A.     Except as otherwise specified in this Agreement, any Dispute will be finally settled under the Rules of Arbitration of the International Chamber of Commerce (the "ICC Rules") for commercial disputes (or any similar successor rules) as are in force on the date when a notice of arbitration is received.

       B.     The arbitrator(s) will be appointed in accordance with the ICC Rules. The number of arbitrators will be one, unless either party to the arbitration requests otherwise, in which case there will be three. If the arbitral tribunal will consist of three arbitrators, each party will select one arbitrator and the ICC will select the third. The language of the arbitration will be English. The place of arbitration will be Paris, France.

       C.     The decision of the arbitral tribunal will be final and binding upon the parties, and such decision will be enforceable through any courts having jurisdiction. The arbitral tribunal will have no authority to amend or modify the terms of this Agreement. The arbitral tribunal will have the right to award or include in their award any relief they deem proper in the circumstances, including money damages (with Interest on unpaid amounts from the date due), specific performance and legal fees

and costs in accordance with this Agreement; however, the arbitral tribunal may not award punitive, consequential or exemplary damages. The costs and expenses of arbitration will be allocated and paid by the parties as determined by the arbitral tribunal.

      D.     The arbitral tribunal will have the authority to make such orders granting interim or provisional relief during the pendency of the arbitration as it deems just and equitable. Any such order will be without prejudice to the final determination of the controversy.

      E.     Any arbitration proceeding under this Agreement will be conducted on an individual (not a class-wide) basis and will not be consolidated with any other arbitration proceedings to which Franchisor is a party, except as specified below. No decision on any matter in any other arbitration proceeding in which Franchisor is a party will prevent any party to the arbitration proceeding from submitting evidence with respect to the same or a similar matter or prevent the arbitral tribunal from rendering an independent decision without regard to such decision in such other arbitration proceeding.

      F.     Franchisor may, without waiving any rights it has under this Agreement, seek from a court having jurisdiction any interim or provisional relief that may be necessary to protect its rights or property (including any aspect of the System, or any reason concerning the safety of the Hotel or the health and welfare of any of the Hotel's guests, invitees or employees).

      G.     Notwithstanding any provision in this Section 24.4 to the contrary, if Italy at any time is not, or ceases to be, a party to The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (June 10, 1958; 21 U.S.T. 2517, T.I.A.S. No 6997, 330 U.N.T.S. 38) (1959), or any successor law, treaty or convention regarding the recognition and enforcement of foreign arbitral awards, then Franchisor may, in its sole discretion commence an action in the Admiralty and Commercial Registry of the High Court of Justice, Queen's Bench Division, London, England. **IN THE EVENT THAT ANY PARTY IS REQUIRED TO COMMENCE AN ACTION IN A COURT FOR ANY REASON RELATED TO THIS AGREEMENT OR THE RELATIONSHIP CREATED HEREBY OR IF THIS ARBITRATION PROVISION IS DEEMED UNENFORCEABLE, FRANCHISEE AND FRANCHISOR EACH HEREBY ABSOLUTELY, IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY.**

      H.     The provisions of this Section 24.4 will survive the expiration or termination of this Agreement.

      I.     Any Dispute to be settled by arbitration under this Section 24.4 will at the request of Franchisor be resolved in a single arbitration before a single tribunal together with any Dispute arising out of or relating to this Agreement, any of the Marriott Agreements or any other agreement between or among Franchisee, Boscolo Group and any Owner and their respective Affiliates on the one hand and Franchisor or its Affiliates on the other and, notwithstanding anything in Section 24.4.E to the contrary, the arbitrator(s) will be appointed in accordance with the ICC Rules for multi-party arbitration.

## 25.  NOTICES

    25.1   Notices.

      A.     Subject to Section 25.1.B, all notices, requests, demands, statements, and other communications required or permitted to be given under the terms of this Agreement will be in writing, in the English language, and delivered by hand against receipt or carried by reputable overnight/international courier service, to the respective party at the following addresses:

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

To Franchisor:

> Marriott International, Inc.
> 10400 Fernwood Road
> Bethesda, MD 20817
> United States of America
> Attn: Sr. Vice President & Associate General Counsel, Franchise
> Telephone: (1) (301) 380-9555
>
> Global Hospitality Licensing S.à r.l.
> c/o International Hotel Licensing Company S.à r.l.
> Postfach 3053
> Bahnhofplatz 14
> CH-8021 Zürich
> Switzerland
> Attn: Sr. Vice President Associate General Counsel
> Telephone: +41-44-723-5100
> Fax: +41-44-723-5151

If sent by international overnight courier services:

> Global Hospitality Licensing S.à r.l.
> c/o International Hotel Licensing Company S.à r.l.
> Bahnhofplatz 14
> CH-8001 Zürich
> Switzerland
> Tel: +41-44-723-5100
> Fax: +41-44-723-5151

with a copy to:

> Marriott International, Inc.
> 10400 Fernwood Road
> Bethesda, MD 20817
> United States of America
> Attn: International Lodging Operations
> Telephone: (1) (301) 380-8326

To Franchisee:

> BH 5 S.p.A.
> Via Uruguay 47
> Padova, Italy
> Attn: Presidente del Consiglio di Amministrazione Boscolo Group S.p.A.
> *pro-tempore*
> Telephone: + 39 0497620111
> E-mail: presidenza@boscolo.com

or at such other address as designated by notice from the respective party to the other party. Any such notice or communication will be deemed to have been given at the date and time of: (i) receipt or first

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

59

refusal of delivery if delivered by hand or; (ii) two days after the posting thereof if sent via reputable overnight/international courier service.

        B.    Franchisor may provide Franchisee with routine information, invoices, the Standards and other System requirements and programs, such as the Quality Assurance Program, including any modifications thereto, by regular mail or by e-mail, facsimile, or by making such information available to Franchisee on the Internet, an extranet, or other electronic means.

## 26.    CONSTRUCTION AND SEVERABILITY; APPROVALS, CONSENTS AND WAIVERS; ENTIRE AGREEMENT

26.1    Construction and Severability.

        A.    Except as expressly provided to the contrary in this Agreement, each section, part, term and/or provision of this Agreement, including Section 16.1, will be considered severable; and if, for any reason any section, part, term, or provision is determined to be invalid, unenforceable or contrary to, or in conflict with, any existing or future Applicable Law or by an arbitral tribunal, a court or agency having valid jurisdiction, such will not impair the operation of, or have any other effect upon, such other sections, parts, terms, and provisions of this Agreement as may remain otherwise intelligible, and the latter will continue to be given full force and effect and bind Franchisor and Franchisee. To the extent possible, such invalid or unenforceable sections, parts, terms, or provisions will be deemed to be replaced with a provision that is valid and enforceable and most nearly reflects the original intent of the invalid or unenforceable provision.

        B.    No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor will be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each will be cumulative of every other right or remedy.

        C.    Nothing in this Agreement is intended, or will be deemed, to create any third party beneficiary or confer any rights or remedies under or by reason of this Agreement upon any Person other than Franchisor (and its Affiliates) or Franchisee, and their respective permitted successors and assigns.

        D.    When this Agreement provides that Franchisor may take or refrain from taking any action or exercise discretion, such as rights of approval or consent, or to modify the System or any part of it, or to make other determinations or modifications under this Agreement, Franchisor may do so from time to time.

        E.    Unless otherwise stated, references to Sections are to Sections of this Agreement.

        F.    Unless otherwise stated, references to Exhibits, Attachments or Addenda are to Exhibits, Attachments and Addenda to this Agreement, and all of such are incorporated by reference into this Agreement.

        G.    Words importing the singular include the plural and vice versa as the context may imply. Words importing a gender include each gender as the context may imply.

        H.    References to days, months, and years are to calendar days, calendar months, and calendar years, respectively.

I.    The words "include," "included" and "including" will be terms of enlargement or example (meaning that, for instance, "including" will be read as "including but not limited to") and will not imply any restriction or limitation unless the context clearly requires otherwise.

J.    Captions and section headings are used for convenience only. They are not part of this Agreement and will not be used in construing it.

26.2    Approvals, Consents and Waivers.

Except as specifically provided in Sections 9.3.C. and 9.4.B., or in Exhibit B, approvals, designations, and consents required under this Agreement will not be effective unless evidenced by a writing signed by the duly authorized officer or agent of the party giving such approval or consent. No waiver, delay, omission, or forbearance on the part of Franchisor or Franchisee to exercise any right, option or power arising from any default or breach by the other party, or to insist upon strict compliance by the other party with any obligation or condition hereunder, will affect or impair the rights of Franchisor or Franchisee, respectively, with respect to any such default or breach or subsequent default or breach of the same or of a different kind. Any delay or omission of either party to exercise any right arising from any such default or breach will not affect or impair such party's rights with respect to such default or breach or any future default or breach. Franchisor will not be liable to Franchisee for providing (or denying) any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement or by reason of any delay or denial of any request. With respect to items submitted for Franchisor's approval, if Franchisor does not respond within fifteen (15) days, and Franchisee desires to use such items in connection with the Hotel or to take action with respect to the matter for which Franchisee has requested approval, Franchisee shall send a formal notice of its intent to use such items or take such action pursuant to Section 25 of this Agreement, and if Franchisor fails to respond within ten (10) additional days, Franchisee shall have the right to use such items of take such action. Franchisor shall have the right to later disapprove such use or action; provided, however, Franchisor must take into consideration any commitments Franchisee has made with respect to such use or action, including cost and duration (e.g., costs of creating such Marketing Materials and duration of time commitment, such as lease of a billboard for one year), and compensate Franchisee fairly for such costs if Franchisor requires Franchisee to discontinue such use or action prior to Franchisee receiving the benefit to be derived therefrom.

26.3    Entire Agreement.

As of the date of this Agreement, this Agreement, including, all exhibits, attachments, and addenda, and the Marriott Agreements contain the entire agreement between the parties as it relates to the Hotel and the Approved Location. Nothing in this Agreement, however, is intended to require Franchisee to waive reliance on any representations contained in the Disclosure Document. This is a fully integrated agreement.

26.4    Amendments.

No agreement of any kind relating to the matters covered by this Agreement will be binding upon either party unless and until the same has been made in a written, non-electronic instrument that has been duly executed by the non-electronic signature of all interested parties. This Agreement may only be amended in a written, non-electronic instrument that has been duly executed by the non-electronic signature of all interested parties and may not be amended or modified by conduct manifesting assent, or by electronic signature, and each party is hereby put on notice that any individual purporting to amend or modify this Agreement by conduct manifesting assent or by electronic signature is not authorized to do so.

## 27.    REPRESENTATIONS, WARRANTIES AND COVENANTS

27.1    Existence and Power; Authorization; Contravention.

A.    Each party represents, warrants and covenants that: (i) it is a legal entity duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation; (ii) it and its Affiliates have and will continue to have the ability to perform its obligations under this Agreement; and (iii) it has and will continue to have all necessary power and authority to execute and deliver this Agreement.

B.    Each party represents, warrants and covenants that the execution and delivery of this Agreement and the performance by such party of its obligations hereunder: (i) have been duly authorized by all necessary action; (ii) do not require the consent, vote, or approval of any third parties (including lenders) except for such consents as have been properly obtained; and (iii) do not and will not contravene, violate, result in a breach of, or constitute a default under (a) its certificate of formation, operating agreement, articles of incorporation, by-laws, or other governing documents, (b) any Applicable Law; or (c) any agreement, indenture, contract, commitment, restriction or other instrument to which it or any of its Affiliates is a party or by which it or any of its Affiliates is bound.

C.    Franchisee represents and warrants that all of the representations and warranties that all financial and corporate information provided in connection with this Agreement, was true, correct and complete as of the time made and as of the date hereof, regardless of whether such representations and warranties were provided by Franchisee, one of its Affiliates, or by a third party on behalf of Franchisee, unless Franchisee has notified Franchisor of a change in the representations and warranties or the financial or corporate information and Franchisor has approved the change.

27.2    Ownership of Franchisee.

Franchisee represents and warrants to Franchisor that Franchisee is owned directly and indirectly as set forth on Exhibit A. Upon the request of Franchisor, Franchisee will submit to Franchisor evidence, in form and substance satisfactory to Franchisor, confirming that Franchisee is owned directly and indirectly as set forth on Exhibit A.

27.3    Ownership of the Hotel.

Franchisee hereby represents, warrants and covenants to Franchisor that (i) Franchisee is the holder of a leasehold interest in the Hotel; (ii) Owner holds good and marketable fee title to the Approved Location; (iii) the Lease grants Franchisee full and exclusive control of the Hotel and all rights, powers and authority with respect to the Hotel required or desirable for the performance of Franchisee's obligations hereunder.  To the extent that the Lease provides that any of the obligations of Franchisee hereunder are to be performed by Owner, Franchisee agrees that it will cause Owner to perform such obligations in accordance with this Agreement.  Franchisee acknowledges and agrees that neither the existence of the Lease nor any terms thereof that require Owner to perform obligations of Franchisee hereunder will serve as an assignment of such obligation to Owner (or Franchisor's consent thereto) or will relieve Franchisee of any obligation under this Agreement, and Franchisee covenants that the Lease shall in no way limit or restrict Franchisor's rights or remedies under this Agreement.

27.4    <u>Additional Franchisee Acknowledgments and Representations.</u>

A.    IN ENTERING THIS AGREEMENT, FRANCHISEE REPRESENTS AND WARRANTS THAT IT DID NOT RELY ON, AND FRANCHISOR AND FRANCHISOR'S REPRESENTATIVES HAVE NOT MADE, ANY PROMISES, REPRESENTATIONS, WARRANTIES OR AGREEMENTS RELATING TO FRANCHISING THE HOTEL OR THE APPROVED LOCATION, EXCEPT AS EXPRESSLY CONTAINED IN THIS AGREEMENT.

B.    FRANCHISEE AGREES THAT THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT INVOLVES SUBSTANTIAL BUSINESS RISKS, IS A VENTURE WITH WHICH FRANCHISEE IS FAMILIAR AND HAS RELEVANT EXPERIENCE AND ITS SUCCESS WILL BE LARGELY DEPENDENT UPON THE ABILITY OF FRANCHISEE AS AN INDEPENDENT BUSINESS. FRANCHISOR EXPRESSLY DISCLAIMS THE MAKING OF, AND FRANCHISEE AGREES FRANCHISEE HAS NOT RECEIVED, ANY INFORMATION, WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS, OR SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED BY THIS AGREEMENT. IF FRANCHISOR FURNISHES ADVICE, CONSULTATION, TRAINING, OR OTHER FORMS OF ASSISTANCE IN CONNECTION WITH THE HOTEL OR THE APPROVED LOCATION WITH REGARD TO MATTERS SUCH AS FINANCING, DESIGN, CONSTRUCTION, RENOVATION, MENU PLANNING, OPERATION AND MANAGEMENT OF THE HOTEL, FRANCHISOR DOES NOT GUARANTEE OR ASSURE THE SUCCESS OR SATISFACTORY RESULT OF SUCH MATTERS AND FRANCHISOR WILL NOT THEREBY INCUR ANY LIABILITY OR BE RESPONSIBLE IN ANY WAY FOR ANY ERROR, OMISSION OR FAILURE OF WHATEVER NATURE IN SUCH FINANCING, DESIGN, CONSTRUCTION, RENOVATION, MENU PLANNING, OPERATION OR MANAGEMENT OF THE HOTEL OR THE APPROVED LOCATION.

C.    FRANCHISEE ACKNOWLEDGES THAT IT HAS READ AND UNDERSTOOD THE FRANCHISE DISCLOSURE DOCUMENT PROVIDED TO FRANCHISEE IN COMPLIANCE WITH ITALIAN LAW, THIS AGREEMENT, INCLUDING THE EXHIBITS AND ATTACHMENTS AND ADDENDA HERETO, IF ANY, AND RELATED AGREEMENTS, IF ANY, AND FRANCHISEE HAS HAD AMPLE TIME AND OPPORTUNITY TO CONSULT WITH ADVISORS AND LEGAL COUNSEL OF FRANCHISEE'S OWN CHOOSING ABOUT THE POTENTIAL BENEFITS AND RISKS OF ENTERING INTO THIS AGREEMENT. FRANCHISEE AGREES THAT FRANCHISEE HAS HAD AN OPPORTUNITY TO NEGOTIATE THIS AGREEMENT, AND HAS FULLY NEGOTIATED, THE ESSENTIAL STIPULATIONS OF THIS AGREEMENT AND THAT SUCH STIPULATIONS WERE NOT UNILATERALLY IMPOSED ON IT BY FRANCHISOR. FRANCHISEE AGREES THAT IT HAS RECEIVED THAT DISCLOSURE DOCUMENT AND HELD THAT DISCLOSURE DOCUMENT AND FRANCHISE AGREEMENT FOR MORE THAN THIRTY (30) DAYS PRIOR TO EXECUTING THIS AGREEMENT.

D.    FRANCHISEE REPRESENTS, WARRANTS AND COVENANTS THAT ITS PRINCIPALS RECEIVED ON JANUARY 8, 2011 FRANCHISOR'S INTERNATIONAL DISCLOSURE DOCUMENT FOR SYSTEM HOTELS DATED MAY 1, 2010 (THE "DISCLOSURE DOCUMENT") CONTAINING, AMONG OTHER INFORMATION, ALL THE INFORMATION REQUIRED BY LAW NO. 129/04 OF MAY 6, 2004 AND REGULATION NO. 204/2005 (THE "ITALIAN DISCLOSURE LAW"). FRANCHISEE HAS HAD A FULL AND ADEQUATE OPPORTUNITY TO READ AND REVIEW THE DISCLOSURE DOCUMENT (INCLUDING WITHOUT LIMITATION ITEMS 5, 6 AND 7) AND THIS AGREEMENT (INCLUDING WITHOUT LIMITATION SECTIONS 3, 6.1.B, 6.2, 8, 9.1, 10.1.C, 10.2, 12.2.B, 16.2, 17.2, 17.6 AND EXHIBIT B) AND TO BE THOROUGHLY ADVISED BY LEGAL COUNSEL.

E.    FRANCHISEE ACKNOWLEDGES THAT IT IS AN ENTREPRENEUR WITH SIGNIFICANT KNOWLEDGE OF THE HOTEL SECTOR AND HOTEL FRANCHISES AND BELONGS TO A GROUP THE BUSINESS ACTIVITY OF WHICH INCLUDES HOTEL OWNERSHIP, MANAGEMENT AND OPERATION.

27.5    Ownership and Operation of the Boscolo Hotel Brands.

Franchisor acknowledges that the Boscolo Group directly and indirectly through its subsidiaries owns the Boscolo Luxury Hotel Brand and the B4 Hotel Brand. So long as Boscolo Group Controls the Boscolo Luxury Hotel Brand and the B4 Hotel Brands, and the following conditions are met, Boscolo Group and its subsidiaries will not be deemed a Competitor for purposes of this Agreement: (i) the Boscolo Luxury Hotel Brand and the B4 Hotel Brand will be operated by separate and distinct corporate entities; (ii) the Persons responsible for the day to day management and operational decisions of the Boscolo Luxury Hotel Brand hotels and shall be different from the Persons responsible for the day-to day operation of the B4 Brand hotels (other than the officers and directors of the Boscolo Group); (iii) no Person (other than the officers and directors of the Boscolo Group) responsible for operation of the B4 Hotel Brand hotels will have access to any of the Franchisor's Confidential Information and none of the Franchisor's Intellectual Property will be utilized in connection with the B4 Hotel Brand; and (iv) in the event that the Boscolo Luxury Hotel Brand at any time has more than twelve (12) luxury hotels that are not operated as System Hotels or under other Brands owned or licensed by Franchisor or its Affiliates or the B4 Hotel Brand at any time has more than forty-five (45) hotels (and such B4 Brand Hotels are not operated under a license with Franchisor or its Affiliates), then the parties shall establish a formal separation plan to ensure that the Boscolo Hotel Brands can be operated at the hotel level in such a way as to have no interference or adverse impact with the operation of the Hotel as a System hotel. In the event the parties cannot agree on a separation plan, the parties agree that the Hotel may be removed from the System in accordance with the Agreed System Removal Process, and neither party will be liable to the other for any damages.

## 28.    MISCELLANEOUS

28.1    Confidential Negotiated Changes.

Franchisee acknowledges and agrees that the terms of this Agreement and all exhibits, attachments or addenda or other agreements ancillary to, or executed in connection with this agreement, that have been negotiated ("negotiated terms") from the standard form of agreements set forth in the Disclosure Document are strictly confidential and Franchisee will not disclose such negotiated terms to any Person without the prior consent of Franchisor except (1) as required by law, (2) as may be necessary to enforce this Agreement in any legal proceedings, or (3) to those of Franchisee's managers, members, officers, directors, employees, attorneys, accountants, agents or lenders as is necessary for the operation or financing of the Hotel. It will be a material default hereunder if Franchisee, its managers, members, officers, directors, employees, attorneys, accountants, agents or lenders disclose the negotiated terms to any unauthorized Person without the prior consent of Franchisor.

28.2    Translations.

All written materials, including this Agreement, the Standards, the Software any other documents, forms, agreements, manuals, and advertising materials provided by Franchisor or its Affiliates to Franchisee will be in the English language. Franchisee may translate any such materials into any other language; provided, however, that any such translation must be approved by Franchisor prior to any use (except as provided in Section 22.1.B), and, provided, further, that Franchisee will modify such non-

597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

English language materials as required in this Agreement. All translations will be at the sole cost and expense of Franchisee. Franchisor or its Affiliates will own all such translated materials and all copyrights in any such translated materials will be assigned by Franchisee to Franchisor or its designated Affiliate upon Franchisor's request. Franchisee will obtain any necessary agreement with any translator that such translation will be the sole property of Franchisor or its Affiliates. In determining the purpose and intent of any provision, the English language version will control.

### 28.3    Multiple Counterparts.

This Agreement may be executed in a number of identical counterparts, each of which will be deemed an original for all purposes and all of which will constitute, collectively, one agreement. Delivery of an executed signature page to this Agreement by electronic transmission will be effective as delivery of a manually signed counterpart of this Agreement.

### 28.4    Effectiveness of the obligations under the Agreement

Notwithstanding anything to the contrary contained in this Agreement, prior to the Implementation Period Exit Date, Franchisee shall have no obligation under this Agreement and may terminate this Agreement at any time prior to the Implementation Period Exit Date without penalty, and thereafter this provision shall have no further force or effect.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement, under seal, as of the Effective Date.

FRANCHISOR:

**GLOBAL HOSPITALITY LICENSING S.À R.L.**

By: _____ (SEAL)
Name:  Carlton C. Ervin
Title:    Chief Development Officer, Europe Division

FRANCHISEE:

**BH 5 S.p.A.**

By: _____ (SEAL)
Name:  Angelo Sesillo Boscolo
Title:    Presidente CdA

## EXHIBIT A

### APPROVED LOCATION, NUMBER OF GUESTROOMS AND OWNERSHIP INTERESTS IN FRANCHISEE

1.    Approved Location of the Hotel:

        Corso Matteotti, 4-6, Milan, Italy

2.    Approved Number of Guestrooms:

        151

3.    Name of Entity That Will Operate the Hotel:

        BH 5 S.p.A.

4.    Ownership Interest(s) in Franchisee:

| Name of Owner | Address | % Interest |
|---|---|---|
| **BH 5 S.p.A.** | | |
| Boscolo Hotels S.p.A. | Via Uruguay 47, Padova Italy | 100.00 |
| **Boscolo Hotels S.p.A.** | | |
| Boscolo Group S.p.A. | Via Uruguay 47, Padova Italy | 65.56 |
| Boscolo International S.A. Societè anonyme | | 33.78 |
| Angelo Boscolo Sesillo | | 0.165 |
| Rosanno Boscolo Sesillo | | 0.165 |
| Romano Boscolo Sesillo | | 0.165 |
| Giorgio Boscolo Sesillo | | 0.165 |
| **Boscolo Group S.p.A.** | | |
| Angelo Boscolo Sesillio | | 0.04 |
| Boscolo 5 S.A.S. di Boscolo Sesillo Angelo & C. | | 99.96 |
| **Boscolo 5 S.A.S. di Boscolo Sesillo Angelo & C.** | | |
| Angelo Boscolo Sesillo | | 33.40 |
| Romano Boscolo Sesillo | | 33.30 |
| Giorgio Boscolo Sesillo | | 33.30 |



597814v2 – Exedra Milan
Master - 591851v6
07/01/2011

66

**EXHIBIT B**

**CONVERSION RIDER**

Franchisee agrees to upgrade and renovate the Hotel at the Approved Location in accordance with the following terms and provisions to be authorized to operate the Hotel as a System Hotel and to use the System:

1.    Renovation of the Hotel.

A.    Franchisor and Franchisee have inspected the Hotel and, based on such inspection, have agreed to the construction, upgrading and renovation requirements (the "Scope of Work") for the Hotel to become a System Hotel and to use the System. The Scope of Work is set forth in Attachment One to this Conversion Rider and must be completed in compliance with this Agreement, the Design Review Agreement and the System requirements. All work, including, furniture, fixtures, equipment, furnishings, materials and signs in the Scope of Work must conform to Approved Quality Standards or the System Standards, as applicable. Franchisee agrees that it will be required to complete the requirements in the modified Scope of Work to Franchisor's satisfaction in addition to the other requirements in this Conversion Rider before it will to be authorized to operate as a System Hotel and to use the System. Franchisee must cooperate fully with any inspections conducted by Franchisor to confirm compliance with the Approved Quality Standards or the Standards, applicable.

B.    Franchisee must commence performance of the items in the Scope of Work no later than twelve (12) months after the Implementation Period Exit Date (the "Conversion Work Commencement Date Deadline"), unless Franchisor has agreed in writing to an extension of such deadline. Franchisee will notify Franchisor of the date Franchisee commences performance of the items in the Scope of Work (the "Conversion Work Commencement Date") within ten (10) days after it occurs and, if requested, Franchisee agrees to submit to Franchisor evidence of the commencement of the performance of such items. Franchisee will maintain continual renovation of the Hotel after the Conversion Work Commencement Date and will complete renovation, upgrading and furnishing the Hotel in accordance with the Design Review Agreement, this Exhibit B and this Agreement so that the Opening Date is not later than twenty-four (24) months after the Implementation Period Exit Date (the "Opening Date Deadline"). Time is of the essence, but the Conversion Work Commencement Date Deadline and the Opening Date Deadline will be equitably extended by reason of any delay caused by acts of God, the public enemy, strikes, war, governmental restrictions, or other causes beyond Franchisee's control (excluding for the avoidance of doubt, unavailability of financing), except that no such extension will be made for aggregate delays in excess of thirty (30) days unless a request for additional time is made in writing to Franchisor giving reasons for the delay, and under no circumstances will such extension exceed one hundred and eighty (180) days. In addition, upon Franchisee's written request and provided Franchisee has diligently pursued renovation of the Hotel, Franchisor may, in its sole discretion, extend the Conversion Work Commencement Date Deadline and the Opening Date Deadline. Extension requests will be considered in increments of one or more months, provided, however, no more than two (2) extensions totaling six (6) months in the aggregate will be considered. Any extension of the Conversion Work Commencement Date Deadline will automatically extend for the same period the Opening Date Deadline.

C.    Franchisee will obtain all permits and certifications required for lawful renovation, upgrading and operation of the Hotel, including zoning, access, sign, building permits and fire requirements, and will certify in writing to Franchisor, if requested, that all such permits and certifications have been obtained.

D. Franchisee will possess or obtain adequate financing for renovation, upgrading and furnishing the Hotel and Franchisee will bear the entire cost of renovation, upgrading, equipping, supplying and furnishing the Hotel, including all FF&E, Electronic Systems and other items and equipment for opening the Hotel as specified by Franchisor for the System.

E. Franchisee will ensure that the Hotel complies with Applicable Law and the Standards, including Franchisor's Fire Protection and Life Safety standards (even if such standards exceed local code requirements).

F. In connection with the completion of the Scope of Work, Franchisee will make an investment in the Hotel and incur costs to satisfy the requirements of the Scope of Work. Franchisee has estimated that the cost for the investments described in the Scope of Work is approximately Two Hundred Fifty Thousand Euros (€250,000). In addition, Franchisor has provided to Franchisee the Disclosure Document, which details other current fees and costs in Items 5, 6 and 7. Franchisee acknowledges that it has received all the information required under the Italian Disclosure Law related to investment and costs that will be incurred in connection with the grant of the franchise under this Agreement and that given its experience in the construction, ownership and operation of hotels in Italy, including the Hotel, it has undertaken its own analysis of the investment and costs to be incurred under this Agreement and acknowledges that it participated with Franchisor in determining the estimates for the costs for the investments set forth in this Section 1.F. Franchisee further acknowledges that Franchisor is relying on Franchisee's representations that it can complete the Scope of Work for the amount estimated above, that Franchisor has advised Franchisee that the actual amount for completing the Scope of Work may exceed the estimated amount, and that Franchisee is solely responsible for all amounts to complete the Scope of Work, including any amounts in excess of the estimated amount.

2. <u>Opening Date</u>. Franchisee understands and specifically agrees that it will not operate the Hotel as a System Hotel and it will not, without Franchisor's prior approval, advertise or otherwise hold out the Hotel as being (or becoming) a System Hotel until:

A. The Scope of Work has been approved and completed in accordance with, and the Hotel complies with, the Design Review Agreement, this Conversion Rider and this Agreement, as determined by Franchisor in its Reasonable Business Judgment; Franchisee has submitted to Franchisor, if requested, an architect's certification that the Hotel has been renovated, upgraded and completed in accordance with the Plans; Franchisee provides to Franchisor, if requested, a copy of the certificate of occupancy for the Hotel;

B. Franchisee has installed at the Hotel all FF&E, Electronic Systems and other items and equipment for opening the Hotel as required herein, and all equipment is in working order as prescribed by Franchisor;

C. Franchisee has employed a general manager, department managers and a reservation manager, and they have successfully completed Franchisor's management training program;

D. Franchisee has paid all amounts due Franchisor and its Affiliates;

E. Franchisee has, if required, complied with all Applicable Law related to the registration of this Agreement with the appropriate governmental authorities without change or modification;

F. Franchisee has complied with the insurance requirements of this Agreement;

G.    Franchisee has given Franchisor notice that the Scope of Work has been completed and all requirements for opening the Hotel have been completed and the Hotel is ready to open for business as a System Hotel; and

H.    Franchisor has granted approval to open and operate the Hotel as a System Hotel and established the Opening Date.  Such approval will be pursuant to a letter agreement, which letter agreement will be signed on behalf of Franchisor by its representative who inspects the Hotel to verify it is ready to open for business as a System Hotel and on behalf of Franchisee by the general manager of the Hotel or Franchisee's director of operations (or a person with a different title but similar duties) who accompanies Franchisor's representative during such inspection.  If Franchisor establishes an Opening Date but the letter agreement provides for additional construction, upgrading, renovation, or training (the "Additional Work"), Franchisee is authorized to use the System and identify the Hotel as a System Hotel only for such time as Franchisee is diligently and actively completing the Additional Work, and failure to timely complete such Additional Work will be a default under this Agreement.

3.    <u>Inspection of the Hotel</u>.  Franchisee will notify Franchisor of completion of renovation of the Hotel. As soon as reasonably practical after receipt of such notice, Franchisor or its designee will inspect the Hotel to verify that Franchisee has satisfied the requirements set forth in the Design Review Agreement and this Conversion Rider.

4.    <u>Opening Team</u>.  Franchisor or its designated Affiliates will provide Franchisee with an opening team to assist in the opening of the Hotel as a System Hotel and to train the Hotel employees. The team members will be designated by Franchisor.  The team members will remain at the Hotel for such time as Franchisor deems appropriate to properly open or convert the Hotel.  Franchisee will obtain any visas, work permits or similar documentation required for team members and pay for the Travel Expenses of the team members and other costs of Franchisor associated with providing such assistance.

5.    <u>Opening Advertising</u>.  In connection with the opening of the Hotel as a System Hotel Franchisee must conduct an advertising and marketing campaign that complies with the Standards.



## ATTACHMENT ONE

### TO CONVERSION RIDER

---

**Boscolo Luxury Hotel Conversion to Autograph Collection
Property Improvement Plan**

---

Immediately below is the Scope of Work that applies to all Boscolo Luxury Hotels that must be completed as a condition to and before the Hotel will be permitted to open as an Autograph Collection Hotel in accordance with Section 1.B of the Conversion Rider.

In addition, attached as Schedule 1 to this Agreement are certain recommendations for the Hotel, which Franchisee and Franchisor have discussed that are not mandated as a condition to become an Autograph Collection Hotel, but that Franchisee will give due consideration in connection with any renovation to the Hotel.

- Provide new Autograph exterior and interior signage, operating supplies, and other logo items relating to rebranding;
- Obtain technological interface at each property in order to allow two-way interface with MARSHA, as more fully described below:

  1. Opera PMS Version 5;

  2. Opera PMS two-way interface to MARSHA;

  3. Opera Interfaces to hotel's operational systems;

  4. Opera-SAP Interfaces;

  5. As well as the infrastructure, implementation services, training and project management to effectively install the above Opera related systems.

- Provide Accessible guest rooms per local law;
- Where permitted by local law and does not require replacement of the guestroom door to do so, provide peephole in each guest room door and a safety latch;
- Where not already provided, provide high quality in-room coffee/tea service, or 24-hour access to complimentary coffee;
- Unless it conflicts with local code, provide full size iron and ironing board in each guest room or an alternative solution to efficiently meet guests needs;
- In hotels where it does not exist already, add "grab bars" above all baths and in showers in bathrooms and slip resistant finish to the base of all bath tubs (ASTM F462 / R10-11).



**Boscolo Exedra Milan - Schedule 1**

**Additional Recommendations**

Guestrooms
- Consider replacing closet hangers with traditional hook hangers
- Consider adding hangers with clips, satin padded hangers on request
- Consider adding make up mirrors

Exercise Area (under renovation)
- Consider adding cardiovascular equipment with individual a personal cardio-theatre with headphones.
- Consider providing emergency house phone with direct dial to guest support services.
- Consider adding healthy snacks and more machines
- Consider adding  guestroom key card access



**Boscolo - Fire Life Safety Scope of Work – Schedule 2**

Franchisee acknowledges that the following items must be completed as a condition of the Hotel to operate as part of the Autograph Collection Hotel System within six months of the Effective Date (or such later time as agreed to by the parties). Franchisor, at its cost has agreed to make or cause to be made the renovations described in this Schedule 2 to the Conversion Rider and Franchisee has agreed to cooperate and provide access to the Hotel and such reasonable assistance as is necessary to complete the Fire Life Safety Scope of Work within such time frame.

**Boscolo Exedra Milan**
Milan, Italy
9 floors (30 m), 151 rooms

- Install battery operated sounder bases in guestrooms for smoke detector and general fire alarm.
- Remove delayed alarm feature.
- Install carbon monoxide detectors.
- Install fire alarm audible devices where needed to reach adequate decibel levels and visual fire alarm devices in hearing-impaired guestrooms.
- Kitchen Hood: Install an Ansul PIRANHA suppression system, Marioff Hi-Fog or Grinnell EA-1 sprinklers.
- Install and/or verify that there is adequate emergency lighting.
- Assembly rooms with a single exit, limit occupancy to 49 people.
- All exit doors in rooms 65 square meters or larger require panic hardware.
- Install electro-magnetic door hold open mechanisms on assembly rooms greater than 65 sq. m.
- Provide stair pressurization in exit stairwells connecting more than 6 levels.



**EXHIBIT C**

**LIST OF LOCAL COUNTRY TRADEMARK REGISTRATIONS AND APPLICATIONS**

| Trademark | Country | Class | Registration Number | Registration Date |
|---|---|---|---|---|
| AUTOGRAPH COLLECTION | European Union | 43 | 8599102 | 05-Apr-2010 |



597814v2 – Exedra Milan
Master – 591851v6
07/01/2011

**EXHIBIT D**

**FRANCHISEE MARKS**

| Name/Trademark | Class | Registration Number | Registration Date |
|---|---|---|---|
| Boscolo Hotels | 43 | 008672181 | 30-August-2010 |
| Exedra | 43 | 006489629 | 28-October-2008 |



# EXHIBIT E

## RESTRICTED TERRITORY MAP

Exedra Milan, Italy



